**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RAZZOO'S, INC., *et al.*, | Case No. 25-90522 (ARP) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF PHILIP PARSONS IN SUPPORT OF**
**THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Philip Parsons, hereby submit this declaration (this "Declaration") under penalty of perjury:

1.      I am the Chief Executive Officer ("CEO") of Razzoo's, Inc. *d/b/a* Razzoo's Cajun Café and have served in this capacity since 2023. I am the Authorized Representative of Razzoo's, Inc. and Razzoo's Holdings, Inc., the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Razzoo's") in these Chapter 11 Cases.

2.      I am generally familiar with the Debtors' day-to-day operations, financial affairs, and books and records. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, assets, and finances; information learned from my review of relevant documents; information supplied to me by other members of Razzoo's management and its advisors; or my opinion based on my experience, knowledge, and information concerning the Debtors' operations, financial condition, and the restaurant industry generally. I am over the age of 18 and authorized to submit this Declaration

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Razzoo's, Inc. (9753) and Razzoo's Holdings, Inc. (9608). The Debtors' service address is 14131 Midway Road, Suite 750, Addison, Texas 75001.

on behalf of the Debtors.  If called upon to testify, I could and would competently testify to the facts set forth herein.

3.      On October 1, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11, title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended and modified, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

4.      To minimize the adverse effects on their businesses, the Debtors have filed motions seeking various types of "first day" relief (the "First Day Motions") to allow the Debtors to meet their obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption or loss of productivity and value.  I further believe that the relief sought in each First Day Motion constitutes a critical element in moving towards a successful restructuring of the Debtors' financial affairs and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.

## COMPANY OVERVIEW

### A.    General Background

5.      The Razzoo's brand has a demonstrated history of success throughout Texas, including a loyal guest base in the DFW Metroplex.  The first Razzoo's opened in 1991 in Dallas, Texas with the goal of filling a market need for Cajun culture and cuisine.  Bolstered by positive cash flow and customer enthusiasm for the concept, Razzoo's grew to six (6) total locations in Texas by 1996, and fourteen (14) total locations by 2001, including the first out-of-state store in Concord, North Carolina.  As growth continued, Razzoo's reached a peak of twenty-four (24)

2

locations across Texas, North Carolina and Oklahoma.  Due to various market factors and the liquidity issues described herein, the Debtors have since closed four (4) underperforming locations – one in 2024 and three in 2025 as noted below.  A detailed listing of the Debtors' restaurants, as of September 2025, is set forth below:[2]

| STORE # | NAME | CITY | STATE | TYPE | SQ. FT | SEATS | OPEN DATE |
|---|---|---|---|---|---|---|---|
| 1 | Keystone | Dallas | TX | Free-standing | 7,095 | 242 | 6/20/1991 |
| 2 | Sundance | Fort Worth | TX | End Cap | 5,700 | 214 | 12/20/1992 |
| 3 | Cityview | Fort Worth | TX | Free-standing | 7,923 | 255 | 2/2/1995 |
| 4 | Mesquite | Mesquite | TX | Free-standing | 8,300 | 260 | 5/1/1995 |
| 5 | Lewisville | Lewisville | TX | Free-standing | 7,460 | 183 | 12/5/1995 |
| 6 | Arlington | Arlington | TX | Free-standing | 7,800 | 243 | 9/7/1996 |
| 7 | Stafford | Stafford | TX | Free-standing | 10,400 | 286 | 1/14/1999 |
| 8 | Irving | Irving | TX | Free-standing | 9,800 | 297 | 5/15/2000 |
| 9 | Concord | Concord | NC | Free-standing | 8,200 | 225 | 1/22/2001 |
| 10 | Cedar Hill | Cedar Hill | TX | End Cap | 5,500 | 186 | 7/22/2008 |
| 11 | Round Rock | Round Rock | TX | End Cap | 5,000 | 160 | 2/9/2009 |
| 12 | Harker Heights | Harker Heights | TX | End Cap | 6,219 | 214 | 5/13/2010 |
| 13 | McKinney | McKinney | TX | Free-standing | 5,178 | 199 | 9/5/2011 |
| 14 | Firewheel | Firewheel | TX | End Cap | 6,429 | 189 | 2/13/2012 |
| 15 | Tyler | Tyler | TX | Free-standing | 6,900 | 240 | 11/11/2013 |
| 16 | Alliance | Alliance | TX | Free-standing | 6,500 | 212 | 1/13/2014 |
| 17 | Spring | Spring | TX | Free-standing | 7,730 | 224 | 9/8/2014 |
| 18 | College Station | College Station | TX | Free-standing | 8,210 | 225 | 8/14/2015 |
| 19 | Pasadena | Pasadena | TX | Free-standing | 7,400 | 218 | 5/14/2018 |
| 20 | Lubbock | Lubbock | TX | Free-standing | 7,300 | 218 | 8/27/2018 |
| 21 | OKC | Oklahoma City | OK | Free-standing | 6,940 | 249 | 10/7/2019 |
| 22 | Corpus Christi | Corpus Christi | TX | Free-standing | 6,500 | 226 | 10/25/2021 |
| 23 | Burleson | Burleson | TX | End Cap | 7,391 | 274 | 8/21/2023 |



---

[2] In September 2025, in the weeks leading up to the Petition Date, the Debtors closed three additional underperforming locations in Pasadena (TX), Corpus Christi (TX) and Oklahoma City (OK).

4922-7462-3590, v. 2

6.      After the most recent store closures, the Debtors currently operate twenty (20) free-standing and end cap locations.  With their geographic foothold in Texas, the Debtors believe that the Razzoo's brand remains well-positioned for additional expansion throughout the Southeast.

7.      The Debtors' organizational culture and values are rooted in their "6-2-101" mindset, which has contributed to their success in providing spicy and bold Cajun cuisine for over thirty (30) years.



8.      The Debtors' long-standing commitment to these core values has enabled them to succeed across market tiers and has enabled Razzoo's to achieve a sector leading per-person average in the casual dining space.  In 2024, the Debtors saw total sales of $76.6 million, Store-Level EBITDA of $9.6 million, and Adjusted EBITDA of approximately $3.3 million

**B.**     **Prepetition Debt**

9.     As of the Petition Date, the Debtors' most significant liabilities consisted of their secured debt obligations. A detailed description of the Debtors' credit facility is set forth below.

10.     Prior to the Petition Date, Debtors Razzoo's Holdings, Inc. and Razzoo's, Inc. (collectively, the "Borrowers") executed that certain Credit Agreement, dated May 19, 2022, as amended by the First Amendment to Credit Agreement, dated June 11, 2023, the Second Amendment to Credit Agreement and Waiver, dated February 28, 2024, and the Third Amendment to Credit Agreement and Waiver, dated September 10, 2024, (collectively the "Prepetition Loan Agreement") with First Horizon Bank ("First Horizon" or the "Prepetition Lender") incurring certain obligations (the "Prepetition Secured Debt").  The Prepetition Secured Debt is secured by all assets of the Debtors.  As of the Petition Date, the outstanding balance owed to First Horizon on account of the Prepetition Secured Debt was approximately $9,650,674.[3]

11.     In addition to the Prepetition Secured Debt, the Debtors have incurred unsecured debt obligations owed to various creditors.  In the ordinary course of business, the Debtors entered into lease agreements with their various landlords and have engaged in numerous strategic relationships with certain service providers in relation to their operations which are critical to maintaining the value of the Debtors' estates. Due to the various liquidity issues described herein, the Debtors have lacked the cash flow necessary to meet all of their lease obligations and miscellaneous trade payables.  The Debtors estimate that they owed approximately $3.1 million in unsecured trade debt as of the Petition Date.

---

[3] Consisting of $9,571,410 in principal and $79,264 in interest.

4922-7462-3590, v. 2

C.    <u>**Events Leading to Chapter 11 Cases**</u>

12.    As more fully set forth below, various factors have led the Debtors to commence these voluntary Chapter 11 Cases.  These factors include the detrimental impact on the Debtors' sales caused by general market conditions and increased competition, burdensome lease obligations for the Debtors' various store locations, and the inability to service the Prepetition Secured Debt with First Horizon.

i.    *Market Conditions and Competition Impacting Sales*

13.    Most significantly, the Debtors have experienced a decline in sales due, in large part, to (i) shifts in consumer spending habits, shifting consumer preferences for convenience, affordability, delivery and innovation in part attributed to the impact of COVID-19 on consumer behavior, general market conditions, geopolitical and economic uncertainty; and (ii) heavy media presence and discounting from competitors in the casual dining space. Recently, macro-economic factors like inflation and higher interest rates have led to many consumers opting to "trade down" to fast-casual or quick-service restaurants in order to stretch their budgets.  Recognizing this, many key competitors such as Chili's and Applebee's have utilized aggressive marketing and value-oriented promotions which have negatively influenced Razzoo's guest traffic.  Thus, the Debtors' sales have continued to be unfavorable to forecasts in light of the heavy competition among casual dining chains to attract consumers searching for best value to fit their strained budgets.

14.    Moreover, as a Cajun-inspired brand, sales at Razzoo's fluctuate seasonally, and typically reach their peak during crawfish season.  Despite the crawfish season starting earlier in 2025 than 2024, increased competition for crawfish drove retail selling prices down and the Debtors experienced a decrease in sales this season relative to prior years.  Despite the benefits realized from ongoing cost-saving initiatives implemented by the Debtors' experienced

6

management team,[4] the Debtors' liquidity situation has left them unable to service their ongoing lease and debt service obligations as described below.

    *ii.*    *Burdensome Leases*

    15.    Razzoo's does not own any real estate.  Rather, in the ordinary course of business, the Debtors have entered into numerous long-term leases for each of their store locations. While the amounts and terms vary by lease, the Debtors' total monthly lease obligations due to their landlords is approximately $650,000.  As a result of the declining sales volumes, the Debtors' long-term lease obligations became increasingly burdensome on their liquidity situation with a sizeable portion of their monthly cash flow dedicated to rent. In the months leading up to the Petition Date, the Debtors undertook a store-by-store analysis to identify underperforming locations and identify leases that were unprofitable or untenable on a long-term basis.  Thereafter, in September 2025, the Debtors elected to exit certain unprofitable leases prior to the Petition Date and closed their store locations in Pasadena (TX), Corpus Christi (TX) and Oklahoma City (OK).

    16.    In addition to other cost savings realized by the closures, the Debtors' recurring monthly rent obligations will be reduced by approximately $110,000.  The Debtors anticipate using the breathing room afforded by the automatic stay to continue their store performance analysis and determine if the rejection of additional leases during the Chapter 11 Cases is necessary or appropriate to right-size their operations.

    *iii.*    *Inability to Service Prepetition Secured Debt Obligations*

    17.    Ultimately, the terms of the Prepetition Loan Agreement with First Horizon have proved too costly. Indeed, the Prepetition Loan Agreement has undergone multiple amendments

---

[4] RIF delivering $1 million in YoY savings in 2025, and supply chain savings of $1 million in 2024 and 2025.

and modifications covering, among other things, the Prepetition Lender's waiver of certain defined Specified Defaults. As of September 2024 – the date the Third Amendment to the Prepetition Loan Agreement was executed – the outstanding principal balance of the Prepetition Secured Debt was $11,926,678.00. Just over one year later, the Debtors estimate that the balance of the Prepetition Secured Debt is approximately $9.7 million, in part as a result of accelerated amortization and the shareholders contributing $850,000 to pay down the debt.

18.     Absent the filing of these Chapter 11 Cases, the Debtors' next principal and interest payment to First Horizon of approximately $500,000 would come due and be swept from the Debtors' accounts on October 1, 2025. In light of their increasingly dire financial circumstances, the Debtors could not afford to make this payment and continue servicing their Prepetition Secured Debt with First Horizon. Faced with this reality, the Debtors worked diligently to maintain the value of their assets, fund trade payables and conserve their remaining cash in preparation for filing these Chapter 11 Cases. Through these Chapter 11 Cases, the Debtors seek the protection of the automatic stay while they endeavor to effectuate the sale or financing transactions that will be necessary to reorganize their financial affairs, preserve thousands of jobs, and ensure that Razzoo's continues providing guests with the highest quality Cajun cuisine and hospitality.

## FIRST DAY MOTIONS

19.     Below is an overview of certain First Day Motions which remain pending as of the filing of this Declaration. The First Day Motions seek relief intended to facilitate a smooth transition for the Debtors into the Chapter 11 Cases and minimize disruptions to the Debtors' business operations. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

4922-7462-3590, v. 2

A. **Debtors' Emergency *Ex Parte* Application for Entry of an Order Authorizing the Employment and Retention of Donlin, Recano & Company, LLC as Claims, Noticing, and Solicitation Agent (the "DRC Application")**

20.     In the DRC Application [Docket No. 3], the Debtors seek entry of an order appointing Donlin, Recano & Company, LLC ("DRC") as claims, noticing and solicitation agent in these Chapter 11 Cases subject to the terms of the engagement agreement attached to the Donlin Application.  I believe that DRC is well-qualified to perform the services contemplated by the Donlin Application, that the services to be performed by DRC are necessary for the successful administration of these Chapter 11 Cases, and that DRC will coordinate their services with the Debtors' other professional to avoid duplication of efforts and expense.

B.     **Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases; and (II) Granting Related Relief (the "Joint Administration Motion")**

21.     Pursuant to the Joint Administration Motion [Docket No. 4], the Debtors request entry of an order directing procedural consolidation and joint administration of these Chapter 11 Cases.  The Debtors do not seek substantive consolidation.

22.     The Debtors are "affiliates" as defined in Bankruptcy Code section 101(2).  Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these Chapter 11 Cases will affect both of the Debtor entities.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.

23.     Parties in interest will not be harmed by the relief requested; rather, the joint administration of these Chapter 11 Cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, who will benefit from the cost reductions associated with

9

the joint administration of the Chapter 11 Cases.  Joint administration also will allow the United States Trustee for the Southern District of Texas (the "U.S. Trustee") and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be approved by the Court.

**C.    Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors and (B) Redact Certain Personal Identification Information and (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information (the "Consolidated Creditor Matrix Motion")**

24.    In the Consolidated Creditor Matrix Motion [Docket No. 8], the Debtors seek entry of an order (i) authorizing the Debtors to (a) file a consolidated creditor matrix (the "Consolidated Creditor Matrix") and a consolidated list of the Debtors' thirty (30) largest unsecured creditors (the "Consolidated Top 30 Creditors List") and (b) redact certain personal identification information of the Debtors' individual creditors; and (ii) approving the form and manner of notifying creditors of the commencement of the Chapter 11 Cases and other information.

25.    With respect to the creditor matrix required by Bankruptcy Rule 1007(a)(1), the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors.  The Debtors believe that the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome.  Moreover, such relief is expressly permitted by the Complex Case Procedures.

26.    With respect to the lists of the Debtors' largest unsecured creditors required by Bankruptcy Rule 1007(d), the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors.  The Debtors believe that such relief will help alleviate administrative burden,

10

costs, and the possibility of duplicative service.  This relief is also permitted by the Complex Case Procedures.

27.     The Debtors further submit that cause exists to redact the address information of the Debtors' individual creditors from the Consolidated Creditor Matrix.  In particular, such information could potentially be used to perpetrate identity theft of the Debtors' individual creditors who may not want their information disclosed in public filings.  I have been advised and come to understand that the Bankruptcy Code grants the Court discretion to protect individuals from the disclosure of such information, and I believe that such relief is appropriate under the circumstances and will not prejudice any party in interest.  Indeed, the Debtors still propose to provide, upon request, unredacted versions of the Consolidated Creditor Matrix to the Court, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), and counsel to any official committee appointed in the Chapter 11 Cases.

28.     Finally, the Debtors propose to have their claims and noticing agent, DRC, serve the notice of commencement (the "Notice of Commencement") of the Chapter 11 Cases to all parties entitled to notice.  Service of the Notice of Commencement on the Consolidated Creditor Matrix will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' Consolidated Creditor Matrix, but also preserve judicial resources and prevent creditor confusion through the efficient service of critical information.  Accordingly, I believe that service of a single Notice of Commencement through DRC is warranted and proper in these Chapter 11 Cases.

4922-7462-3590, v. 2

**D.     Debtors' Emergency Motion For Entry Of An Order Extending The Time To File (I) Schedules of Assets and Liabilities, (II) Schedules of Current Income and Expenditures, (III) Schedules of Executory Contracts and Unexpired Leases, and (IV) Statements of Financial Affairs ("Schedules Motion")**

29.     In the Schedules Motion [Docket No. 9], the Debtors seek entry of an order: (i) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by an additional thirty (30) days, for a total of twenty-four (44) days from the Petition Date, through and including November 14, 2025.

30.     The Debtors have spent, and continue to spend, a substantial amount of time ensuring a smooth transition into Chapter 11, with minimal disruptions to the Debtors' businesses. To prepare the Schedules and Statements, I understand that the Debtors must compile information from books, records, and documents maintained by each of the Debtors, relating to the claims, assets and contracts from both Debtor entities.  Given the scope of the Debtors' operations, it will take substantial time to gather and process such information.  These tasks also include working with the Debtors' landlords, vendors and various other parties in interests to stabilize business operations, a process that the Debtors anticipate will exceed the fourteen (14) days provided by the Bankruptcy Code and Bankruptcy Rules.  In light of the significant amount of work required to complete the Schedules and Statements, as well as the competing demands on the Debtors' professionals to assist in critical efforts to stabilize the Debtors' businesses, I believe an extension is necessary.

31.     Further, I believe the requested extension also will aid the Debtors in efficiently preparing accurate Schedules and Statements, as it will allow the Debtors to account for prepetition

invoices not yet received or entered into their accounting system as of the Petition Date, and will minimize the possibility that any subsequent amendments to the Schedules and Statements are necessary. As such, I believe the extension will benefit not only the Debtors, but all creditors and other parties in interest. Although the Debtors, with the assistance of their professional advisors, have begun to compile the information necessary for the Schedules and Statements, the Debtors have been consumed with a multitude of other legal, business, and administrative matters in the time leading up to the Petition Date. Nevertheless, recognizing the importance of the Schedules and Statements in these Chapter 11 Cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances. Further, the Schedules and Statements will be filed well in advance of any deadline for filing proofs of claim in the Chapter 11 Cases. Thus, all creditors will be afforded sufficient notice of the claim amounts scheduled by the Debtors.

32. In view of the amount of information that must be assembled and compiled, and the limited time available to do so, I believe that ample cause exists for the requested extension.

**E.  Debtors' Emergency Motion for Entry of an Order Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records (the "Cash Management Motion")**

33. Pursuant to the Cash Management Motion [Docket No. 10], the Debtors seek entry of an order authorizing the Debtors to: (i) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; (ii) maintain existing business forms; (iii) continue the performance their business transactions consistent with the Debtors' historical practices; and (d) waiving the guidelines (the "Guidelines") established by the U.S. Trustee related to cash management systems.

34. In the ordinary course of business, the Debtors use and maintain certain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes,

promotional materials and other business forms related to their oil and gas operations and assets (collectively, the "Business Forms").  Adopting a new set of Business Forms would create unnecessary administrative burdens and hardship and would cause unnecessary expense, use of resources, and delay.  To minimize the administrative interruptions and expenses, the Debtors request authority to continue to use their Business Forms substantially in the form existing immediately prior to the Petition Date, without reference to the Debtors' status as "Debtors in Possession" in these Chapter 11 Cases as required by the U.S. Trustee Guidelines.

35.     The Debtors also maintain a cash management system (the "Cash Management System") in the ordinary course of business to gather, allocate, transfer, and disburse funds with respect to their operations and to facilitate cash monitoring and reporting.  The Cash Management System is comprised of twenty-nine (29) active bank accounts (the "Accounts"), twenty-seven (27) Accounts are maintained at First Horizon, one is maintained at Pathway, and one is maintained at US Bank.  First Horizon and US Bank are authorized depositories pursuant to the U.S. Trustee Guidelines. Debtors maintain a cash balance less than or equal to the FDIC insured limit in an account other than an authorized depository. As currently established, the Debtors' existing Accounts and Cash Management System function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtors and all parties in interest.

36.     Given the nature of the Debtors' businesses, the uninterrupted use of the Debtors' Accounts is vital to their operations and overall Cash Management System and will facilitate the Debtors' transition into the Chapter 11 Cases by minimizing delays in paying post-petition debts and eliminating administrative inefficiencies.  Moreover, maintaining the current Cash Management System will allow the Debtors' workforce to attend to their daily responsibilities rather than organize and administer a new system.  Requiring the Debtors to adopt a new cash

14

management system in these Chapter 11 Cases would be costly, burdensome, and disruptive to operations at this critical juncture, and could have a negative effect on the Debtors' ongoing restructuring efforts.

37.     Additionally, in the ordinary course of business, Debtors are required to provide a surety bond to certain third parties to secure Debtors' payment or performance of certain obligations. These surety bonds are required to provide financial assurances to state governments, regulatory agencies, and other third parties.

38.     Finally, the Debtors seek a waiver of the Guidelines established by the U.S. Trustee requiring that Chapter 11 debtors in possession, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish separate bank accounts for operations, payment of taxes, and cash collateral); and (iii) obtain new checks bearing the designation "Debtors in Possession," along with additional information.

39.     I believe that compliance with these requirements would create substantial and unnecessary administrative burdens, including additional expense, confusion among creditors, and diversion of scarce resources to the detriment of the Debtors as they transition into these Chapter 11 Cases.  On the other hand, permitting the Debtors to maintain their existing Accounts and Cash Management System will prevent the disruption of operations and will not prejudice any party in interest.  Further, because the Debtors presently maintain sophisticated, computerized accounting and record keeping systems related to their Accounts and oil and gas and helium operations, the Debtors will be able to ensure that all prepetition and post-petition transactions are properly accounted for and easily distinguished.  The Debtors intend to continue maintain complete and accurate records of all transfers of funds in and out of the Accounts.  I therefore believe a waiver of the U.S. Trustee Guidelines is appropriate, as set forth in the Cash Management Motion.

**F.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Pay Prepetition Wages to Employees and (II) Granting Related Relief (the "<u>Employee Wage Motion</u>")**

40.      In the Employee Wage Motion [Docket No. 11], the Debtors request entry of an order: (i) authorizing, but not directing, the Debtors to (a) pay, in their sole discretion, all obligations incurred under or related to wages, salaries, other compensation, reimbursable expenses, and payroll service fees (collectively, the "<u>Employee Obligations</u>") and all costs related to the foregoing, and (b) maintain and continue to honor their practices, programs, and policies in place for the Employees, as such may be modified, amended, or supplemented from time to time in the ordinary course of business; and (ii) authorizing and directing the Debtor's Banks, including Kleberg, to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the Employee Obligations.

41.      As set forth in the Employee Wage Motion, the Debtors maintain a large staff of salaried and hourly employees (collectively, the "<u>Employees</u>") to support their businesses and restaurant operations.  The roles of Employees include directors and officers, administrative and other corporate staff, area managers, multi-unit managers, and numerous store-level managers, servers, hosts, bartenders, bussers, cooks and other support staff at individual locations.  While the total number of Employees fluctuates given the size and nature of the Debtors' operations, the Debtors currently have approximately 1,042 Employees, of which 101 are employed on a salaried basis and 941 are employed on an hourly basis[5].  These Employees are vital to maintaining the value of the Debtors' estates as they transition into the Chapter 11 Cases, and the vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living

---

[5] Of the 941 hourly employees, 40 qualify as full-time employees while the remaining 901 are part-time.

expenses and support their families.  Thus, Employees would be exposed to significant financial hardship if the Debtors were not permitted to continue paying their compensation, providing benefits, and maintain existing programs.

42.     The Debtors utilize the services of a professional employment organization, Paycom ("Paycom"), to process payroll and employee benefit plans. The Debtors submit a net amount of money to Paycom prior to the conclusion of each pay period, who then administers all of the Debtors' obligations incurred or related to wages, salaries, payroll taxes, and payroll service fees.  Employees are paid bi-weekly via direct deposit or pay card from Paycom. Paycom also has check stock to prepare and print checks for those employees who have not selected direct deposit or pay card as their payment method. The Debtors' description of the payroll process and the amounts and other Employee Obligations due to the Employees as set forth in the Employee Wage Motion and Exhibit A thereto is accurate.

43.     I believe that the relief requested in the Employee Wage Motion is in the best interest of the Debtors' estates and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases without disruption so as to avoid immediate and irreparable harm to the estates. Accordingly, I believe the Court should grant the relief requested in the Employee Wage Motion and authorize the Debtors to honor the Employee Obligations, including those incurred prior to the Petition Date, and pay the Employees during the Chapter 11 Cases.

**G.     Debtors' Emergency Motion for Entry of an Order Authorizing (I) the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors, and (II) Banks to Honor All Related Checks and Electronic Payment Requests (the "Critical Vendor Motion")**

44.     Pursuant to the Critical Vendor Motion [Docket No. 12], the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to pay certain third-party Critical Vendors

on account of their prepetition Critical Vendor Claims in the ordinary course of business; and (ii) authorizing and directing the Banks to receive, process, honor and pay all checks and electronic payment requests made by the Debtors related to such obligations.

45.     To Debtors used a set of criteria focusing on which of their vendors were crucial to continued ordinary course operations, whether such vendors could assert a lien or were otherwise entitled to an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code, and whether the third party vendors were likely to continue doing business with the Debtors notwithstanding any nonpayment of prepetition claims. With these factors in mind, the Debtors exercised their business judgment to determine which types of third-party vendors could be considered Critical Vendors.  As would be expected in the restaurant industry, the Debtors' Critical Vendors are providers of goods primarily falling into the following three categories: (i) food and produce suppliers; (ii) liquor, beer and wine ("LBW") distributors; and (iii) essential or custom restaurant supplies.

| Category | Description |
|---|---|
| Food / Produce Suppliers | If these Critical Vendors alter their terms or otherwise refuse to provide goods to the Debtors due to non-payment, the Debtors' business would grind to a halt.  Given the nature of the Debtors' operations, it would take months to replace these Critical Vendors with alternatives who could meet the demand for the specific flavor profiles and food offerings on the Razzoo's menu and who possess necessary distribution capability to service all the Debtors' locations. |

| | |
|---|---|
| Liquor, Beer and Wine ("<u>LBW</u>") Distributors | The Debtors only maintain approximately 1 to 2 weeks of critical LBW on hand at any given time. Failing to pay the LBW distributors in the ordinary course of business would thus have a domino effect on operations.  The distributors are required to report nonpayment to the State licensing authority. Immediately thereafter the Debtors would be prohibited from buying LBW at any location in that State. Ultimately, the Debtors could lose the required liquor licenses. In turn, the Debtors' sales would further suffer, and the going-concern value of the Debtors' business would be significantly impacted.  In order to maximize the value of their assets for all stakeholders during these Chapter 11 Cases, the Debtors must continue paying the LBW distributors in the ordinary course of business. |
| Essential / Custom Restaurant Supplies | The Debtors rely on certain Critical Vendors to supply restaurant goods that are specific to Razzoo's, including, but not limited to, menus, certain glassware and tableware, and other supplies and materials utilized at the Debtors' stores which either bear the Razzoo's brand and marketing materials, or are otherwise essential to the business.  These Critical Vendors are not easily replaceable, and their failure to continue providing goods could severely hinder the Debtors' operations and the value of their assets. |

46.     In general, the Debtors have satisfactory payment histories with these Critical Vendors, and there are no material defaults or arrearages owed as of the Petition Date.  Thus, most of the prepetition claims of the Critical Vendors (collectively, the "Critical Vendor Claims") are for goods provided immediately prior to the Petition Date and would likely be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code. In light of this, and given that maintaining current trade terms with these Critical Vendors is crucial to the viability of the Debtors' operations, the Debtors contemplate making payments on the Critical Vendor Claims that become payable post-petition in the ordinary course of business as and when they become due. Under the current payment terms, which are quite favorable to the estates, the Debtors estimate that on a rolling basis, they will continue paying approximately (i) $300,000 to food and produce

suppliers; (ii) $25,000 to LBW distributors; and (iii) $60,000 to certain other restaurant suppliers in the ordinary course of business.

47.     The Debtors intend to apply their sound business judgment and discretion on a case-by-case basis and pay only those Critical Vendor Claims that are: (i) vital to maintaining their operations; and (ii) are willing to provide the Debtors with favorable post-petition terms in accordance with any order granting the relief requested in this Motion.  For these reasons, and as further detailed in the Critical Vendor Motion, I believe that authorization to pay Critical Vendors on account of their Critical Vendor Claims is immediately necessary and is in the best interests of the Debtors, the estates, creditors and all parties in interest.

**H.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Coverage Obtained Prepetition and Pay Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreements Entered into Prepetition, (C) Continue to Pay Brokerage Fees, and (D) Renew, Amend, Supplement, Modify, Extend or Purchase Insurance Policies and Surety Bonds, and (III) Granting Related Relief (the "<u>Insurance Motion</u>")**

48.     In the Insurance Motion [Docket No. 13], the Debtors seek entry of an order (i) authorizing Debtors to (a) continue their prepetition insurance coverage and surety bond program and satisfy prepetition obligations related thereto, (b) renew, supplement, or enter into new insurance coverage and surety bonds in the ordinary course of business on a post-petition basis, (c) pay or reimburse all undisputed premiums, charges, claims, deductibles, retentions, administrative fees, Insurance Broker Fees, and all other obligations relating to the Insurance Policies or Surety Bonds that are or may become due and payable, including any prepetition amounts (collectively, the "<u>Coverage Obligations</u>"), (d) continue paying and/or funding the Debtors' Workers' Compensation Program (together with the amounts related thereto, the "<u>Workers Compensation Obligations</u>"), including administrative obligations to certain third

20

parties in connection therewith, during these Chapter 11 Cases in the ordinary course of business as such Workers' Compensation Program was in effect as of the Petition Date and as such may be modified, terminated, amended, or supplemented by the Debtors; (e) continue the Debtors' premium financing agreements; and (b) granting related relief.

49.     In the ordinary course of business, the Debtors maintain twenty-six insurance policies administered by approximately twenty insurance carriers. These insurance policies coverage for the following aspects of the Debtors' general operations: general liability, excess liability policy, property, workers' compensation, crime, management liability, terrorism, equipment breakdown, hired and non-owned auto, package, gl & property, food borne illness, flood insurance, excess flood, cyber liability, term life insurance, medical, dental and vision, short term disability, long term disability, life & a&d, and an umbrella policy. Additionally, Debtors maintain Surety Bonds and a Workers' Compensation Program.

50.     On an annual basis, the Debtors spend an aggregate of approximately (i) $2,122,834 on insurance premiums; (ii) $75,000 on the Workers' Compensation Program; and (iii) $1,200 on the surety bond.

51.     The Insurance Policies, Workers' Compensation Program and Surety Bond Program provide comprehensive protection for the Debtors' business, property, and assets. It is vital for the Debtors' Insurance Policies and Surety Bond Program to stay in effect during these Chapter 11 Cases. For these reasons, and as further detailed in the Insurance Motion, I believe that authorization to continue to pay on Debtors' Insurance Policies, Surety Bond and Workers' Compensation Program is immediately necessary and is in the best interests of the Debtors, the estates, creditors and all parties in interest. Therefore, it is crucial that the Insurance Motion be approved by this Court.

I.      **Debtors' Emergency Motion for Entry of an Order (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>")**

52.      Pursuant to the Utilities Motion [Docket No. 14], the Debtors seek entry of an order: (i) approving the Debtors' proposed adequate assurance of payment for future utility services; (ii) prohibiting utility companies from altering, refusing, or discontinuing services; and (iii) establishing procedures for determining adequate assurance of payment and resolving adequate assurance requests.

53.      In connection with the operation of their businesses and management of their assets, the Debtors obtain Utility Services from a number of Utility Providers.  A nonexclusive list of the Utility Providers that provide Utility Services to the Debtor as of the Petition Date (the "<u>Utilities Service List</u>") is attached as Exhibit A to the Utilities Motion.

54.      The Debtors spend an aggregate amount of approximately $170,000 per month on Utility Services from the Utility Providers. Most, if not all, of the Debtors' Utility Providers do not hold any deposits from the Debtors.  As of the Petition Date, the Debtors owed approximately $170,000 on account of prepetition Utility Services.  To the best of the Debtor's knowledge, there were no other defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services.

55.      The uninterrupted continuation of the Utility Services is critical to the Debtors' ongoing business operations throughout the course of the Chapter 11 Cases.  Should any of the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operation and primary revenue source would be jeopardized.  Accordingly, I believe the Utilities Motion should be approved by the Court.

4922-7462-3590, v. 2

**J.**     **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral; (II) Authorizing the Debtors to Obtain Secured Post-Petition Financing; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief (the "<u>DIP Motion</u>")**

56.     The DIP Motion [to be filed before the First Day Hearing] is critical to the Debtors' success in these Chapter 11 Cases, and without the Court granting the relief requested in the DIP Motion, each of the foregoing First Day Motions would be rendered moot. Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to obtain and be obligated in respect of senior secured post-petition financing on a superpriority and priming basis (the "<u>DIP Facility</u>") from a third-party lender, TJF Financial LLC (the "<u>DIP Lender</u>") in the aggregate principal amount of $4,000,000 to be used to fund the working capital and liquidity needs of the Debtors, of which, an Interim Draw of $1,800,000 will be advanced to the Debtors upon entry of the Interim Order; and (ii) authorizing the Debtors to use of cash collateral ("<u>Cash Collateral</u>") of the DIP Lender and Prepetition Lender, all for the purposes specified in, and at least for the period provided in, the budget (the "<u>Budget</u>") attached as an exhibit to the DIP Motion. Specifically, the Debtors request that the Court enter an order on an interim basis (the "<u>Interim Order</u>") authorizing the Debtors to execute and enter into the DIP Term Sheet and obtain the initial Interim Draw on an interim basis and use of Cash Collateral in accordance with the Budget, provide priming DIP Liens and DIP Super-Priority Claims to the DIP Lender, provide adequate protection for, and to the extent of, any diminution in value of the Cash Collateral of the Prepetition Lender, and scheduling a final hearing (the "<u>Final Hearing</u>") for the Court to consider entry of a final order (the "<u>Final Order</u>") authorizing and approving the relief requested in the DIP Motion.

57.     Authorization to obtain the DIP Term Loans and to use Cash Collateral will ensure that the Debtors have immediate and continued access to the liquidity needed to maintain ordinary

course operations at the store level for the duration of these Chapter 11 Cases.  The Debtors require a DIP Facility and use of Cash Collateral to make payments to Employees, Utility Providers, and vendors, among others, for purposes of conducting their operations and paying related expenses. Any failure to make those payments could cause substantial uncertainty and disruption to the Debtors' business and imperil the sale process contemplated by the Debtors.

58.     Based on the financial forecasts and analysis conducted by Debtors with the assistance of their professionals and other advisors, I believe the Debtors would be unable to generate enough cash from operations in the ordinary course of business to cover their working capital needs in addition to the projected costs of these Chapter 11 Cases.  Therefore, absent the DIP Commitment from the DIP Lender, the Debtors would have insufficient cash in the initial weeks following the Petition Date to sustain these Chapter 11 Cases and to execute on a comprehensive sale or financing transaction on the timeline being contemplated by the Debtors. Obtaining the DIP Facility and continued use of Cash Collateral, with or without the consent of the Prepetition Lender, will also send a positive, credible message to the Debtors' Employees, commercial counterparties, prospective buyers and other parties in interest that the Debtors will be able to meet their ordinary course obligations and operate in these Chapter 11 Cases as they move forward with their restructuring efforts.

59.     I believe the Debtors will face substantial and irreparable harm without the relief requested in the DIP Motion.  Accordingly, I believe the Court should grant the relief requested in the DIP Motion and enter the Interim Order, and after the conclusion of the Final Hearing, a Final Order, authorizing the Debtors to obtain the full amount of the DIP Commitment from the DIP Lender and continue using Cash Collateral all in accordance with the Budget.

Dated: October 1, 2025.

By:       /s/ *Philip Parsons*     
             Philip Parsons
             Chief Executive Officer
             Razzoo's, Inc.

4922-7462-3590, v. 2