## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| RAZZOO'S, INC., *et al.*, | Case No. 25-90522 (ARP) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MOTION FOR
(I) ENTRY OF AN ORDER (A) APPROVING BIDDING
PROCEDURES; (B) ASSUMPTION AND ASSIGNMENT PROCEDURES;
AND (C) STALKING HORSE PROCEDURES AND BID PROTECTIONS;
(D) SCHEDULING BID DEADLINE, AUCTION DATE, AND SALE HEARING
DATE; AND (E) APPROVING FORMS OF NOTICE THEREOF; (II) ENTRY OF
AN ORDER AFTER THE SALE HEARING AUTHORIZING THE DEBTORS TO
(A) SELL THEIR ASSETS; AND (B) ASSUME AND ASSIGN CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

---

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON NOVEMBER 4, 2025 AT 11:00 A.M. (PREVAILING CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002. YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE PÉREZ'S CONFERENCE ROOM NUMBER IS 282694. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE PÉREZ'S HOME PAGE. THE MEETING CODE IS "JUDGEPEREZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE PÉREZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Razzoo's, Inc. (9753) and Razzoo's Holdings, Inc. (9608).  The Debtors' service address is 14131 Midway Road, Suite 750, Addison, Texas 75001.

Razzoo's, Inc., *et al.*, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby file this *Motion for (I) Entry of an Order (A) Approving Bidding Procedures; (B) Assumption and Assignment Procedures; and (C) Stalking Horse Procedures and Bid Protections; (D) Scheduling Bid Deadline, Auction Date, and Sale Hearing Date; and (E) Approving Forms of Notice Thereof; (II) Entry of an Order After the Sale Hearing Authorizing the Debtors to (A) Sell Their Assets; and (B) Assume and Assign Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Sale Motion"), and in support hereof, respectfully state as follows:

## I. PRELIMINARY STATEMENT

1.      By this Sale Motion, the Debtors seek entry of a Bidding Procedures Order as well as one or more Sale Orders.  Following an initial hearing (the "Bidding Procedures Hearing"), the Debtors seek entry of an order (the "Bidding Procedures Order"), substantially in the form filed herewith: (i) approving bidding procedures (the "Bidding Procedures")[2] attached as **Exhibit 1** to the Bidding Procedures Order authorizing the Debtors to market their assets for sale in one or more transactions (each, a "Sale Transaction" and collectively, the "Sale"), including through the sale of the existing equity interests in the Debtors, the subscription for new equity interests, or the sale of substantially all of the assets used in connection with the Debtors' business (collectively, the "Assets" or "Purchased Assets"); (ii) approving procedures for the assumption and assignment of executory contracts and unexpired leases and proposed cure costs related thereto; (iii) approving the bid protections (the "Bid Protections") payable to a Stalking Horse Purchaser (as defined below); (iv) scheduling certain dates and deadlines with respect to

---

[2] Capitalized terms used herein and not otherwise defined shall be given the meaning ascribed to them in the Bidding Procedures.

each of the foregoing, including the bid deadline, auction date, and sale hearing date; (v) approving form and manner of notice thereof; and (vi) granting related relief.

2. Following a final hearing (the "Sale Hearing") to be scheduled by the Court in the Bidding Procedures Order, the Debtors seek entry of one or more orders (each, a "Sale Order"): (i) authorizing the Debtors to sell the Purchased Assets to a Winning Bidder (as defined below) free and clear of liens, claims and encumbrances; (ii) authorizing the Debtors to assume and assign certain executory contracts and unexpired leases to the Winning Bidder; and (iii) granting related relief. The Debtors will file a proposed form of Sale Order and definitive Asset Purchase Agreement in advance of the Sale Hearing.

3. In addition to providing optionality to the Debtors with respect to how the Sale Transaction(s) may be structured, the Bidding Procedures also provide Potential Bidders (as defined in the Bidding Procedures) with the flexibility of bidding on the Assets as a collective whole or in any lesser subsets thereof. Moreover, the Bidding Procedures provide sufficient time for the Debtors to market the Assets, execute a Stalking Horse Agreement (if applicable), receive and evaluate any additional Bids, and hold an Auction (if necessary) to determine the highest or otherwise best Bid for the Assets. The timeline set forth in the Bidding Procedures is reasonable under the circumstances to maximize the value of the Debtors' business by obviating the considerable expense and burden of prolonging the Chapter 11 Cases. Granting the relief requested in this Sale Motion will facilitate the overall marketing process and allow the Debtors to realize significant value that will inure to the benefit of the Debtors' estates, creditors, and stakeholders in these Chapter 11 Cases.

## II.  JURISDICTION AND VENUE

4.      The Court has jurisdiction to consider this Sale Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O).  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended and modified, the "Bankruptcy Code"), Rules 2002, 6004, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 4002-1 and 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "Complex Case Procedures").

## III.  BACKGROUND

### A.    In General

6.      On October 1, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").  The Debtors' chapter 11 cases (the "Chapter 11 Cases") have been consolidated for procedural purposes only and are being jointly administered by the Court under Case No. 25-90522.

7.      Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are operating their business and managing their property as debtors in possession. No official committee has been appointed in the Chapter 11 Cases, and no request has been made for the appointment of a trustee or examiner.

8.      Since 1991, Razzoo's has delivered a mix of Cajun culture, bold bayou cuisine, and an upbeat atmosphere to guests across multiple states.  Bolstered by positive cash flow and customer enthusiasm for the concept, Razzoo's grew to six (6) total locations by 1996, fourteen

4

(14) total locations by 2001, and reached a peak of twenty-four (24) locations across Texas, North Carolina and Oklahoma.  For over thirty years, the Debtors have served soulful Cajun food to loyal guests and have demonstrated their ability to succeed in the casual dining space.

9.      Various factors have led the Debtors to commence these Chapter 11 Cases. Most significantly, the Debtors have experienced a decline in sales in recent years due, in large part, to (i) shifts in spending habits following the COVID-19 pandemic and consumer preferences for more delivery, convenience and affordability; (ii) general market conditions and macro-economic factors like inflation and higher interest rates which have left many consumers opting to "trade down" to fast-casual or quick-service restaurants in order to stretch their budgets; and (iii) heavy media presence and discounting from competitors in the casual dining space.

10.     As a result of the declining sales volumes, the Debtors' long-term lease obligations became increasingly burdensome on their liquidity situation with a sizeable portion of their monthly cash flow dedicated to rent.  Despite the benefits realized from ongoing cost-saving initiatives implemented by their experienced management team, the Debtors' liquidity situation left them unable to service the ongoing lease obligations, ordinary course trade payables, and the prepetition secured debt obligations owed to First Horizon Bank ("First Horizon" or the "Senior Secured Lender").

11.     The Debtors have since closed four (4) underperforming locations and now operate twenty (20) free-standing and end cap locations.  With a strong geographic foothold in the state of Texas, the Debtors believe that the Razzoo's brand remains well-positioned for additional expansion throughout the Southeast. The Debtors commenced these voluntary Chapter 11 Cases to effectuate the Sale or financing transactions that will be necessary to reorganize their

financial affairs, preserve thousands of jobs, and ensure that Razzoo's continues providing guests with the highest quality Cajun cuisine and hospitality.

12.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Philip Parsons in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 16] (the "First Day Declaration"), which has been filed with the Court and is incorporated herein by reference.

**B.     The Chapter 11 Cases**

13.     On October 7, 2025, the Court entered its *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 60] (the "Interim DIP Order").   Pursuant to the Interim DIP Order, the Debtors were authorized to obtain secured post-petition financing in a principal amount not to exceed $3,300,000 (the "New Money DIP Facility") from First Horizon as Senior Secured Lender in these Chapter 11 Cases.  Of that amount, an initial draw of $1,800,000 was made immediately available to the Debtors upon entry of the Interim DIP Order.

14.     Pursuant to the Interim Order, a hearing (the "Final Hearing") to consider final approval of the total DIP Commitment and entry of the a final order (the "Final DIP Order," and collectively with the Interim Order (the "DIP Orders") will be held on November 4, 2025 at 11:00 a.m. (prevailing Central Time).[3]  Subject to entry of the Final DIP Order, the DIP Orders will provide for a roll-up of all Senior Secured Prepetition Obligations owed to First Horizon. As

---

[3] The Debtors request that the Bidding Procedures Hearing be held concurrently with the Final Hearing.

of the Petition Date, the Senior Secured Prepetition Principal Balance was $9,571,410.39. Accordingly, the DIP Obligations owed to the Senior Secured Lender pursuant to the DIP Orders will be approximately $12,871,410.39 upon the occurrence of the roll up.[4]

15.     The New Money DIP Facility will permit the Debtors to sustain operations and fund the Chapter 11 Cases while the Debtors conduct a process for the Sale of their Assets in accordance with the applicable milestones (the "Milestones") set forth in the DIP Orders. Although the Debtors intend to move more expeditiously with their marketing and Sale process than is required by the Senior Secured Lender, the Milestones pertinent to this Sale Motion include:

| Milestones | Description |
|---|---|
| Entry of Bidding Procedures Order | No later than December 15, 2025, the Court shall have entered to the Bidding Procedures Order authorizing the Debtors to market their Assets and to select a Stalking Horse Bidder in accordance with the Bidding Procedures. |
| Bid Deadline | The Bid Deadline established by the Bidding Procedures shall be no later than March 2, 2026. |
| Entry of Sale Order | No later than March 11, 2026, the Court shall have entered one or more Sale Orders approving the Winning Bid(s) and authorizing the Debtors to sell the Purchased Assets. |
| Sale Closing | Subject to the Court's entry of the Sale Order(s), the closing of the Sale(s) shall occur no later than March 31, 2026. |

**C.     Proposed Sale Process and Stalking Horse Procedures**

16.     In accordance with their obligations and the Milestones as set forth in the DIP Orders, the Debtors intend to market substantially all of their Assets for Sale during the Chapter 11 Cases pursuant to section 363 of the Bankruptcy Code. As more fully set forth in the proposed Bidding Procedures, the Debtors will consider bids for all Assets, as well as partial "Lot" bids for

---

[4]  Subject to interest, fees and costs, and contingent upon the actual amount of the DIP Term Loans borrowed during the Chapter 11 Cases.

certain Assets to the extent such bids, when taken together, will maximize value to the Debtors' estates.

17.     The Debtors request that they be authorized, but not directed, to select a bidder to act as a stalking horse (a "Stalking Horse Purchaser") and to enter into an asset purchase agreement with such Stalking Horse Purchaser (a "Stalking Horse Agreement") for the Sale of the Assets.  If a Stalking Horse Purchaser is timely selected by the Debtors in accordance with the Bidding Procedures, the Debtors will promptly file and serve a notice (the "Stalking Horse Selection Notice") as soon as reasonably practicable. The Stalking Horse Selection Notice will: (i) contain information regarding (a) the identity of the Stalking Horse Purchaser, (b) its bid for applicable Purchased Assets (the "Stalking Horse Bid"), and (c) any Bid Protections that may be payable to the Stalking Horse Purchaser pursuant to the Bidding Procedures Order and Bidding Procedures approved by the Court; and (ii) attach a copy of the proposed Stalking Horse Agreement.

18.     Thereafter, all parties in interest will have five (5) days from service of the Stalking Horse Selection Notice (the "Stalking Horse Objection Deadline") to file objections (a "Stalking Horse Objection") to the designation of the Stalking Horse Purchaser or any of the terms of the Stalking Horse Agreement, including to any of the proposed Bid Protections.  If a timely Stalking Horse Objection is filed and served in accordance with the Bidding Procedures Order, the proposed designation of the Stalking Horse Purchaser and the Bid Protections under such Stalking Horse Agreement will not be deemed approved until either the Stalking Horse Objection is resolved by agreement of the objecting party and the Debtors (in consultation with the Stalking Horse Purchaser and any statutory committee appointed in the Chapter 11 Cases) or by order of the Court.  If no timely Stalking Horse Objection is filed and served with respect to a

Stalking Horse Bid, the Bid Protections contemplated by such Stalking Horse Bid shall be deemed approved without further order of the Court upon the expiration of the Stalking Horse Objection Deadline.

19.     Having the flexibility to designate a Stalking Horse Purchaser and provide Bid Protections will provide the Debtors with the ability to maximize the value of the Assets while maintaining a timely and efficient marketing process.  The ability to designate Stalking Horse Purchasers and offer Bid Protections to such bidder is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

20.     Regardless of whether the Debtors elect to designate any Stalking Horse Purchaser, and in order to ensure that the Debtors' estates realize the maximum value for all Assets within the timeline afforded by the applicable Milestones, the Debtors will further "test" the marketplace in accordance with the Bidding Procedures. The Debtors have received significant interest from various parties regarding participation in the contemplated Sale process, and the Debtors' proposed investment banker is actively targeting and engaging with these strategic parties in order to obtain the highest and best offer for the prompt Sale of the Debtors' Assets. Thus, to the extent any Potential Bidders submit a Stalking Horse Agreement that is accepted by the Debtors, the Stalking Horse Bid will be expressly subject to higher or better bids in accordance with the Bidding Procedures.

## IV.  **RELIEF REQUESTED**

21.     By this Sale Motion, and after notice and a Bidding Procedures Hearing, the Debtors seek entry of the Bidding Procedures Order: (i) approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order, in connection with the Sale(s) of the Debtors' Assets; (ii) scheduling certain dates related thereto, including bid

deadline, auction date, and Sale Hearing date as set forth below; (iii) approving the Bid Protections payable to a Stalking Horse Purchaser; (iv) approving procedures for the assumption and assignment of executory contracts and unexpired leases and proposed cure costs related thereto; and (v) approving the forms of notice thereof. The Bidding Procedures contemplate the following schedule, subject to Court approval and modification as necessary, in connection with consummating the Sale Transaction(s) for the Debtors' Assets, as applicable:

| Event | Date |
|---|---|
| Stalking Horse Designation Deadline | December 15, 2025 as the deadline for the Debtors to select Stalking Horse Purchaser(s), if any, for the Assets, and file a Stalking Horse Selection Notice; *provided*, *however*, the Debtors may, in consultation with any statutory committee, extend the Stalking Horse Designation Deadline in their discretion. |
| Stalking Horse Objection Deadline | Five (5) days after the Debtors file a Stalking Horse Selection Notice as the deadline by which parties in interest must file and serve a Stalking Horse Objection. |
| Sale Objection Deadline | December 15, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline by which any party in interest must file and serve objections relating to the relief requested in this Sale Motion, as it relates to the Sale of the Debtors' Assets outside the ordinary course of business to a Stalking Horse Purchaser or other Winning Bidder. |
| Cure Objection Deadline | December 15, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline by which any contract counterparty to an executory contract or unexpired lease which may potentially be assumed and assigned by the Debtors (each, an "Assigned Contract" or "Assigned Lease") must file and serve objections relating to assumption and assignment of executory contracts and unexpired leases or to the Cure Amounts set forth in the Cure Notice. |
| Bid Deadline | January 5, 2026 at 5:00 p.m. (prevailing Central Time) as the deadline by which any Potential Bidder may deliver its bid for any of the Debtors' Assets |
| Qualified Bids Determined | January 7, 2026 at 10:00 a.m. (prevailing Central Time) as the date by which the Debtors shall determine whether a bid is a Qualified Bid and shall notify each Potential Bidder whether they are Qualified Bidder. |
| Auction Date | January 9, 2026 at 10:00 a.m. (prevailing Central Time) as the date and time that an auction (the "Auction") for the Assets, if one is needed, will be held by the Debtors. |
| Auction Objection Deadline | January 13, 2026 at 5:00 p.m. (prevailing Central Time) as the last date by which any party in interest must file and serve objections to the manner in which the Auction was conducted, and the selection of the Winning Bidder. |

| Event | Date |
|-------|------|
| Adequate Assurance Objection Deadline | January 13, 2026 at 5:00 p.m. (prevailing Central Time) as the last date by which any contract counterparty to a potential Assigned Contract or Assigned Lease must file and serve objections relating to adequate assurance of future performance of the Stalking Horse Purchaser or other Winning Bidder |
| Sale Hearing Date | Subject to Court availability and approval of the Sale Hearing date in the Bidding Procedures Order, the Debtors will seek to schedule a Sale Hearing on or about January 15, 2026. |

22.     In addition, the Debtors seek, at the conclusion of the Sale Hearing, entry of one or more Sale Orders: (a) authorizing the Sale(s) of the Debtors' Assets as Purchased Assets to the applicable Stalking Horse Purchaser or other Winning Bidder, with such Sales being free and clear of all liens, claims, and encumbrances, and with such Stalking Horse Purchaser or Winning Bidder being deemed a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases which may be designated as Assigned Contracts and Assigned Leases to the applicable Stalking Horse Purchaser or other Winning Bidder; and (c) granting certain related relief.

## A.     Proposed Bidding Procedures

23.     Pursuant to this Sale Motion, the Debtors seek to sell substantially all of their Assets, as well as assume and assign certain executory contracts and unexpired leases in connection with such Sale.  Bankruptcy Rule 6004(f) provides that sales of property outside the ordinary course of business may be by private sale or auction.  FED. R. BANKR. P. 6004(f).  The Debtors believe that good cause exists to pursue Sale Transactions and sell the Assets to a Stalking Horse Purchaser, or if applicable, other Winning Bidder after conducting an Auction. An Auction conducted substantially in accordance with the proposed Bidding Procedures will

enable the Debtors to obtain the highest and best offers for the Assets and thereby maximize the value of the Assets for the benefit of the Debtors' estates and creditors.

24.     The Debtors submit that the Bidding Procedures attached to the proposed Bidding Procedures Order will afford interested parties a reasonable opportunity to evaluate whether to submit a bid for the Assets.  The Bidding Procedures ensure that the Debtors will be well-positioned to pursue a successful marketing and Sale process designed to maximize value for the estates. Accordingly, the Debtors request that the Court enter the proposed Bidding Procedures Order submitted herewith and approve the Bidding Procedures.

### B.     Approval of Sale Notice Procedures

25.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the proposed Sale of the Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the Sale, and the deadline for filing any objections thereto. The proposed sale notice (the "Sale Notice") attached hereto as **Exhibit A** contains the type of information required under Bankruptcy Rule 2002(c), and also includes information on the Bidding Procedures.  The Debtors' proposed Sale Notice procedures are as follows:

(i)     The Debtors shall serve the Sale Notice no later than five (5) business days after the entry of the Bidding Procedures Order upon all parties on the Debtors' Master Service List, and, for the avoidance of doubt: (a) counsel to the Senior Secured Lender; (b) counsel to any statutory committee appointed in the Chapter 11 Cases; (c) the United States Trustee for the Southern District of Texas; (d) all other parties known to the Debtors who have or may have asserted liens, claims, encumbrances, or interests in or against any of the Assets; (e) the Debtors' thirty (30) largest unsecured creditors (on a consolidated basis); (f) all of the Debtors' creditors as required by Bankruptcy Rule 2002(a)(2); (g) federal, state, and local taxing authorities; (h) all of the counterparties to the executory contracts and unexpired leases as set forth on Schedule 1 to the Cure Notice (defined below) as may be amended, modified, or supplemented; (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (j) all parties known to have expressed an interest in a transaction with respect to the Assets.

(ii)    Any objections to the relief requested in this Sale Motion as relates to the Sale of the Assets outside the ordinary course of business (a "Sale Objection") must: (a)

set forth in writing and describe with specificity the factual and legal basis for the Sale Objection; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; and (c) be filed with the Clerk of the Court no later than December 15, 2025 at 5:00 p.m. (prevailing Central Time) or such other date as determined by the Court and set forth in the Bidding Procedures Order (the "Sale Objection Deadline").

(iii)   The failure of any person or entity to file a Sale Objection by the Sale Objection Deadline shall be deemed consent to the Sale of the Assets outside the ordinary course of business.  Further, the failure to file a Sale Objection by the Sale Objection Deadline shall be a bar to the assertion of an objection, at the Sale Hearing or thereafter, to (a) the Sale of the Assets free and clear of any liens, claims, and encumbrances; and (b) the Debtors' consummation and performance of the applicable Stalking Horse Agreement or other Asset Purchase Agreement, as applicable.

(iv)   If a Sale Objection is timely filed by the Sale Objection Deadline and the relevant parties are unable to resolve the Sale Objection prior to the commencement of the Sale Hearing, such Sale Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court.

26.    The Debtors submit that the Sale Notice to be provided and the method of service proposed herein constitute good, proper and adequate notice of the Sale of the Assets and the proceedings to be had with respect thereto.  This information will enable interested parties to participate in the Auction and Sale Hearing if they choose.  Accordingly, the Debtors request that the Court approve the form and content of, and procedures related to, the Debtors' proposed Sale Notice.

**C.     Approval of Cure Notice Procedures**

27.    To facilitate and effectuate the Sale(s) of any Purchased Assets, the Debtors will be required to assume and assign to a Stalking Horse Purchaser or other Winning Bidder certain Assigned Contracts and Assigned Leases.  The proposed cure notice (the "Cure Notice") attached hereto as **Exhibit B** contains detailed information regarding the procedures with respect to the potential Assigned Contracts and Assigned Leases and affords counterparties to the

executory contracts and unexpired leases reasonable notice and opportunity to object.  The

Debtors' proposed Cure Notice procedures are as follows:

(i) The Debtors shall serve the Cure Notice no later than five (5) business days after entry of the Bidding Procedures Order upon any counterparties to the Debtors' executory contracts and unexpired leases that may potentially be assumed and assigned as Assigned Contracts and Assigned Leases, and as set forth in Schedule 1 attached to the Cure Notice.  The Cure Notice shall provide the counterparties to such executory contracts and unexpired leases with notice of the amount that the Debtors believe must be cured upon assumption and assignment as required under Bankruptcy Code section 365 (the "Cure Amount").

(ii) Any objections to the assumption and assignment of any executory contract or unexpired lease identified in the Cure Notice or to the Cure Amounts set forth in the Cure Notice (a "Cure Objection"), must: (a) set forth in writing and describe with specificity the factual and legal basis for the Cure Objection; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) and be filed with the Clerk of the Court no later than December 15, 2025 at 5:00 p.m. (prevailing Central Time), or such other date as determined by the Court and set forth in the Bidding Procedures Order (the "Cure Objection Deadline").

(iii) If a counterparty to an executory contract or unexpired lease set forth on Schedule 1 of the Cure Notice fails to file a Cure Objection by the Cure Objection Deadline, then the Cure Amount set forth in the Cure Notice will be binding upon the contract counterparty, and all parties in interest, for all purposes in the Chapter 11 Cases and otherwise. All such counterparties to those executory contracts and unexpired leases on Schedule 1 of the Cure Notice will: (a) be forever barred from objecting to the Cure Amounts with respect to such executory contracts and unexpired leases, and the applicable Cure Amounts shall be the only amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults thereunder if the applicable Stalking Horse Purchaser or Winning Bidder ultimately decides to have such executory contracts and unexpired leases assumed by the Debtors and assigned to it as Assigned Contracts or Assigned Leases; (b) be deemed to have consented to the assumption and assignment if the applicable Stalking Horse Purchaser or other Winning Bidder designates such contract or lease as an Assigned Contract or Assigned Lease; and (c) be forever barred and estopped from asserting or claiming against the Debtors, the Stalking Horse Purchaser, or other Winning Bidder, as applicable, that any additional amounts are due, other defaults exist, other conditions to assignment must be satisfied under such executory contracts or unexpired leases, or that there is any objection or defense to the assumption and assignment.

(iv) In the event that the Debtors and the non-debtor counterparty cannot resolve the Cure Objection, the Debtors shall segregate the disputed Cure Amount (each, a "Disputed Cure Amount") pending the resolution of such dispute by the Court or

14

mutual agreement of the parties; *provided*, *however*, that the Debtors shall not be required to segregate any Disputed Cure Amount if the applicable Stalking Horse Agreement or Asset Purchase Agreement provides for payment of Cure Amounts by the Stalking Horse Purchaser or Winning Bidder (and not by the Debtors).

(v)    If a counterparty to an executory contract or unexpired lease set forth on Schedule 1 of the Cure Notice timely files a Cure Objection, whether based on Cure Amount or any other alleged cause or claim, then, to the extent the relevant parties are unable to resolve the Cure Objection prior to the commencement of the Sale Hearing, such Cure Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court.

(v)    If at any time after the Cure Notice is served (but prior to the closing of a Sale pursuant to any Stalking Horse Agreement or other Asset Purchase Agreement) the Debtors: (a) amend Schedule 1 to the Cure Notice and include additional executory contracts or unexpired leases; or (b) receive notice from the Stalking Horse Purchaser or Winning Bidder that additional prepetition executory contracts and or unexpired leases are to be designated as Assigned Contracts or Assigned Leases under the applicable Stalking Horse Agreement or other Asset Purchase Agreement, then the Debtors shall serve a supplemental cure notice (a "Supplemental Cure Notice") by first class mail, facsimile, electronic transmission, or overnight mail on the counterparty (and its attorney, if known) to each such contract (a "Previously Omitted Contract") within two (2) business days of the amendment to the Cure Notice, or the receipt of notice of designation as an Assigned Contract or Assigned Lease. Each Supplemental Cure Notice shall set forth the following: (i) the name and address of the contract counterparty; (ii) notice of the proposed effective date of the assignment (subject to the right of the Debtors and the Stalking Horse Purchaser or Winning Bidder to withdraw such request for assumption and assignment of the Assigned Contract or Assigned Lease prior to closing); (iii) identification of the Assigned Contract or Assigned Lease; and (iv) the Cure Amount, if any.

(vi)    Unless the contract counterparty to the Previously Omitted Contract properly files a Cure Objection to the Supplemental Cure Notice within fourteen (14) days of service of the Supplemental Cure Notice, the Debtors shall obtain an order of the Court fixing the Cure Amounts and approving the assumption and assignment of the Previously Omitted Contract as an Assigned Contract or Assigned Lease. If a Cure Objection is timely filed and served with respect to a Previously Omitted Contract, and the relevant parties are unable to resolve the Cure Objection, such Cure Objection will be adjudicated at the Sale Hearing or, if the Sale Hearing date has passed, at such other date and time as may be fixed by the Court.

(vii)    For the avoidance of doubt, the inclusion of an executory contract or unexpired lease on Schedule 1 of the Cure Notice shall not obligate the Debtors to assume and assign any executory contract or unexpired lease listed thereon, and the rights of the Debtors, Stalking Horse Purchaser, or other Winning Bidder to establish or

modify the list of Assigned Contracts and Assigned Leases, including to remove any contracts or leases from such list, are expressly reserved.  Only those executory contracts and unexpired leases designated as Assigned Contracts or Assigned Leases at closing will be assumed and assigned to the Stalking Horse Purchaser or other Winning Bidder, if applicable.

28.     The Debtors submit that the Cure Notice (and Supplemental Cure Notice, if applicable) to be provided and the method of service proposed herein constitutes good, proper and adequate notice of potential assumption and assignment of the Debtors' executory contracts and unexpired leases and designation of Assigned Contracts, Assigned Leases, and Cure Amounts. This information will provide contract counterparties with ample notice and opportunity to object pursuant to section 365 of the Bankruptcy Code.  Accordingly, the Debtors request that the Court approve the form and content of, and procedures related to, the Debtors' proposed Cure Notice and Supplemental Cure Notice, if applicable.

## V.  BASIS FOR RELIEF REQUESTED

**A.     The Bidding Procedures are Fair and are Designed to Maximize the Value Received for the Purchased Assets Given the Financial Exigencies Facing the Debtors**

29.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc*., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Official Committee of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the [Debtor]'s duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (citations omitted)).

16

30.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate, and, therefore, are appropriate in the context of bankruptcy transactions.  *See In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for compensation of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").  Where there is a court-approved auction process, the assets are presumed to sell for a full and fair price because the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

31.     The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and expend the time and resources necessary to submit competing bids, taking into account the financial exigencies facing the Debtors.  The Debtors believe that the Bidding Procedures provide Potential Bidders with sufficient notice and opportunity to complete due diligence and acquire the information necessary to submit a timely and informed bid.  Thus, the Debtors submit that the period between the filing of this Sale Motion and the Bid Deadline provides a fair and reasonable means for maximizing the return from any Sale of the Assets.

32.     At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest or best offer for the completion of one or more Sales for the Assets.  The Bidding Procedures and, if necessary, the Auction process will ensure that the consideration ultimately paid for any Purchased Assets will be fair, reasonable, and in the best interest of the Debtors' estates and creditors, and there are sound business reasons to approve the Bidding Procedures.

**B.**     **The Bid Protections Have a Sound Business Purpose and are Appropriate**

33.     The Debtors are also seeking authority to designate a Stalking Horse Purchaser and offer Bid Protections. If and when a Stalking Horse Selection Notice is filed by the Debtors, all parties in interest will be sufficiently apprised of any Bid Protections afforded in the applicable Stalking Horse Agreement.  By establishing a Stalking Horse Objection Deadline and permitting all parties in interest to file Stalking Horse Objections, if needed, the rights of all parties in interest are sufficiently preserved.  Accordingly, as set forth herein, the Debtors submit that they should be authorized to designate Stalking Horse Purchasers, and that the Bid Protections contemplated in the Bidding Procedures should be approved by the Court.

34.     The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254, at *1 n. 1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due

18

diligence necessary to enter into an asset purchase agreement." *Id.* (citation omitted).  The use of bid protections has become an established practice in chapter 11 cases.

35.     If one or more Stalking Horse Purchasers are ultimately selected for any of the Assets, the Debtors respectfully submit that any Bid Protections set forth in a Stalking Horse Agreement will be designed to maximize value in a competitive bidding process and should be approved as fair and reasonable under the circumstances of the Chapter 11 Cases.

36.     Historically, bankruptcy courts have approved bidding incentives, including breakup fees awarded to an initial bidder, or "stalking horse," in the event of a successful overbid based on the business judgment of the debtor.  *See, e.g. In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"); *In re Integrated Resources, Inc.*, 147 B.R. at 656 (noting that "the business judgment of the Debtor is the standard applied under the law in this district" and applying the standard to a breakup fee).

37.     The Third Circuit Court of Appeals has also addressed the appropriate standard for determining whether proposed bidding incentives in the bankruptcy context are appropriate. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern bidding incentives in the bankruptcy context. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 534–35 (3d Cir. 1999).  Finding no "compelling justification" for treating an application for breakup fees and expenses under section 503(b) any differently from other application for administrative expenses, the Court concluded that "the determination

whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowance and payment of breakup fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Id*. at 535.

38.     In *O'Brien*, the Third Circuit identified at least two circumstances in which bidding incentives may provide actual benefit to the estate, thereby justifying administrative expense status.  First, there exists an actual benefit to the estate where "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id*. at 537.  Second, where the availability of bidding incentives induces a prospective buyer to research the value of the debtor and submit a bid that serves as a minimum bid on which other bidders can rely, the initial "bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id*.

39.     Both of those circumstances exist here because the inducement of Bid Protections consisting of a Breakup Fee and Expense Reimbursement are critical in persuading any Stalking Horse Purchaser to: (i) expend the time and resources associated with conducting due diligence regarding the Debtors' Assets and operations, (ii) make an initial offer (which will serve as a "floor" for other competing bidders in connection with the Bidding Procedures), and (iii) negotiate and enter into a Stalking Horse Agreement.

40.     Under the "administrative expense" standard, as well as the "sound business judgment" standard followed in other jurisdictions and the Fifth Circuit, the Bidding Procedures proposed by the Debtors, including the Bid Protections, should be approved as fair and

reasonable.  Here, the proposed Bid Protections, which remain subject to negotiation by the Debtors in any applicable Stalking Horse Agreement, will consist of: (i) a reasonable Breakup Fee not to exceed three percent (3%) of the cash portion of the purchase price in any Stalking Horse Agreement; plus (ii) Expense Reimbursement for actual, reasonable out-of-pocket expenses not to exceed $50,000.

41.     The Debtors respectfully submit that any Bid Protections provided under a Stalking Horse Agreement, as limited by the provisions of the Bidding Procedures Order, are, and will be demonstrated to be, reasonable under the circumstances of these Chapter 11 Cases and comport with the general range of bidding protections approved by bankruptcy courts in Texas.  Specifically, the Debtors submit that the Bid Protections: (i) are reasonable in light of the potential value of the Purchased Assets and the size of a transaction that would be contemplated by a Stalking Horse Agreement; and (ii) are reasonably related to the fees and expenses incurred by a Stalking Horse Purchaser in relation to its efforts to enter into a Stalking Horse Agreement with the Debtors.

42.     The Debtors further believe the proposed Bid Protections would confer actual benefits upon their bankruptcy estates in the event a Stalking Horse Purchaser is ultimately selected because they are reasonably calculated to incentivize a potential Stalking Horse Purchaser to set the bidding "floor" and induce competitive bidding that may produce higher and better offers for the Purchased Assets.  Accordingly, the Debtors respectfully request that the Court approve the Bid Protections in the Bidding Procedures Order.

C.    **A Stalking Horse Purchaser or Winning Bidder Should be Entitled to the Protections of Bankruptcy Code Section 363(m)**

43.    Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith …." 11 U.S.C. § 363(m).  Under this section, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007).

44.    As discussed above, the Sale process and the Bidding Procedures contemplated as a part thereof (if and in whatever form approved by the Court at the Bidding Procedures Hearing), have been designed to create a fair, open and level playing field.  In furtherance of this effort, any transaction reflected in a Stalking Horse Agreement with a Stalking Horse Purchaser will be negotiated by the parties at arm's length and in good faith, and any Stalking Horse Purchaser and its affiliates will not have any relationship with the Debtors that has not been fully disclosed to the Court.

45.    Moreover, to the extent a Stalking Horse Purchaser is selected but another Winning Bidder prevails at the Auction, if any, the Debtors will demonstrate at the Sale Hearing that the final Asset Purchase Agreement with the Winning Bidder was negotiated at arm's-length, with each of the parties represented by its own advisors and counsel.  Accordingly, the Debtors request that the Stalking Horse Purchaser or other Winning Bidder submitting a Winning Bid for any Purchased Assets be determined to have acted in good faith and be entitled

22

to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.  *See, e.g., In re United Press Int'l, Inc.*, No. 91 B 13955 (FGC), 1992 U.S. Bankr. LEXIS 842, at *3 (Bankr. S.D.N.Y.  May 18, 1992).   The Debtors maintain that providing the Stalking Horse Purchaser or other Winning Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Purchased Assets.

**D.    The Debtors Have Exercised Sound Business Judgment and Provided Adequate Notice and Opportunity to Object With Respect to Assigned Contracts and Leases**

46.     Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *In re Gardiner, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987). Under the business judgment test, a court should approve a debtor's proposed assumption if such assumption will benefit the estate.  *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 53-54 (Bankr. D. Del. 2001); *see also, In re Chi-Feng, Huang*, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982); *In re Gunter Hotel Assocs.*, 96 B.R. 696, 698 (Bankr. W.D. Tex. 1988); *In re Food City, Inc.* 94 B.R. 91, 93-94 (Bankr. W.D. Tex. 1988).  Moreover, the business judgment standard requires that the court approve the debtor's business decision unless that judgment is the product of bad faith, whim, or caprice. *See Lubrizol Enter. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985); *In re Prime Motor Inns*, 124 B.R. 378, 383 (S.D. Fla. 1991).   "More exacting scrutiny would slow the administration of the debtors' estates and increase its cost, interfere with

the Bankruptcy Court's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing*, 762 F.2d at 1311.

47.     Two conditions are imposed upon a debtor's ability to assume and assign an executory contract.   First, in order to assume an agreement, pursuant to Bankruptcy Code section 365(b)(1), a debtor must "cure, or provide adequate assurance that the debtor will promptly cure" any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).  Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.   Bankruptcy Code section 365(f) specifically provides that contract provisions seeking to prohibit or limit assignment are unenforceable.  *See* 11 U.S.C. § 365(f)(1); *see also, e.g.*, *In re Office Prods. of Am., Inc.*, 140 B.R. 407, 409-410 (Bankr. W.D. Tex. 1992) (provisions that work as a restriction on assignment of leases should be struck down); *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he code generally favors free assignability as a means to maximize the value of the debtor's estate").

48.     Pursuant to Bankruptcy Code section 365(a), assignment is conditioned upon "adequate assurance of future performance [being] provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes. Inc. v. Arrari (In re Carlisle Homes,* Inc.*)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when

24

prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

49.     Here, the Assigned Contracts and Assigned Leases (as may be finally determined in one or more of the Stalking Horse Agreements or Asset Purchase Agreements) are integral Assets of the Debtors' business, and the Debtors have determined, in the exercise of their business judgment, that the assumption and assignment of such executory contracts and unexpired leases in connection with a Sale of the Assets is necessary to yield significant value and benefit to the Debtors and their estates from any Sale Transaction.

50.     Further, any Stalking Horse Purchaser or other Winning Bidder, must be an entity with financial resources adequate to perform under the respective executory contracts and unexpired leases.   Additionally, the Debtors respectfully submit that the proposed cure procedures for the identification and payment of Cure Amounts are appropriate and reasonably tailored to provide non-Debtor counterparties to potential Assigned Contracts and Assigned Leases with adequate notice of the proposed assumption and assignment of their applicable contract, as well as the proposed Cure Amounts related thereto, if any.   Such parties to the Assigned Contracts and Assigned Leases are given reasonable notice and opportunity to object to the proposed assumption and assignment and, in the event an objection is not resolved, this Court will adjudicate the dispute, including issues pertaining to adequate assurance of future performance.   In light of the foregoing, the Debtors respectfully request that the Court approve the assumption and assignment of the executory contracts and unexpired leases in a Sale Order entered after the Sale Hearing.

E.    **The Sale of the Purchased Assets Is Authorized Under Bankruptcy Code Section**
      **363(b)**

51.    At the conclusion of the Sale Hearing, the Debtors request that the Court enter the
Sale Order approving the Sale of the Purchased Assets to the Stalking Horse Purchaser or
Winning Bidder, as applicable.[5]  The Debtors submit that the Sale of the Purchased Assets is in
the best interest of the Debtors' estates and their creditors.

52.    Bankruptcy Code section 363(b)(1) provides that a debtor, "after notice and a
hearing, may use, sell, or lease, other than in the ordinary course of business, property of the
estate."  11 U.S.C. § 363(b)(1).  To approve the use, sale or lease of property outside the
ordinary course of business, this Court need only determine that the Debtors' decision is
supported by "some articulated business justification," as established by the Second Circuit in
*Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070
(2nd Cir. 1983), which decision has been adopted in the Fifth Circuit.  *Institutional Creditors
of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines,
Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986); *see also, Fulton State Bank* v. *Schipper,* 933 F.2d
513, 515 (7th Cir. 1991); *In re San Jacinto Glass Industries, Inc.,* 93 B.R. 934, 944 (Bankr.
S.D. Tex. 1988); *In re Condere Corp.,* 228 B.R. 615, 628-69 (Bankr. S.D. Miss. 1998).

53.    The business judgment rule shields a debtor's management from judicial second-
guessing.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a
presumption of reasonableness attaches to a debtor's management decisions").  Once a debtor
articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in
making a business decision the directors of a corporation acted on an informed basis, in good
faith and in the honest belief that the action was in the best interests of the company.'"  *In re*

---

[5] This portion of the relief is requested to be entered after the Sale Hearing in the form of the Sale Order.  The
Debtors reserve the right to file supplemental pleadings in support of its request for entry of the Sale Order.

*Integrated Resources, Inc.*, 147 B.R. at 656 (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of Bankruptcy Code.

54.     When applying the business judgment standard, courts show great deference to a debtor's business decisions.  *See GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005); *In re First Wellington Canyon Assocs.*, 1989 U.S. Dist. LEXIS 10687, at *8-9 (N.D. Ill. Sep. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion."); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a § 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith).

55.     The Debtors respectfully submit that their proposed Sale of Assets outside the ordinary course of business fits squarely within the parameters of the sound business judgment test, taking into consideration that the Debtors operate in a difficult and highly-competitive business segment and are operating under exigent financial circumstances.  The Debtors have articulated a sound business purpose for any Sale Transaction emanating from the marketing or Auction process, including as a baseline, and one or more Sale Transactions contemplated by a potential Stalking Horse Agreement, if applicable.  As set forth above, the Debtors, in the business judgment of their Chief Executive Officer and Authorized Representative in these Chapter 11 Cases, have determined that it is in the best interest of the estates to consummate one or more Sales of the Assets.  In order to monetize the Assets for distribution to creditors, it is

critical that the Debtors are permitted to consummate one or more Sales of the Assets pursuant to this Sale Motion and any Sale Order entered by the Court.

56.     The Debtors believe that any purchase price obtained pursuant to a Stalking Horse Agreement or other Asset Purchase Agreement during the marketing process will be fair and reasonable.  Thus, if a Stalking Horse Purchaser is selected, the Debtors will be prepared to close a transaction with the Stalking Horse Purchaser even if no other Qualified Bids (as defined in the Bidding Procedures) are submitted.   However, the fairness and reasonableness of the consideration ultimately paid for the Assets by the applicable Stalking Horse Purchaser, or other Winning Bidder, will be conclusively demonstrated by the exposure of the opportunity to the marketplace in connection with the Bidding Procedures. Accordingly, the Debtors submit that any Sale Transaction presented in connection with this Sale Motion is warranted and appropriate under section 363(b) of the Bankruptcy Code, and the Sale Order should be entered by the Court.

F.      **The Sale of the Purchased Assets Free and Clear of Liens, Claims, and Interests Is Authorized Under Bankruptcy Code Section 363(f)**

57.     The Debtors respectfully request that the Sale and transfer of the Assets be approved free and clear of all liens, claims, encumbrances and other interests (other than those specifically assumed by a Stalking Horse Purchaser or other Winning Bidder), with all such interests attaching to the net Sale proceeds of the Assets to the extent applicable.  Such relief is consistent with the provisions of section 363(f) of the Bankruptcy Code in these types of cases.

58.     Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

> (2)     such entity consents;

     (3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

     (4)     such interest is in bona fide dispute; or

     (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by Bankruptcy Code section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

59.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the Sale of the Purchased Assets free and clear of the interests.  *In re Nature Leisure Times, LLC*, 2007 WL 4554276, *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied."); *In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale 'free and clear' provided at least one of the subsections of section 363(f) is met).

60.     The Debtors believe that one or more of the tests under section 363(f) will be satisfied with respect to the transfer of the Purchased Assets pursuant to a Sale Order.  In particular, the Debtors believe that any secured creditors will consent to the Sale Transaction(s) presented for approval at the Sale Hearing. The Debtors further believe section 363(f)(5) will be satisfied.  Based on the above, the requirements of section 363(f) of the Bankruptcy Code can be satisfied, and the Sale(s) of the Purchased Assets free and clear of all liens, claims, encumbrances and other interests is appropriate.

**G.     The Form, Manner and Extent of Notice of the Sale Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances**

61.     The Debtors will serve the Bidding Procedures, Sale Notice, and Cure Notice in accordance with the Bidding Procedures Order and will serve this Sale Motion as set forth below.  The notices to be provided by the Debtors as set forth herein and in the Bidding Procedures Order sufficiently describes the terms and conditions of the Sale(s) proposed by the Debtors.

62.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Sale Motion and the related notices satisfy all such requirements:

    (a)     <u>Bankruptcy Code Section 363</u> – Bankruptcy Code section 363 provides that a trustee may sell property "after notice and hearing."  Under Section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  As set forth above, creditors have been, and will be, provided notice of the salient details regarding this Sale Motion and the Sale Hearing.  Accordingly, notice is sufficient under Bankruptcy Code section 363.

    (b)     <u>Bankruptcy Rule 2002</u> – Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business.  In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." FED. R. BANKR. P. 2002.  As set forth above, the notice of this Sale Motion that has been, and will be, provided by the Debtors satisfies each of these requirements.

    (c)     <u>Bankruptcy Rules 6004 and 6006</u> – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business comply with Bankruptcy Rule 2002.  As set forth above, the Debtors have complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as the Court may direct.  The Cure Notice will be served on counterparties to the Debtors' executory contracts and unexpired leases, thereby satisfying this requirement.  Bankruptcy

30

Rule 6004(c) requires service of a motion for authority to sell property free and clear of liens and other interests on parties who have liens or other interests in the property to be sold. A copy of this Sale Motion will be served on parties claiming liens or interests in the Debtors' Assets.

(d) <u>Procedural Due Process</u> – The notices of this Sale Motion that are being provided as described herein are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. See *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Sale Motion, the Bidding Procedures, any Sale Transaction(s), and the other relief requested herein.

63. The Debtors submit that the notice they have provided and intend to provide as outlined above with respect to the proposed Sale, the Bidding Procedures, and Cure Amounts, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the Sale of the Assets and the procedures and proceedings related thereto and therefore should be approved by this Court.

## H.   **The Stay of the Sale Order Should be Waived**

64. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d).

65. The Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived, including with respect to any executory contracts and unexpired leases. To require the Debtors to effectively be liable under their existing obligations for an extra fourteen (14) days, and to needlessly delay closing in the event the parties are otherwise prepared to close on a more accelerated timeline,

would cause additional burden on the estates and require further expenditures of the Debtors' limited resources which may not be necessary under the circumstances if the parties are prepared proceed to a closing.

## VI. <u>PRAYER</u>

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order after the Bidding Procedures Hearing (a) authorizing the Debtors to implement the Bidding Procedures and conduct a marketing and Sale process under section 363 of the Bankruptcy Code, and (b) approving the Bid Protections payable to a Stalking Horse Purchaser, if any; (ii) enter the Sale Order(s) after the Sale Hearing (a) authorizing the Debtors to sell substantially all of their Assets as Purchased Assets to a Stalking Horse Purchaser or Winning Bidder free and clear of all liens, claims, encumbrances and other interests, and (b) authorizing the Debtors to assume and assign the Assigned Contracts and Assigned Leases to the respective Stalking Horse Purchaser or Winning Bidder; and (iii) grant such other and further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted on the 13th day of October, 2025.

**OKIN ADAMS BARTLETT CURRY LLP**

By:   /s/ *Matthew S. Okin*
      Matthew S. Okin
      Texas Bar No. 00784695
      Email: mokin@okinadams.com
      Ryan A. O'Connor
      Texas Bar No. 24098190
      Email: roconnor@okinadams.com
      Kelley Killorin Edwards
      Texas Bar No. 24129017
      Email: kedwards@okinadams.com
      1113 Vine St., Suite 240
      Houston, Texas 77002
      Tel: 713.228.4100
      Fax: 346.247.7158

**PROPOSED ATTORNEYS FOR THE DEBTORS**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2025, a true and correct copy of the foregoing Notice was served via the Court's CM/ECF system to all parties consenting to service through the same.

By:   /s/ *Matthew S. Okin*
      Matthew S. Okin