**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RAZZOO'S, INC., *et al.*, | Case No. 25-90522 (ARP) |
| Debtors.[1] | (Jointly Administered) |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING
THE SALE OF THE DEBTORS' ASSETS OUTSIDE THE ORDINARY COURSE OF
BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS (III) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF</u>**
(Relates to Docket Nos. 69 and 130)

Upon the motion [Docket No. 69] (the "<u>Sale Motion</u>")[2] of Razzoo's, Inc., *et al*., the debtors

and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases

(the "<u>Chapter 11 Cases</u>"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States

Code, 11 U.S.C. § 101 *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, 6006, 9007 and 9014

of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "<u>Bankruptcy</u>

<u>Rules</u>"), and the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern

District of Texas (the "<u>Bankruptcy Local Rules</u>"), seeking entry on an order (this "<u>Sale Order</u>"):

(i) authorizing and approving the Sale of certain of the Debtors' assets (the "<u>Purchased Assets</u>")

pursuant to, and as described in, that certain Asset Purchase Agreement by and between the

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Razzoo's, Inc. (9753) and Razzoo's Holdings, Inc. (9608).  The Debtors' service address is 14131 Midway Road, Suite 750, Addison, Texas 75001.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Sale Motion [Docket No. 69], the Bidding Procedures Order [Docket No. 130], Final DIP Order [Docket No. 137], or the APA [Docket No. 166-1], as applicable.  Notwithstanding, to the extent any capitalized term has a definition inconsistent with a defined term in the APA, the definition in the APA shall control.

Debtors and ThirtyThree97 LLC (the "Buyer"), a true and correct copy of which is attached hereto as **Exhibit 1** (as may be subsequently amended, restated or otherwise modified in accordance with its terms and the terms of this Sale Order, the "APA"),[3] free and clear of all liens, claims, encumbrances and interests, (ii) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases to be assumed by the Buyer (the "Assigned Contracts") as more fully described in the APA and the proposed cure costs with respect thereto (the "Cure Costs"), and (iii) granting related relief; and the Debtors having determined that the highest and otherwise best offer for the Sale of the Purchased Assets was made by the Buyer pursuant to the APA; and the Court having held a hearing on December 23, 2025 (the "Sale Hearing") to approve the Sale and the APA; and the Court having reviewed and considered (x) the Sale Motion, (y) any objections thereto and resolution of the objections announced on the record, and (z) the arguments of counsel and the evidence and testimony proffered or adduced at the Sale Hearing; and, upon the record of the Sale Hearing, and all other pleadings and proceedings in the Chapter 11 Cases, the Court being satisfied that the relief requested in the Sale Motion is necessary and in the best interests of the Debtors, their estates, creditors and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES THAT:[4]**

---

[3] For the avoidance of doubt, the term "APA" as used in this Sale Order expressly includes the "Agreement" as defined in the APA between the Debtors and Buyer.

[4] The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

A.     Jurisdiction and Venue.  The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. § 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for the Chapter 11 Cases and the Sale Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     Statutory Predicates.  The statutory predicates for the relief ordered herein are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, and applicable Bankruptcy Local Rules.

C.     Entry of Bidding Procedures Order.  On November 4, 2025, this Court entered the *Order (I) Approving (A) Bidding Procedures; (B) Assumption and Assignment Procedures; and (C) Stalking Horse Procedures and Bid Protections; (II) Scheduling Bid Deadline, Auction Date, and Sale Hearing Date; (III) Approving Forms of Notice Thereof; and (IV) Granting Related Relief* [Docket No. 130] (the "Bidding Procedures Order"), which, among other things, (i) established procedures (the "Bidding Procedures") in connection with the Sale of substantially all of the Debtors' assets; (ii) approved procedures relating to the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and determining Cure Costs; (iii) scheduled an auction (the "Auction") and Sale Hearing and approved the form and manner of notice thereof; and (iv) granted related relief.

D.     Compliance with Bidding Procedures.  The Sale is duly authorized pursuant to sections 363(b)(1) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004(f).  As demonstrated by: (i) the testimony and other evidence submitted and adduced at the Sale Hearing; and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors marketed the Purchased Assets and conducted all aspects of the marketing process in compliance with the Bidding Procedures and Bidding Procedures Order, and upon expiration of the Bid

Deadline, the Debtors' in consultation with their professionals and the Committee, determined that no other Qualified Bids were received, that an Auction was unnecessary, and that the Stalking Horse Bid should be selected as the Winning Bid in accordance with the Bidding Procedures. The marketing process undertaken by the Debtors, their professionals, and other representatives with respect to the Purchased Assets has been adequate, appropriate and reasonably calculated to maximize value for the benefit of all stakeholders, and the Debtors afforded potential purchasers a full and fair opportunity to make higher and better offers.

E.      <u>Notice</u>. As evidenced by the affidavits of service previously filed with the Court, and based upon the representations of counsel at the Sale Hearing, proper, timely, adequate, and sufficient notice of: (i) the Sale Motion; (ii) the Sale of the Purchased Assets to a Winning Bidder; (iii) the assumption and assignment of Assigned Contracts to a Winning Bidder and associated Cure Costs; (iv) the Bid Deadline established by the Bidding Procedures Order; (v) the Auction, (vi) the Sale Hearing; (vii) the *Notice of Selection of Winning Bidder* [Docket No. 178]; and (viii) all other dates and deadlines established by the Bidding Procedures Order or otherwise related thereto, has been provided by the Debtors in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, 9008, and 9014, and in compliance with the Bidding Procedures Order to each party entitled thereto. Such notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale (and the Contemplated Transactions in connection therewith), the assumption and assignment to the Buyer of the Assigned Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto is or shall be required.

F.      <u>Cure Notices</u>. In accordance with the Bidding Procedures Order, the Debtors filed with the Court and served upon the non-Debtor counterparties to executory contracts and

unexpired leases which are potential Assigned Contracts an appropriate notice [Docket No. 144-3], and a supplemental notice [Docket No. 192-1] (collectively, the "Cure Notice"), providing that such executory contract or unexpired lease may be assumed and assigned to the Buyer and setting forth the applicable Cure Costs. *See* Docket No. 148 (*Affidavit of Service*). The Cure Notice was sufficient under the circumstances and in full compliance with the Bidding Procedures Order, and no further notice of the Debtors' assumption and assignment to the Buyer of the Assigned Contracts or the Cure Costs is or shall be required. All non-Debtor counterparties to the Assigned Contracts have had an adequate opportunity to object to the assumption and assignment of the Assigned Contracts and the Cure Costs in accordance with the applicable Cure Notice.

G.      Corporate Authority. The Purchased Assets as more fully described in the APA constitute property of the Debtors' bankruptcy estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the Bankruptcy Code. The Debtors: (i) have full corporate power and authority to execute the APA, and the Sale by the Debtors to the Buyer has been duly and validly authorized by all necessary corporate action; (ii) have all of the corporate power and authority necessary to consummate the Sale and all Contemplated Transactions described in the APA; (iii) have taken all corporate action necessary to authorize and approve the APA and consummate the Sale; and (iv) do not require any consents or approvals that have not been obtained to consummate the Sale, other than the Court's entry of this Sale Order and any consents expressly provided for in the APA.

H.      Opportunity to Object. A fair and reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including but not limited to: (i) the Office of the United States Trustee; (ii) the Debtors' prepetition secured lender and DIP Lender; (iii) the Committee; (iv) all parties known

or reasonably believed by the Debtors to have asserted a lien or interest on any of the Purchased Assets; (iv) any party that requested notice pursuant to Bankruptcy Rule 2002; and (v) all federal, state, county and local regulatory or taxing authorities which have a reasonably known interest in the relief requested in the Sale Motion.

I.      Consideration.  Pursuant to the APA, and as more fully set forth therein, the Buyer has offered to purchase the Purchased Assets in exchange for (i) a Credit Bid in the amount of the Senior Secured Prepetition Obligations and DIP Obligations; (ii) payment of Cure Costs, if any, for the applicable Assigned Contracts, *plus*, (iii) the assumption of the Assumed Liabilities; *plus* (iv) the amount of the Stout Transaction Fee in the amount of $630,000.00 (collectively, clauses (i), (ii), (iii), and (iv) are the "Purchase Price").  The sum of the components of the Purchase Price is projected to equal approximately $18,800,000. The Purchase Price provided by the Buyer for the Purchased Assets pursuant to the APA: (1) constitutes (a) reasonably fair and equivalent value and consideration under the Bankruptcy Code and any Uniform Fraudulent Transfer or Conveyance Act, and (b) reasonably equivalent value, fair consideration, fair salable value, and fair value under any other applicable laws, (2) is fair and reasonable, (3) is the highest or otherwise best offer for the Purchased Assets, and (4) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative.

J.      Sale in Best Interests.  The relief requested in the Sale Motion, the approval of the APA, and consummation of the Sale of the Purchased Assets at this time is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.

K.      Business Justification. Sound business reasons exist for authorizing, approving, and consummating the Sale, and the Debtors' entry into the APA constitutes the sound exercise of the Debtors' business judgment.  The Court finds that the Debtors have articulated good, sufficient

and sound business purposes and justifications for the Sale, and compelling circumstances for this Court to approve the APA and authorize the Sale of the Purchased Assets to the Buyer pursuant to section 363(b) of the Bankruptcy Code.

L.    <u>Arm's-Length Sale</u>. The APA was negotiated, proposed, and entered into by the Debtors and the Buyer without collusion or fraud, in good faith, and from arm's length bargaining positions.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.  The Buyer did not act in a collusive manner with any person or entity in connection with any aspect of Sale process established by the Bidding Procedures Order, and the Purchase Price was not controlled by any agreement among any parties.

M.    <u>Good Faith Purchaser</u>.  The Buyer is a good faith purchaser for value within the meaning of section 363(m) of the Bankruptcy Code with respect to the Sale, the APA, and the Contemplated Transactions authorized by this Sale Order, and is therefore entitled to all of the protections afforded by that provision.  As demonstrated by the record of these Chapter 11 Cases, the representations of counsel made on the record at the Sale Hearing and the testimony and other evidence proffered or adduced at the Sale Hearing, and in addition to the other findings set forth in this Sale Order, the Buyer: (i) recognized the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) complied with the Bidding Procedures, (iii) agreed to subject its Stalking Horse Bid to the competitive Bidding Procedures and Auction process; (iv) disclosed any payments to be made by the Buyer with respect to the Purchase Price; and (v) has not violated section 363(n) of the Bankruptcy Code by any action or inaction.

N.    <u>Buyer Not an Insider</u>. The Buyer and its affiliates are not an "insider" or "affiliate" of the Debtors, as that term is defined in section 101 of the Bankruptcy Code, and no common

identity of incorporators, directors or stockholders exists between the Buyer and the Debtors.

O.      No Fraudulent Transfer.  Neither the Debtors nor the Buyer entered into the APA, or are consummating the Contemplated Transactions, for the purpose of hindering, delaying or defrauding creditors of the Debtors or with any fraudulent or otherwise improper purposes.

P.      Sale Free and Clear; Buyer's Reliance. The Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (except to the extent that such liens, claims, encumbrances or other interests are Assumed Liabilities or Permitted Liens), because, in each case, (a) such liens, claims, encumbrances and other interests are junior to the senior secured, priming DIP Liens of Buyer, as DIP Lender; or (b) one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  All parties in interest, including, without limitation, any holders of liens, claims, encumbrances, and other interests and counterparties to the Assigned Contracts, that did not object, or who withdrew any such objection, to the Sale, the Sale Motion, the assumption and assignment of the applicable Assigned Contract, or the associated Cure Costs, are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code.  The Buyer would not have entered into the APA and would not consummate the Contemplated Transactions: (i) if the Sale of the Purchased Assets to the Buyer, and the assumption and assignment of the Assigned Contracts to the Buyer, were not, except as otherwise expressly provided in the APA, free and clear of all claims, liens, interests and encumbrances of any kind or nature whatsoever; or (ii) if the Buyer would, or in the future could (except and only to the extent expressly provided in the APA with respect to any Assumed Liabilities or Permitted Liens), be liable for any of such liens, claims, interests or encumbrances.  For the avoidance of doubt, nothing in this Sale Order or the APA shall alter or impair the liens, claims, encumbrances or other interests

8

of any party in interest to the extent such liens, claims and interests attach to any Excluded Assets.

Q.      <u>Ombudsman</u>.  The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the relief requested in the Sale Motion.

R.      <u>Legal, Valid Transfer</u>.  As of the Closing, pursuant and subject to the terms of the APA, the transfer of the Purchased Assets and the Sale will effect a legal, valid, enforceable, and effective transfer of the Purchased Assets and will vest the Buyer with all of the Debtors' right, title, and interest in the Purchased Assets, free and clear of all liens, claims, encumbrances and other interests, except as expressly set forth in the APA.

S.      <u>No Successor Liability</u>.  The Buyer: (i) is not a successor (and shall not be deemed a successor) to the Debtors or their estates by reason of any theory of law or equity; (ii) has not, *de facto* or otherwise, merged with or into the Debtors; (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of the Debtors or their estates; and (iv) does not have a common identity of incorporators, directors or equity holders with the Debtors.  The Buyer shall not be deemed to have assumed or in any way be responsible for any liability or obligation of the Debtors or the estates, except as expressly provided in the APA.

T.      <u>Assumption of Executory Contracts and Unexpired Leases</u>. The Debtors have demonstrated the assumption and assignment of the Assigned Contracts designated by Buyer pursuant to the terms of the APA and the assignment thereof to the Buyer in connection with the consummation of the Sale is an exercise of the Debtors' sound business judgment and is in the best interests of the Debtors, their estates, creditors, and other parties in interest.  The designation of Assigned Contracts by Buyer prior to Closing under the APA and the assignment thereof to the Buyer upon Closing are an integral part of the APA and the Sale and, accordingly, such designation

procedures and the potential assumption and assignment of the Assigned Contracts is reasonable and enhances the value of the Debtors' estates. Any counterparty to an Assigned Contract that has not filed with the Court an objection to such assumption and assignment in accordance with the terms of the Bidding Procedures Order and Cure Notice is deemed to have irrevocably consented to such assumption and assignment. Any objections to the assumption and assignment of any of the Assigned Contracts to the Buyer in accordance with the APA that have not been resolved or adjourned by agreement of the parties are hereby overruled.

U.    Cure / Adequate Assurance. The Debtors and the Buyer, as applicable under the APA, have: (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Buyer has, based upon the record of these proceedings, provided adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. No default exists in the Debtors' performance under the Assigned Contracts as of the Closing other than the failure to pay Cure Costs or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code. The Buyer provided adequate assurance of future performance of and under the Assigned Contracts within the meanings of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code. Except for any Cure Costs as to which an objection was filed, either as to the assumption and assignment of such agreement or as to the Cure Costs relating thereto, and that remain pending as of the date of this Sale Order, all Cure Costs are hereby found to be the sole amounts necessary to

cure any and all defaults under the Assigned Contracts under section 365(b) of the Bankruptcy Code.

V.      <u>Not a *Sub Rosa* Plan</u>. The Sale does not constitute a *de facto* or *sub rosa* plan of reorganization or liquidation because it does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any plan which may be proposed by the Debtors; (iii) circumvent chapter 11 safeguards, including those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests.

W.      <u>Prompt Consummation</u>. Time is of the essence in consummating the Sale.  The consummation of the Sale as soon as practicable is necessary both to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors, their estates, creditors, and all other parties in interest in the Chapter 11 Cases, and to provide the means for the Debtors to maximize creditor recoveries.  The Debtors and the Buyer intend to close the Sale as soon as reasonably practicable in accordance with the APA.

X.      <u>Final Order</u>. The Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay including as contemplated by Bankruptcy Rules 6004 and 6006, directs that this Sale Order be effective immediately upon its entry, and expressly directs entry of this Sale Order as set forth herein. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      <u>General Provisions</u>.  The findings and conclusions set forth in this Sale Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this matter by Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing shall be deemed additional findings of fact and

conclusions of law in this matter and are incorporated herein.  When appropriate, all findings of fact shall be construed as conclusions of law, and all conclusions of law shall be construed as findings of fact.

2.      <u>Relief Granted; Objections Overruled</u>.  The Sale of the Purchased Assets as contemplated by the APA is approved for the reasons set forth in this Sale Order and on the record of the Sale Hearing, which is incorporated fully herein as if fully set forth in this Sale Order.  All objections, statements, and reservations of rights to the Sale Motion and the relief requested therein and to the entry of this Sale Order or the relief granted herein that have not been expressly withdrawn, waived, adjourned, or settled as announced to the Court at any prior hearing, at the Sale Hearing, or by stipulation filed with the Court, or previously overruled, including, without limitation, all reservations of rights included therein or otherwise, are hereby overruled and denied in their entirety on the merits and with prejudice, except as expressly set forth herein.  Those parties who failed to timely file a Sale Objection by the Sale Objection Deadline established by the Bidding Procedures Order, or withdrew their Sale Objection, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      <u>Approval of Sale and APA</u>.  The APA, including all of the terms and conditions thereof, are hereby authorized and approved in all respects.  Pursuant to section 363(b) of the Bankruptcy Code, the Sale of the Purchased Assets to the Buyer free and clear of all liens, claims, encumbrances and other interests (except those specifically permitted by the APA), and the Contemplated Transactions set forth in the APA, are approved in all respects.

4.      <u>Authorization</u>.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are hereby: (i) authorized to sell the Purchased Assets to the Buyer and consummate the Sale in accordance with the terms and conditions of the APA; (ii) authorized to transfer and assign all

right, title and interest (including common law property rights) to all property, licenses and rights

to be conveyed in accordance with and subject to the terms of the APA, including the transfer and

assignment of operatorship of the Purchased Assets; (iii) authorized and directed to execute and

deliver, perform under, consummate, implement, and comply with the APA, together with all other

Contemplated Transaction documents that may be reasonably necessary or desirable to implement

the APA and the Sale and; (iv) authorized and empowered to take all further actions as may be

reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying

and conferring to the Buyer or reducing to possession, the Purchased Assets, or as may be

reasonably necessary or appropriate to the performance of the obligations as contemplated by the

APA.

      5.    <u>Binding Effect</u>.  This Sale Order and the APA shall be binding in all respects upon

the Debtors and their estates, successors, and assigns, all creditors of and equity holders in the

Debtors, and any and all other parties in interest, including, without limitation, any and all holders

of liens, claims, encumbrances, and other interests (including holders of any rights or claims based

on any putative successor or transferee liability) of any kind or nature whatsoever in the Purchased

Assets, all parties to the Assigned Contracts, and any trustee or successor trustee appointed in the

Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code.  The APA and

the Sale are not subject to rejection or avoidance (whether through any avoidance or recovery,

claim, action, or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar

state or federal law or any other cause of action) by the Debtors, any chapter 7 or chapter 11 trustee

of the Debtors' estates or any other person or entity.  The APA and this Sale Order, and the

Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected,

discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in the Chapter 11

Cases.  This Sale Order and the APA shall inure to the benefit of the Debtors, their estates, creditors, the Buyer, and the respective successors and assigns of each of the foregoing.

6.      <u>Good Faith Purchaser</u>.  The Buyer is a good faith purchaser of the Purchased Assets and is hereby granted and is entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.  Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Sale Order are hereafter reversed, modified or vacated by a subsequent order of the Court or any other court, such reversal, modification or vacatur shall not affect the validity and enforceability of the Sale or any other sale, transfer or assignment under the APA or any obligation or right granted pursuant to the terms of this Sale Order (unless stayed pending appeal prior to the Closing of the Contemplated Transactions) and, notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment, shall be governed in all respects by the original provisions of this Sale Order and the APA as the case may be.

7.      <u>Section 363(n) of the Bankruptcy Code</u>.  The Sale approved by this Sale Order is not subject to avoidance and neither the Buyer nor any of its affiliates are subject to any recovery of damages, in each case pursuant to section 363(n) of the Bankruptcy Code.  Neither the Buyer nor any of its affiliates violated section 363(n) of the Bankruptcy Code in any respect in connection with the Sale.

8.      <u>Free and Clear</u>. Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Buyer upon consummation of the APA free and clear of all claims, liens, interests and encumbrances (except as set forth in the APA) of any kind or nature whatsoever, including any liens in or to the Purchased Assets which are junior to the senior secured, priming DIP Liens of the DIP Lender, and the Buyer shall not be responsible for any such liens, claims, encumbrances, interests, including, without limitation, any liens, claims,

encumbrances and interests in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between the Debtors and their equity interest holders, (iv) any pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of ERISA, health or welfare, compensation or other employee benefit plans, agreements, practices and programs, (v) the WARN Act or any state or other laws of similar effect, including any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors; (vi) liabilities arising under any Environmental Laws with respect to any assets owned or operated by the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (ix) any Excluded Liabilities.  For the avoidance of doubt, nothing in this Sale Order or in the APA shall be deemed to constitute a release of any liens, claims, encumbrances, or other interests in the Excluded Assets.

9.     <u>DIP Liens and DIP Obligations</u>.  Effective as of the Closing, Buyer shall be deemed to have Credit Bid the full amount of the Senior Secured Prepetition Obligations and DIP Obligations, each as granted and defined in the Final DIP Order, pursuant to section 363(k) of the

Bankruptcy Code.  Accordingly, effective as of the Closing, and except with respect to any liens extending to or establishing the Professional Fee Escrow or the Carve Out set forth in the Final DIP Order: (i) all DIP Liens, Replacement Liens and claims granted to Buyer, as DIP Lender, pursuant to the Final DIP Order to secure the DIP Obligations on the DIP Collateral and Prepetition Collateral shall be forever released, discharged and waived in their entirety; and (ii) the DIP Lender shall have no further claims against the Debtors, their estates, or property of the estates, including, for the avoidance of doubt, administrative expense claims, adequate protection claims, diminution in value claims, deficiency claims, DIP Fees or Lender Professional fee claims.  Except as expressly provided in this Sale Order, all other terms and conditions of the Final DIP Order are unmodified and shall remain in full force and effect including the Carve Out established thereunder.  The Professional Fee Escrow Securing payment of the Carve Out shall remain property of the Debtors' estates but subject to the DIP Liens to the extent necessary to preserve the Carve Out for its intended beneficiaries.  Upon payment in full of all Professional Fees subject to the Carve Out, the DIP Liens shall be released and, to the extent any excess funds remain in the Professional Fee Escrow, such remaining funds shall be returned to the Debtors or their successors in interest for the benefit of the Debtors' estates, free and clear of liens, claims, encumbrances or other interests.

10.    <u>Valid Transfer</u>.  Except as otherwise expressly permitted or specifically provided for in the APA or this Sale Order, pursuant to sections 105(a), 363(b), 363(f), 365(b), 365(f) of the Bankruptcy Code or any other applicable section of the Bankruptcy Code, upon the Closing, the Purchased Assets shall be transferred to the Buyer, and such transfer shall constitute a legal, valid, binding and effective transfer of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever pursuant to section 363(f) of

the Bankruptcy Code.  Upon the Closing, the Buyer shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities and Permitted Liens, if any.

11.    <u>Parties Enjoined</u>.  Except as expressly permitted or otherwise specifically provided by the APA or this Sale Order, all persons and entities (as defined in section 101(15) of the Bankruptcy Code), including, but not limited to, all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, and creditors holding liens, claims, encumbrances, or interests of any kind or nature whatsoever against or in the Debtors or any of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) or arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing, or the transfer of the Purchased Assets to the Buyer, are hereby forever barred, estopped, and permanently enjoined from asserting any claims of any kind or nature whatsoever, against the Buyer and its successors, designees, assigns, or property, or the Purchased Assets upon Closing.  From and after the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be deemed by the Debtors and Buyer to be necessary or desirable to release any liens, claims, encumbrances or interests on the Purchased Assets, if any, as provided for herein.  This Sale Order: (i) shall be effective as a determination that, upon the Closing, all liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected; and (ii) shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of

deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, foreign, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Purchased Assets.

12.     <u>Possession and Operations</u>.   All persons and entities that are in possession or operatorship of some or all of the Purchased Assets on the Closing Date are directed to surrender possession and operatorship of such Purchased Assets to the Buyer or its assignee as of the Closing Date.

13.     <u>Release of Liens</u>.   Notwithstanding anything herein, if any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing liens, claims, and encumbrances in the Purchased Assets conveyed pursuant to the APA and this Sale Order has not delivered to the Debtors, prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, claims, and encumbrances which the person or entity has with respect to the Purchased Assets or otherwise, then: (i) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; and (ii) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens on or against the Purchased Assets of any kind or nature whatsoever upon Closing.   Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Purchased Assets free and clear of liens, claims, and encumbrances shall be self-executing, and neither the Debtors nor the

Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments to effectuate, consummate, or implement the provisions of this Sale Order.

14.     <u>Authorization of Assumption and Assignment</u>.  The Debtors are hereby authorized to and shall, in accordance with sections 105(a) and 365 of the Bankruptcy Code, and upon payment of the applicable Cure Costs, if any, in accordance with the terms of the APA: (i) assume and assign the Assigned Contracts to the Buyer, effective upon and subject to the occurrence of the Closing, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, which Assigned Contracts by operation of this Sale Order, shall be deemed assumed and assigned effective as of the Closing; and (ii) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Buyer.  The Buyer's assumption on the terms set forth in the APA of the Assigned Contracts, is hereby approved, and all requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Assigned Contracts by the Debtors to the Buyer have been satisfied.  Upon Closing, and as set forth more fully in the APA, the Buyer shall be deemed to have assumed the Debtors' obligations and liabilities under the Assigned Contracts arising from and after the Closing.  Unless otherwise agreed between the Buyer and a landlord for a Continuing Restaurant, any accrued liability under the applicable Leases constituting Assigned Contracts which is not yet due and payable shall, as of the Closing, be assumed by Buyer and paid pursuant to the terms of the Lease.

15.     <u>Contract and Cure Schedule</u>.   Buyer shall have the right, pursuant to Section 2.6 of the APA, to modify the Contract and Cure Schedule (as defined in the APA) until the Closing of the Sale, and to change the designation of any Contract or Lease as "Included" (and each Contract so designated shall become an Assigned Contract), or "Excluded" (and each Contract so

designated shall become an Excluded Contract).  For the avoidance of doubt, only those Contracts or Leases which are actually designated as Assigned Contracts at Closing shall be assumed by the Debtors and assigned to the Buyer pursuant to this Sale Order.  As soon as reasonably practicable after Closing, but no later than three (3) Business Days after the Closing, the Debtors shall file the Contract and Cure Schedule setting forth the final list of Assigned Contracts transferred to Buyer upon Closing, and the list of Excluded Contracts.

16.      <u>Anti-Assignment Provisions Unenforceable</u>.  The Assigned Contracts shall be transferred to, and upon assignment to the Buyer, shall remain in full force and effect for the benefit of the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that (i) prohibits, restricts, limits, or conditions (including requiring consent of such parties to an Assigned Contract) such assignment or transfer, or (ii) allows the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract.  Each party to an Assigned Contract is hereby forever barred, estopped, and permanently enjoined from asserting any objection to the party's Assigned Contract including, without limitation, that its consent is necessary for such assumption and assignment.

17.      <u>Substitution of Buyer</u>.  Upon assignment to the Buyer at Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of the Debtors in each Assigned Contract free and clear of liens, claims, encumbrances, and other interests of any kind or nature whatsoever.  Upon Closing, the Buyer shall be deemed to be substituted for all purposes as a party to all Assigned Contracts in the place of the Debtors, and the Buyer shall have any and all rights and benefits of the Debtors under

all such Assigned Contracts without interruption or termination of any kind, and all terms thereof applicable to the Debtors shall apply to the Buyer as if such Assigned Contracts were amended to replace the Debtors with the Buyer.

18.     Cure.  All amounts that must be paid and obligations that must be otherwise satisfied, if any, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assignment and assumption of the Assigned Contracts, including costs to obtain any consents or cure any defaults thereunder that are required to be cured pursuant to the Bankruptcy Code to effect the assignment and obtain this Sale Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured as set forth in the APA: (i) with respect to those Assigned Contracts as to which no objections were interposed or remain pending as of the date of this Sale Order, in the ordinary course of business after Closing in the Cure Costs set forth in the applicable Cure Notice; or (ii) with respect to those Assigned Contracts as to which an objection was filed to the assumption and assignment of such agreement or the Cure Costs relating thereto and remains pending as of the date of this Sale Order, upon the later of (a) five (5) business days immediately following Closing when any amount(s) becomes due under the Assigned Contract in the ordinary course, or (b) ten (10) business days from the date of resolution of such objection by settlement or order of this Court.  Any non-Debtor counterparty to an Assigned Contract that failed to timely file a Cure Objection on or before the Cure Objection Deadline set forth in the Bidding Procedures Order or the relevant Cure Notice shall be barred from asserting any monetary or non-monetary defaults with respect to such Assigned Contract and from challenging, objecting to or denying the validity and finality of the Cure Costs set forth in the Cure Notice at any time, and such Cure Costs,

when paid, shall completely revive any Assigned Contract to which it relates and such Assigned Contract shall be deemed assumed by the Debtors and assigned to the Buyer on the Closing Date.

19.  <u>No Claims Against Buyer</u>.  Upon the Closing and payment of any Cure Costs, each party to an Assigned Contract shall be forever barred, estopped, and permanently enjoined from asserting against the Buyer or any of its affiliates any default, breach, claims of pecuniary losses arising from the Assigned Contract and existing as of the Closing Date of the Sale, or claims by reason of Closing, action, liability, or other cause of action existing as of the date of the Closing whether asserted or not, or, against the Buyer or any of its affiliates, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtors.

20.  <u>Adequate Assurance</u>.  The Buyer has provided adequate assurance of its future performance under each Assigned Contract within the meaning of sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3) of the Bankruptcy Code).  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment to the Buyer of the Assigned Contracts have been satisfied.

21.  <u>Continuing Restaurants / Excluded Restaurants; Rejection of Leases</u>.  Only those Company Restaurants for which the associated Leases are designated Assigned Contracts at Closing shall constitute Continuing Restaurants from and after Closing. With respect to the Continuing Restaurants, the landlord counterparties to such Leases shall continue to hold all security deposits pursuant to the terms of the applicable Lease.  All other Company Restaurant locations shall, upon Closing, be deemed Excluded Restaurants, and the Leases associated therewith shall be deemed Excluded Contracts.  The Excluded Contracts for such Excluded

Restaurants shall be deemed rejected by the Debtors pursuant to section 365 of the Bankruptcy Code effective as of the Closing Date.   With respect to such Excluded Restaurants:

(a)      all landlord counterparties to the rejected Leases are authorized and directed to reasonably cooperate with the Debtors and applicable third parties (the "Third-Party Owner(s)") by providing reasonable access to the Excluded Restaurant locations for the turnover and removal of any leased equipment and tangible personal property by the respective Third-Party Owners thereof;

(b)      promptly after the Closing, the Debtors shall provide notice to the applicable Third-Party Owners of leased equipment and tangible personal property that they are authorized and instructed to make mutually acceptable arrangements with the landlord counterparties for the Excluded Restaurant locations for the removal of such equipment and property from the Excluded Restaurant locations not later than January 30, 2026 (the "Removal Deadline") or such later date as may be agreed between the applicable landlord and Third-Party Owner;

(c)      except with respect to the leased equipment and personal property of Third-Party Owners, and unless otherwise agreed between the Debtors and the applicable landlord, any personal property remaining at Excluded Locations following the Removal Deadline may be retained and/or disposed of by the landlord counterparties to the rejected Leases;

(d)      to the extent applicable, the automatic stay under section 362 of the Bankruptcy Code is hereby modified solely to the extent necessary to permit Third-Party Owners of leased equipment and tangible personal property, at such Third-Party Owner's sole expense, to retrieve such equipment and property from the Excluded Restaurant locations;

(e)        all landlord counterparties to the rejected Leases may rely on the representations of the Debtors with respect to whether such leased equipment or tangible personal property at the Excluded Restaurant locations properly belongs to a Third-Party Owner, and the landlord counterparties shall not have any liability to any party for relying, in good-faith, on such representations by the Debtors to the extent such reliance otherwise complies with applicable law;

(f)        nothing in this Sale Order shall be construed to: (i) create, in favor of any person or entity, any interest in such leased equipment or tangible personal property that did not exist as of the Petition Date; (ii) alter or impair the validity, priority, enforceability, or perfection of any interest or encumbrance on any property that existed as of the Petition Date; or (iii) authorize any person or entity to remove or otherwise take possession or control of any leased equipment or tangible personal property, except as expressly set forth herein;

(g)        consistent with the limitations of section 362 of the Bankruptcy Code and any other applicable law, any landlords or other non-Debtor counterparties to the rejected Leases are prohibited, without further order of the Court, from setting off, recouping, or otherwise utilizing: (i) any amount deposited by the Debtors as a security deposit, or (ii) any amount owed to the Debtors by such landlords or other non-Debtor counterparties pursuant to the applicable Leases;

(h)        the landlord counterparties to the rejected Leases may take such actions as are necessary to secure their property, including changing the locks at Excluded Restaurant locations, effective as of the Closing Date; and

(i)        any claims for damages arising from the rejection of the Leases associated with the Excluded Restaurants pursuant to this Sale Order shall be filed by the landlord

counterparties to such rejected Leases on or before the general claims bar date of February 8, 2026 established in these Chapter 11 Cases.

22.     <u>Assumption and Assignment of Assigned Contracts</u>.   Each counterparty to an Assigned Contract as to which no objection remains pending as of the date of this Sale Order is hereby forever barred, estopped and permanently enjoined from asserting against the Debtors, the Buyer or any of their affiliates (including any designees), or the property of any of them, any default, breach, claims of pecuniary losses existing as of the Closing or by reason of Closing, action, liability, or other cause of action existing as of the date of the Sale Hearing whether asserted or not, or, against the Buyer or any of its affiliates (including any designees), any counterclaim, defense, setoff, or any other claim asserted or assertable against the Debtors.   Each non-Debtor party to an Assigned Contract as to which no objection remains pending as of the date of this Sale Order is hereby forever barred, estopped and permanently enjoined from asserting any objection to the assumption and assignment of such non-Debtor party's Assigned Contract including that its consent is necessary for such assumption and assignment.

23.     <u>Assumed Liabilities</u>.   The Assumed Liabilities listed on Schedule 2.5(a)(iii) of the APA shall not be deemed to be capped at the projected, estimated, or approximate amounts for the respective line items set forth in such Schedule, and such Assumed Liabilities shall be paid, whether at a higher amount or a lesser amount, as provided in the APA.

24.     <u>Cooperation</u>. As specifically provided in the APA, the Debtors and Buyer shall cooperate in a commercially reasonable manner to ensure that the Contemplated Transactions in the APA are consummated, and to provide an orderly transition of the Purchased Assets and Assumed Liabilities from the Debtors to the Buyer.

25.    <u>Buyer's Assignment of Rights</u>.  At any time prior to the Closing, the Buyer may designate one or more of its affiliates as the Buyer for purposes of the APA, and such designee shall be deemed to be the Buyer for all purposes under this Sale Order.

26.    <u>Modifications</u>.  The APA may be modified, amended, or supplemented in a writing signed by the Debtors and the Buyer in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, or supplement shall not reduce the Purchase Price or otherwise have a material adverse effect on the Debtors' estates.

27.    <u>No Successor Liability</u>.  The Buyer is not, and shall not be deemed, as a result of the consummation of the Sale contemplated herein, to: (i) be a legal successor to the Debtors or their estates by reason of any theory of law or equity, (ii) be an affiliate of the Debtors, (iii) have, *de facto* or otherwise, merged with or into the Debtors, or (iv) be an alter ego or a mere continuation or substantial continuation or successor of the Debtors in any respect.  Except as expressly permitted or otherwise specifically provided for in the APA or this Sale Order, neither the Buyer nor any of its affiliates shall: (x) assume or in any way be responsible for any liability or obligation of any of the Debtors or their estates or (y) have any liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Purchased Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, the Buyer and its affiliates shall not be liable for any claims against the Debtors or their affiliates, and the Buyer and its affiliates shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of warranty, product liability, environmental, successor or transferee liability, labor law, *de facto* merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors,

including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing.

28.     <u>Release of Buyer and Related Parties</u>.  Except with respect to the obligations under the APA, upon Closing: (i) the Debtors and each of their past, present and future members, directors, managers, officers, employees, agents, representatives and advisors, (ii) the Committee and each of its past, present and future members, agents, representatives and advisors, (iii) any subsequently appointed chapter 11 trustee, chapter 7 trustee, liquidating trustee, litigation trustee, or plan agent (collectively, clauses (i), (ii) and (iii) are the "<u>Estate Entities</u>"), each shall irrevocably and unconditionally release and forever discharge the Buyer, its affiliates, and each of their respective predecessors, successors, assigns, officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, equity holders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest (collectively, the "<u>Buyer Entities</u>") from any and all suits, legal or administrative proceedings, claims, demands, damages, losses, costs, liabilities, interest or causes of action whatsoever at law or in equity, known or unknown, which the Estate Entities might now or subsequently may have, based on, relating to or arising out of or in connection with the Debtors' Chapter 11 Cases and the Sale process.

29.     <u>No Interference</u>.  All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the APA and this Sale Order.  Following the Closing, no holder of a lien, claim, or encumbrance in the Purchased Assets shall interfere with the Buyer's title to or use and enjoyment of the Purchased

Assets based on or related to such lien, claim, or encumbrance, or any actions that the Debtors may take in the Chapter 11 Cases or any successor case.

30.     <u>Jurisdiction</u>.  This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to: (i) compel delivery of the Purchased Assets or performance of other obligations owed to the Buyer under the APA or this Sale Order; (ii) interpret, implement, and enforce the provisions of the APA and this Sale Order; and (iv) protect the Buyer and its affiliates against (a) any claims, liens, encumbrances or other interests in the Debtors or the Purchased Assets of any kind or nature whatsoever and (b) any creditors or other parties in interest regarding the turnover of the Purchased Assets that may be in their possession.

31.     <u>No Bulk Sales</u>.  All "bulk sale" laws or any similar law of any applicable state or other jurisdiction are waived and deemed inapplicable to the Sale.

32.     <u>Employee Issues</u>.  Except as otherwise expressly provided in the APA, the Buyer shall have no responsibility or obligation to assume and/or pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtors.  Except as otherwise expressly provided in the APA, the Buyer shall have no liability with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which the Debtors are a party (including, without limitation, arising from or related to the rejection or other termination of any such agreement), and the Buyer shall in no way be deemed a party to or assignee of any such agreement, and no employee of the Buyer shall be deemed in any way covered by or a party to any

such agreement, and except as otherwise expressly provided in the APA, all parties to any such agreement are hereby permanently enjoined from asserting against the Buyer any and all claims arising from or relating to any such agreement.

33.     Ad Valorem Taxes.  For the avoidance of doubt and notwithstanding anything to the contrary in this Sale Order or the APA, all pre- and post-Closing ad valorem Tax claims and liens of the Texas Taxing Authorities[5] and any other applicable Governmental Authority, solely to the extent such Tax claims and liens attach to the Purchased Assets, are Assumed Liabilities, as defined in the APA.  The Buyer assumes full responsibility for the ad valorem Taxes assessed against the Purchased Assets and shall be responsible for paying the ad valorem Taxes in full, in the ordinary course of business, when due.  Any dispute regarding the proration of such Taxes between the Debtors and Buyer shall have no effect on Buyer's responsibility to pay the ad valorem Taxes.  The Texas Taxing Authorities shall retain their respective prepetition and post-petition Tax liens against the Purchased Assets, as applicable, until paid in full, including any applicable post-petition penalties or interest that may accrue.

34.     Notice of Closing.  No later than two (2) Business Days following the Closing, the Debtors shall file in the Chapter 11 Cases a *Notice of Closing* setting forth the Closing Date of the Sale of the Purchased Assets and copies of the executed transaction documents.

---

[5] "Texas Taxing Authorities" means all Texas ad valorem taxing entities represented by the firms of (1) McCreary, Veselka, Bragg & Allen, PC, (2) Linebarger Goggan Blair & Sampson, LLP, and (3) Perdue Brandon Fielder Collins & Mott, LLP including Tax Appraisal District of Bell County, Brazos County, Denton County, Williamson County, Dallas County, Fort Bend County, Harris County Emergency Service District #07, Harris County Emergency Service District #11, Lewisville Independent School District, Lone Star College System, City of Pasadena, Tarrant County, Lubbock CAD, Carrollton-Farmers Branch ISD, City of Garland, Garland Independent School District, Richardson Independent School District, City of Burleson, Burleson Independent School District, Johnson County, Tyler Independent School District, Pasadena Independent School District, San Jacinto Community College District, Spring Independent School District, and Harris County Water Control Improvement District #110.  The term also includes the Collin County Tax Assessor/Collector on behalf of Collin County, Collin College, City of McKinney, and McKinney ISD.

35.  <u>Additional Provisions</u>.

(a)  To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Buyer as of the Closing Date.

(b)  Possession of any and all alcohol Inventory at the Continuing Restaurants shall be surrendered to the Buyer at the earliest of (i) immediately following Closing where allowed by law, (ii) receipt by the Buyer of authorization from the applicable Governmental Authority where required by applicable law, (iii) receipt by the Buyer of the applicable Liquor Licenses or Liquor License Approvals; provided that possession of such Inventory shall not be surrendered to the Buyer if doing so would violate applicable law.

(c)  To the extent any license or permit necessary for the operations of the Continuing Restaurants is not an assumable and assignable executory contract, the Buyer shall make reasonable efforts to apply for and obtain any such license or permit promptly after the Closing Date, and the Debtors shall cooperate reasonably with the Buyer in those efforts.  All existing licenses or permits, including the Liquor Licenses for the Continuing Restaurants, shall remain in place for the Buyer's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.

(d)  With regard to the sale of alcohol at the Continuing Restaurants, the Debtors and all other parties in interest shall cooperate fully with and support the Buyer in executing such applications and furnishing such documents as are necessary for the Buyer to obtain, in its name,

the Liquor Licenses or Liquor License Approvals. To the fullest extent allowed by applicable law, the Buyer may continue to operate at such locations under existing TABC and NCABCC Liquor Licenses, state food service licenses, local occupational licenses, and any other licenses needed to operate at such premises, with no interruption of the Business conducted at the premises, until new Liquor Licenses, Liquor License Approvals, and other licenses and permits have been issued or otherwise transferred to the Buyer.

(e)     To the maximum extent permitted by section 525 of the Bankruptcy Code, no Governmental Authority may revoke or suspend any right, Copyright, Patent, Trademark, or other permission, permit or license, including Liquor Licenses, relating to the use of the Purchased Assets, due to the filing or pendency of the Debtors' Chapter 11 Cases or the consummation of the Sale of the Purchased Assets.  Each and every federal, state, and local Governmental Authority or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale.

(f)     At any time prior to the Closing, the Buyer may assign the APA and any rights thereunder to its affiliate or subsidiaries, each of which shall be entitled to assume and accede to the APA and to purchase and acquire any and all of the Purchased Assets and assume any and all of the Assumed Liabilities in lieu of the Buyer, and such affiliate and designee shall be deemed to be the Buyer for all purposes under this Sale Order and shall be, jointly with the Buyer and each other, entitled to all rights and benefits conferred upon the Buyer pursuant to this Sale Order.

36.     Failure to Specify Provision.  The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA be authorized and approved in its entirety.

37.     <u>Headings</u>.  The headings in this Sale Order are for convenience of reference only and shall not be deemed to modify or limit the provisions of this Sale Order or the APA.

38.     <u>Conflict</u>.  To the extent of any direct conflict between the APA, on the one hand, and this Sale Order, on the other hand, the terms and provisions of this Sale Order shall govern.

39.     <u>Non-Severable</u>.  The provisions of this Sale Order are non-severable and mutually dependent.

40.     <u>Automatic Stay</u>.  To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of Court: (i) to allow the Buyer to give the Debtors any notice provided for in the APA; and (ii) allow the Buyer to take any and all actions permitted by the APA which are necessary to consummate the Sale.

41.     <u>No Stay of Sale Order</u>.  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any entity obtaining a stay pending appeal, the Debtors and the Buyer are free to close the Sale upon the occurrence of all conditions precedent as set forth in the APA.

Signed:  December ___, 2025.

_____
THE HONORABLE JUDGE ALFREDO R. PÉREZ
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Asset Purchase Agreement**

*Execution Version*

# ASSET PURCHASE AGREEMENT

**by and among**

## RAZZOO'S, INC.

**and**

## RAZZOO'S HOLDINGS, INC.

**as Sellers,**

**and**

## THIRTYTHREE97 LLC

**as Buyer**

**December 2, 2025**

# TABLE OF CONTENTS

<b>Page</b>

**ARTICLE I. DEFINITIONS** ................................................................. 2

**ARTICLE II. PURCHASE AND SALE** ....................................................... 15

Section 2.1    Purchase and Sale of Purchased Assets ......................... 15
Section 2.2    Excluded Assets ....................................................... 18
Section 2.3    Assumption of Assumed Liabilities ............................... 19
Section 2.4    Excluded Liabilities .................................................. 20
Section 2.5    Consideration .......................................................... 20
Section 2.6    Assumption and Assignment of Contracts; Excluded Locations ... 21
Section 2.7    Closing .................................................................. 22
Section 2.8    Deliveries at Closing ................................................ 22
Section 2.9    Allocation .............................................................. 24

**ARTICLE III. SELLERS' REPRESENTATIONS AND WARRANTIES** ............ 24

Section 3.1    Organization of Sellers; Good Standing ......................... 25
Section 3.2    Authorization of Transaction ...................................... 25
Section 3.3    Non-contravention .................................................... 25
Section 3.4    Compliance with Laws ............................................... 26
Section 3.5    Title to Purchased Assets .......................................... 26
Section 3.6    Contracts ............................................................... 26
Section 3.7    Intellectual Property ................................................ 27
Section 3.8    Litigation .............................................................. 28
Section 3.9    Employees and Employment Matters .............................. 28
Section 3.10   Employee Benefit Plans ............................................. 29
Section 3.11   Real Property ......................................................... 30
Section 3.12   Permits ................................................................. 30
Section 3.13   Environmental ........................................................ 31
Section 3.14   Taxes ................................................................... 31
Section 3.15   Brokers' Fees ......................................................... 32
Section 3.16   No Other Representations or Warranties ......................... 32

**ARTICLE IV. BUYER'S REPRESENTATIONS AND WARRANTIES** ............ 33

Section 4.1    Organization of Buyer ............................................... 33
Section 4.2    Authorization of Transaction ...................................... 33
Section 4.3    Non-contravention .................................................... 333
Section 4.4    Financial Capacity ................................................... 34
Section 4.5    Adequate Assurances Regarding Executory Contracts ......... 34
Section 4.6    Good Faith Purchaser ............................................... 34
Section 4.7    Brokers' Fees ......................................................... 34

Section 4.8    Condition of Business ............................................................... 34

**ARTICLE V. PRE-CLOSING COVENANTS** ................................................... 35

Section 5.1    Certain Efforts; Cooperation ....................................................... 35
Section 5.2    Notices and Consents ............................................................... 355
Section 5.3    Bankruptcy Actions .................................................................. 37
Section 5.4    Conduct of Business ................................................................. 39
Section 5.5    Certain Restricted Conduct ........................................................ 40
Section 5.6    Notice of Developments ............................................................ 41
Section 5.7    Access .................................................................................... 42
Section 5.8    Press Releases and Public Announcements ................................... 42
Section 5.9    Bulk Transfer Laws .................................................................. 42
Section 5.10   Contracts ................................................................................ 42
Section 5.11   Casualty, Condemnation, Loss of Lease ...................................... 43

**ARTICLE VI. OTHER COVENANTS** .............................................................. 43

Section 6.1    Cooperation ............................................................................. 43
Section 6.2    Further Assurances ................................................................... 44
Section 6.3    Availability of Business Records ................................................ 44
Section 6.4    Employee Matters ..................................................................... 44
Section 6.5    Landlord and Vendor Matters ..................................................... 46
Section 6.6    Recording of Intellectual Property Assignments ........................... 46
Section 6.7    Transfer Taxes ......................................................................... 46
Section 6.8    Wage Reporting ........................................................................ 46
Section 6.9    Collection of Accounts Receivable .............................................. 46
Section 6.10   Use of Name and Marks ............................................................ 47
Section 6.11   Liquor License Approvals .......................................................... 47
Section 6.12   Data Privacy Protection ............................................................ 48
Section 6.13   Transaction Services Agreement ................................................ 49

**ARTICLE VII. CONDITIONS TO CLOSING** ................................................... 49

Section 7.1    Conditions to Buyer's Obligations ............................................... 49
Section 7.2    Conditions to Sellers' Obligations ............................................... 50
Section 7.3    No Frustration of Closing Conditions .......................................... 50

**ARTICLE VIII. TERMINATION** ..................................................................... 51

Section 8.1    Termination of Agreement ......................................................... 51
Section 8.2    Procedure Upon Termination ..................................................... 52
Section 8.3    Effect of Termination ............................................................... 52

**ARTICLE IX. MISCELLANEOUS** ................................................................... 53

Section 9.1    Remedies ................................................................................. 53

Section 9.2       Expenses ................................................................................................. 53
Section 9.3       Entire Agreement ................................................................................... 54
Section 9.4       Incorporation of Schedules, Exhibits and Disclosure Schedule ............ 54
Section 9.5       Amendments and Waivers ...................................................................... 54
Section 9.6       Succession and Assignment ................................................................... 54
Section 9.7       Notices ................................................................................................... 54
Section 9.8       Governing Law; Jurisdiction................................................................. 55
Section 9.9       Severability ............................................................................................ 56
Section 9.10      No Third Party Beneficiaries ................................................................. 56
Section 9.11      No Survival of Representations, Warranties and Agreements ................ 56
Section 9.12      Construction........................................................................................... 56
Section 9.13      Computation of Time ............................................................................. 57
Section 9.14      Mutual Drafting ..................................................................................... 57
Section 9.15      Disclosure Schedule............................................................................... 57
Section 9.16      Headings; Table of Contents .................................................................. 57
Section 9.17      Counterparts; Facsimile and Email Signatures ..................................... 57
Section 9.18      Time of Essence ..................................................................................... 57

## EXHIBITS

Exhibit A        Bill of Sale
Exhibit B        Assignment and Assumption Agreement
Exhibit C        Intellectual Property Assignment – Registered Trademarks
Exhibit D        Intellectual Property Assignment – Domain Names
Exhibit E        IP License Assignment
Exhibit F        Interim Management Agreement

## SCHEDULES

Schedule PL            Permitted Liens
Schedule 2.5(a)(i)     Credit Bid Amount
Schedule 2.5(a)(iii)   Assumed Liabilities Schedule
Schedule 2.6(a)(i)     Contract and Cure Schedule
Schedule 5.4           Conduct of Business
Disclosure Schedules

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as amended or modified, this "Agreement") by and among Razzoo's Holding, Inc., a Texas corporation ("Parent"), and Razzoo's, Inc., a Texas corporation (collectively with Parent, the "Sellers" and each individually, a "Seller") and ThirtyThree97 LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, the "Buyer") is dated effective as of December 2, 2025 (the "Effective Date"). Sellers and Buyer are referred to herein collectively as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in ARTICLE I.

## RECITALS

WHEREAS, Sellers are engaged in the business of owning and operating a chain of restaurants serving Cajun cuisine under the trade name and brand "Razzoo's Cajun Cafe" (collectively, the "Business"); and

WHEREAS, on October 1, 2025, Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11, Title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"); where the Sellers' Chapter 11 Cases are jointly administered under Case No. 25-90522 (ARP); and

WHEREAS, subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein and pursuant to the Bidding Procedures set forth in the *Order (I) Approving (A) Bidding Procedures; (B) Assumption and Assignment Procedures; and (C) Stalking Horse Procedures and Bid Presentations; (II) Scheduling Bid Deadline Auction Date and Sale Hearing Date; (III) Approving Forms of Notice Thereof; and (IV) Granting Related Relief* [Docket No. 130] entered by the Bankruptcy Court on November 4, 2025 (the "Bidding Procedures Order"); and

WHEREAS, pursuant to the Bidding Procedures, Sellers shall conduct an Auction and sale process, as ordered by the Bankruptcy Court in the Bidding Procedures Order, to determine the highest or otherwise best offer for the Business; and

WHEREAS, the Contemplated Transactions (as defined herein) are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court; and

WHEREAS, subject to approval of the Bankruptcy Court, Sellers wish to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Sellers, pursuant to Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities as of the Closing; and

WHEREAS, subject to approval of the Bankruptcy Court, on the Closing Date but effective as of the Effective Time, Buyer will acquire certain assets and assume certain liabilities of the Business of Sellers in accordance with the terms of this Agreement;

1

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

## AGREEMENT

## ARTICLE I.
## DEFINITIONS

"Accounts Receivable" means (a) all accounts, accounts receivable, Credit Card Receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Adequate Assurance Account" shall have the meaning ascribed to it in any Order entered by the Chapter 11 Cases with respect to adequate assurance under Section 366 of the Bankruptcy Code.

"Adverse Consequences" means all Litigation, charges, complaints, demands, injunctions, judgments, Orders, decrees, awards, rulings, damages, penalties, fines, costs, reasonable amounts paid in settlement, Liabilities, obligations, Taxes, Liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person, including those Persons defined and described as an Affiliate or "insider" in Section 101(31) of the Bankruptcy Code.

"Agreement" has the meaning set forth in the first paragraph of this Agreement.

"Allocation" has the meaning set forth in Section 2.9(a).

"Alternate Agreement" means one or more definitive agreements with respect to one or more Alternate Transactions.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers, consistent with the Bidding Procedures Order, (a) accept a Qualified Bid other than that of Buyer, as the highest or best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a Plan or refinancing, all or substantially all of the Purchased Assets or the equity interests of either Seller (or agree to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer.

"Approved Budget" has the meaning set forth in Final DIP Order.

"Assigned Contracts" means each Contract marked as "Included" for assumption by Sellers and assignment to Buyer in accordance with the requirements of Section 2.6(a)(ii).

2

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.8(a)(ii)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Assumed Permits</u>" means all Permits relating to the Business of the Continuing Restaurants that are transferable in accordance with their terms, but excluding all Permits to the extent related to any Excluded Asset (including any Lease that is not an Assigned Contract).

"<u>Auction</u>" means an auction for the sale and assumption of the Purchased Assets and the Assumed Liabilities.

"<u>Avoidance Actions</u>" has the meaning given such term in the definition of "Purchased Actions."

"<u>Back-Up Bid</u>" has the meaning set forth in <u>Section 5.3(d)</u>.

"<u>Back-Up Bidder</u>" has the meaning set forth in <u>Section 5.3(d)</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure.

"<u>Bid Deadline</u>" has the meaning set forth in the Bidding Procedures Order.

"<u>Bid Protections</u>" has the meaning set forth in <u>Section 5.3(a)</u>.

"<u>Bidding Procedures</u>" means the procedures approved pursuant to the Bidding Procedures Order establishing the bidding and auction procedures to be followed by Sellers and all potential bidders in connection with the Debtors' marketing and sale process.

"<u>Bidding Procedures Order</u>" has the meaning set forth in the Recitals.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 2.8(a)(i)</u>.

"<u>Breakup Fee</u>" has the meaning set forth in <u>Section 5.3(a)</u>.

"<u>Business</u>" has the meaning set forth in the Recitals.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banks located in Houston, Texas shall be authorized or required by Law to close.

"<u>Buyer</u>" has the meaning set forth in the first paragraph of this Agreement.

"<u>Cash</u>" means all cash and cash equivalents of Sellers as of the Closing except for cash and cash equivalents held by each Continuing Restaurant to fund its monthly operations.

"<u>Casualty</u>" has the meaning set forth in <u>Section 5.11(b)</u>.

"Casualty Proceeds" has the meaning set forth in Section 5.11(b).

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Claim" or "claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

"Company Restaurants" means all restaurant locations operated by Sellers as of the Petition Date.

"Condemnation" has the meaning set forth in Section 5.11(a).

"Condemnation Proceeds" has the meaning set forth in Section 5.11(a).

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Continuing Restaurant" means any of Sellers' restaurant locations with respect to which the associated Leases for the Leased Real Property are Assigned Contracts.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement, collective bargaining agreement, or other arrangement, understanding, permission or commitment that, in each case, is legally binding.

"Contract and Cure Schedule" has the meaning set forth in Section 2.6(a)(i).

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Credit Bid" has the meaning set forth in Section 2.5(a)(i).

"Credit Card Receivables" means all accounts receivable and other amounts owed to Sellers (whether current or non-current) in connection with any customer purchases from any Continuing Restaurants operated by Sellers that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers, including all Credit Card Receivables generated with respect to sales occurring from and after the Effective Time.

"Cure Costs" means, for only the Assigned Contracts, all amounts that are determined by a Final Order of the Bankruptcy Court must be paid, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assigned Contracts to Buyer as provided herein.

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date with respect to all Continuing Restaurants, including those who are: (a) on a Seller-approved leave of absence on the Closing Date as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any other leave under applicable Law; and (b) expected to return to work in the time permitted for such leave under applicable Law and, for any other leave, in accordance with the terms of such leave but not longer than one hundred twenty (120) calendar days following the Closing Date.

"Customer Programs" means those certain customer gift card programs offered by the Sellers in connection with the Business for the benefit of its restaurants and customers.

"Debtors" means Sellers, as debtors and debtors in possession in the Chapter 11 Cases.

"Deposits" has the meaning set forth in Section 2.1(e).

"DIP Lender" means ThirtyThree 97 LLC, as successor and assign of First Horizon Bank in its capacity as the Senior Secured Lender.

"DIP Term Loans" shall have the same meaning given such term in the Final DIP Order.

"DIP Obligations" means all "DIP Obligations" as defined in the Final DIP Order.

"Disclosure Schedule" has the meaning set forth in ARTICLE III.

"Effective Date" shall have the meaning set forth in the introductory paragraph to this Agreement.

"Effective Time" has the meaning set forth in Section 2.7.

"Employee Benefit Plan" means any "employee benefit plans" (as defined in Section 3(3) of ERISA) and any bonus, stock option, stock purchase, restricted stock, equity based, incentive, deferred compensation, pension plan, retiree medical or life insurance, supplemental retirement, severance, change in control or other benefit plans, programs or arrangements, and all employment, termination, severance, any cafeteria plan or any holiday or vacation plan or practice

or other contracts or agreements (a) to which any Seller or any Seller's ERISA Affiliate is a party, with respect to which any Seller or any Seller's ERISA Affiliate has any obligation to or which are maintained, contributed to or sponsored by any Seller or any Seller's ERISA Affiliate for the benefit of any Current Employee or Former Employee, officer, manager or director of any Seller, or (b) for which any Seller has or could reasonably be expected to have any Liability; provided, that any statutory benefit plan to which any Seller is required to participate in or comply with that is sponsored by a Governmental Authority shall not be an "Employee Benefit Plan".

"Employee Health Plan" has the meaning set forth in Section 3.10(b).

"Employee Liabilities" means each of the following: (a) either Seller's or any of its respective Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any Employee Benefit Plan, including (i) any arrangement that provides severance-type, stay or retention pay or change-in-control payments or benefits (other than with respect to any severance obligations to Transferred Employees due to eligible terminations of employment incurred after the Closing Date) and (ii) any retention, severance or other arrangement established pursuant to section 503(c) of the Bankruptcy Code; (b) any and all Liabilities arising out of, relating to or resulting from any Litigation with respect to any Employee Benefit Plan or any current or former Employee or Service Provider relating to his/her employment or services, or termination of employment or services, with either Seller or any of its Affiliates; (c) any and all Liabilities arising out of, relating to, or resulting from any defined benefit pension plans, defined contribution plans, post-employment health (other than as required by COBRA), welfare or death benefits (and associated Liabilities), or any ERISA Affiliate Liability; (d) any and all Liabilities arising out of, relating to, or resulting from the withdrawal and/or cessation of Transferred Employees or other Employees or Service Providers from participation in any Employee Benefit Plan, including, if applicable, pursuant to Section 4062(e) of ERISA; (e) any and all Liabilities arising out of, relating to, or resulting from the engagement or employment, or termination of the engagement or employment, of any Employees or Service Providers who do not become Transferred Employees (including any Employee who does not accept an offer of employment with the Buyer and any former Employee or Service Provider), or  any applicant with respect to potential employment or engagement with either Seller or any of its Affiliates, in each case whether arising before, on or after the Closing Date; and (f) any and all other Liabilities arising out of, relating to or resulting from any current, former or prospective Employees (whether or not any such Employee becomes a Transferred Employee (including any Employee who does not accept an offer of employment with the Buyer)) with respect to their employment or termination of employment with either Seller or any of its Affiliates, including (i) payments or entitlements that either Seller or any of its Affiliates may owe or have promised to pay to any current, former or prospective Employee, including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commissions, Taxes, or insurance premiums, (ii) any and all Liabilities relating to any employment agreement or Contract, any current, former or negotiated collective bargaining agreement, or the employment practices of either Seller or any of its Affiliates, (iii) any and all Liabilities under the WARN Act relating to actions, inactions or practices of either Seller or any of its Affiliates on or prior to the Closing Date (including, for the avoidance of doubt, any reduction in force programs initiated prior to the Closing Date, even if any employment losses resulting from such reduction in force programs occur on or after the Closing Date), and (iv) any and all Liabilities relating to workers' compensation claims and occupational health claims against

either Seller or any of its Affiliates for accidents or injuries occurring on or prior to the Closing, if any.

"Employee Transfer Date" has the meaning set forth in Section 6.4(a).

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" of any entity means any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Internal Revenue Code or Section 4001 of ERISA.

"ERISA Affiliate Liability" means any actual or contingent Liability of either Seller as a result of such Seller being treated as a single employer under Section 414 of the IRC or Section 4001 of ERISA prior to the Closing Date with respect to any other Person, including all Liabilities (a) under Title IV of ERISA, (b) under Sections 206(g), 302 or 303 of ERISA, (c) under Sections 412, 430, 431, 436 or 4971 of the IRC, (d) as a result of the failure to comply with the continuation of coverage requirements of Section 601 *et seq.* of ERISA and Section 4980B of the IRC, and (e) under corresponding or similar provisions of any foreign Laws.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Cash Amounts" means all amounts held by Sellers (i) on account of any good faith deposit provided by another bidder pursuant to the Bidding Procedures; (ii) in the Professional Fee Account as defined in the Final DIP Order; (iii) in the Adequate Assurance Account; (iv) in the Sales Tax Escrow Account as defined in the Final DIP Order; (v) in any of Sellers' bank accounts, safety deposit boxes, smart safes, lock boxes and other cash management accounts as of the close of Business on the Closing Date other than Petty Cash; and (vi) in a reserve established for issued and outstanding checks.

"Excluded Claims" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of each Debtor and its bankruptcy estate (a) arising under Chapter 5 of the Bankruptcy Code or under any applicable state Law providing for the avoidance and recovery of preferential transfers or fraudulent claims, or both, against any Person or entity (other than those causes of action, lawsuits, claims, rights of recovery and other similar rights of each Debtor that are included in the definitions of "Purchased Actions"), including all claims and causes of action of the Debtors arising under Section 544 to 550 of the Bankruptcy Code, (b) against any current or former officer, member, manager, or director of either of the Debtors or any Affiliate or Subsidiary of any of the Debtors, or (c) to the extent related to any Excluded Asset or Excluded Liability.

"Excluded Contracts" means those Contracts and Leases which are not assumed by Sellers and assigned to Buyer as Assigned Contracts.

"Excluded Employee" has the meaning set forth in Section 6.4(c).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Restaurants" means any of Sellers' restaurant locations that are not Continuing Restaurants.

"Expense Reimbursement" has the meaning set forth in Section 5.3(a).

"Final DIP Order" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 137] entered by the Bankruptcy Court on November 7, 2025.

"Final Order" means an order, an order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction or other similar determination or finding by, before, or under the supervision of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (ii) with respect to which no stay shall have been issued in connection with any notice of appeal or petition for certiorari filed within any deadline provided by applicable Law and any deadline provided by applicable Law to file any such a notice of appeal or petition for certiorari shall have passed without any such a notice of appeal or petition for certiorari having been filed.

"Former Employees" means all individuals who have been employed by Sellers or their Affiliates who are not Current Employees.

"Governmental Authority" means any including the United States federal, state, local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"HCERA" has the meaning set forth in Section 3.10(b).

"Healthcare Reform Laws" has the meaning set forth in Section 3.10(b).

"Health Plans" means all health plans of Sellers including, but not limited to, health, dental, life, disability and long-term care insurance.

"Immigration Laws" has the meaning set forth in Section 3.9(e).

"Independent Accounting Firm" means any nationally recognized accounting firm, as mutually agreed by Buyer and Sellers.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other form of insurance owned or held by or on behalf of Sellers and their operations, properties and assets, or providing insurance coverage to the Business.

"Intellectual Property" means all worldwide intellectual property and rights, title and interests arising from or in respect of the following: (a) industrial design registrations and applications therefore, utility models, patents and patent applications (including provisional applications), including continuations, divisionals, continuations in-part, reexaminations and

reissues, extensions, renewals and any patents that may be issued with respect to the foregoing (collectively, "Patents"); (b) trademarks, service marks, certification marks, collective marks, trade names, business names, slogans, common law trademarks and service marks, acronyms, forms of advertisement, assumed names, d/b/a's, fictitious names, trade dress, logos, designs, devices, signs, symbols, design rights including product design, configuration and packaging rights, internet domain names, icons, symbols or designations, corporate names, and general intangibles of a like nature and other indicia of identity, origin or quality, whether Registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing (collectively, "Trademarks"); (c) published and unpublished works of authorship in any medium, whether copyrightable or not, whether in final form or not, in all media now known or hereafter created, including writings, graphics, artworks, photographs, compositions, sound recordings, motion pictures and audiovisual works, databases and other compilations of information, computer software, mobile and internet applications and content, source code, object code, algorithms, and other similar materials, all packaging, advertising and promotional materials related to the products, and all copyrights and moral rights therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof, in each case, whether Registered or not (collectively, "Copyrights"); (d) trade secrets, Recipes and menus; (e) confidential or proprietary information, inventions and invention disclosures (whether patentable or not and whether or not reduced to practice), improvements, unregistered designs, trade secrets, and know-how, including methods, processes, procedures, business plans, strategy, marketing data, marketing studies, advertisements, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, and compositions, drawings, prototypes, models, discoveries, technology, research and development and customer information and lists (collectively, "Trade Secrets"), and (f)(i) any Contract that contains any grant by either Seller to any third Person of any right to use, publish, perform or exploit any of the Purchased Intellectual Property; and (ii) any Contract (other than a Contract concerning the licensing of commercially available software, including "shrink wrap" and "click wrap" licenses) that contains any grant by any third Person to either Seller of any right to use, modify, copy, publish, perform or exploit any Intellectual Property of such third Person concerning or relating to the Business (collectively, "Intellectual Property Licenses"), together with all rights of action and remedies for past, present and future infringement of any of the foregoing Intellectual Property.

"Intellectual Property Assignments" has the meaning set forth in Section 2.8(a)(iii).

"Inventory" means all of Sellers' consumable food, alcoholic beverages, and other beverages and raw materials and work-in-process therefor and all tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IP Lease Assignments" has the meaning set forth in Section 2.8(a)(iv).

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or Order of any Governmental Authority.

"Leased Real Property" means all leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property used in the Business.

"Leases" means all leases, subleases, unexpired leases, unexpired subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which either Seller holds any Leased Real Property.

"Liability" means all indebtedness, losses, claims, damages, expenses, fines or other penalties, costs, royalties, proceedings, deficiencies, duties, obligations, and other liabilities (including those arising out of any Litigation, such as any settlement or compromise thereof or judgment or award therein) of a Person (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, and whether known or unknown, and whether due or to become due, and whether in contract, tort, strict liability, or otherwise, and whether or not resulting from third-party claims).

"Lien" as applied to any Person means, with respect to any property or asset, any mortgage, deed of trust, lien (statutory or otherwise, including PACA/PASA Claims), encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance Lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Liquor License Approvals" has the meaning set forth in Section 6.11(a).

"Liquor Licenses" has the meaning set forth in Section 3.12(b).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at Law or in equity and whether before any Governmental Authority or arbitrator.

"Management Agreement" or "Interim Management Agreement" means an agreement in the form as shall be reasonably acceptable to Buyer and Sellers, and which provides that all costs of operations of the Purchased Assets from and after the Effective Time shall be paid on a current basis by Buyer and the economic benefit of the operations of the Purchased Assets accrues to Buyer.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects,

developments, conditions, circumstances or occurrences), that has or could reasonably be expected to have a material adverse effect on (a) the condition (financial or otherwise), or results of operations of Sellers, the Business, or the Purchased Assets, in each case taken as a whole, (b) the ability of the Sellers to conduct the Business consistent with recent history, or (c) the ability of Sellers to perform their obligations under this Agreement and the Related Agreements in material compliance with the requirements thereof or to consummate the Contemplated Transactions, but excluding (i) any change or effect to the extent that it results from or arises out of (A) the consequences of the filing of the Chapter 11 Cases and the impact thereof on the condition (financial or otherwise), business, properties, assets, or results of operations of Sellers, the Business or the Purchased Assets, (B) the execution and delivery of this Agreement or the announcement thereof or consummation of the Contemplated Transactions, (C) changes in (or proposals to change) Law, generally accepted accounting principles, or other accounting regulations or principles, or (D) any action contemplated by this Agreement or taken at the request of Buyer; (ii) any change or effect generally applicable to economic or political conditions or the securities or financial markets in any country or region; (iii) any outbreak or escalation of hostilities or war or any act of terrorism; or (iv) any failure by the Business to meet any internal or published projections, forecasts or revenue or earning predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded), in the case of clauses (ii) through (iv), which do not disproportionately affect Sellers relative to other industry participants.

"Material Contracts" has the meaning set forth in Section 3.6.

"M&A Qualified Beneficiary" means an individual (a) who is a Qualified Beneficiary, (b) whose qualifying event occurred prior to or in connection with the sale, *and* (c) who is (or, for a spouse or dependent, whose qualifying event was associated with) an employee whose last employment prior to the qualifying event was associated with the Purchased Assets.

"Multiemployer Plan" has the meaning set forth in Section 3.10(a).

"NCABCC" has the meaning set forth in Section 6.11(a).

"Offeree" has the meaning set forth in Section 6.4(c).

"Order" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of the Business of Sellers consistent with past custom and practice and subject to any modifications of such practice as a result of the filing of the Chapter 11 Cases.

"PACA/PASA Claims" means any valid claims against Sellers under the Perishable Agricultural Commodities Act of 1930 or any similar state statutes of similar effect or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181, *et seq*., timely filed and served pursuant to an Order of the Bankruptcy Court issued in the Chapter 11 Cases.

"Parties" has the meaning set forth in the first paragraph of this Agreement.

11

"Permit" means any approval, authorization, consent, license (including Liquor Licenses), order, permit, waiver, easement, qualification, grant, concession, exception, ruling, waiver, variance, registration, certificate or other form of permission, or similar right issued, granted, given or otherwise obtained from or by any Governmental Authority, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means: (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings, with any such contests and the amounts at issue with respect thereto described on Schedule PL, (b) with respect to leased or licensed personal property, the terms and conditions of the Lease or license applicable thereto to the extent constituting an Assigned Contract, (c) mechanics Liens and similar Liens for labor, materials or supplies provided with respect to Leased Real Property incurred in the Ordinary Course of Business or otherwise approved by the Bankruptcy Court for amounts which are not delinquent or which are being contested in good faith by appropriate proceedings in an aggregate amount not to exceed $50,000, (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted, (e) Liens securing the Senior Secured Prepetition Obligations and the DIP Obligations, and (f) with respect to Leases that constitute Assigned Contracts for each Continuing Restaurant, easements, covenants, conditions, restrictions and other similar matters affecting such real property and other encroachments that do not or would not materially impair the use or occupancy of such real property or materially interfere with the operation of the Business at such real property.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Authority or any group or syndicate of any of the foregoing.

"Petition Date" means October 1, 2025, the date of the filing of the Chapter 11 Cases.

"Petty Cash" has the meaning set forth in Section 5.4(d).

"PII" has the meaning set forth in Section 6.12.

"Plan" means a plan of reorganization or liquidation proposed by Sellers and/or any party in interest.

"PPACA" has the meaning set forth in Section 3.10(b).

"Prepetition Loans" means the loans set forth in the Prepetition Loan Documents.

"Prepetition Loan Documents" has the meaning given such term in the Final DIP Order.

"Purchase Price" has the meaning set forth in Section 2.5.

12

"Purchased Actions" means all causes of action, lawsuits, claims, or rights of recovery of each Debtor and its bankruptcy estate that are not Excluded Claims, including those (a) arising under any Assigned Contract, (b) against any current vendor of the Business for goods or services provided or performed on, prior to, or after the Petition Date with respect to Continuing Restaurants, including those of each Debtor and its bankruptcy estate arising under Chapter 5 of the Bankruptcy Code or under an applicable state Law against any such vendor, or (c) arising under any Customer Program.

"Purchased Assets" has the meaning set forth in Section 2.1; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets.

"Purchased Intellectual Property" means any and all Intellectual Property owned by either Seller or its Affiliates or Subsidiaries, including all rights of action and remedies for past, present and future infringements thereof.

"Qualified Beneficiary" means an individual that loses employer health coverage due to "qualifying events", such as (a) an employee's termination of employment or divorce from a covered employee or (b) whose employment before the sale was associated with the Purchased Assets.

"Qualified Bid" has the meaning set forth in the Bidding Procedures Order.

"Qualified Bidder" has the meaning set forth in the Bidding Procedures Order.

"Rapid Paycard Account" means the bank account maintained by Sellers for the payment of tips due and owing to certain employees of Company Restaurants.

"Recipes" has the meaning set forth in Section 2.1(h).

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Authority or domain name registrar.

"Related Agreements" means the Bills of Sale, the Assignment and Assumption Agreements, the Intellectual Property Assignments, one or more Management Agreements, if any, the Post-Petition Contract Assignment Agreement, any Transition Services Agreement, as determined by Buyer, IRS Forms W-9, and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Hearing" means the hearing scheduled by the Bankruptcy Court in the Bidding Procedures Order to consider the sale of the Debtors' assets to a Winning Bidder.

"Sale Order" means an Order of the Bankruptcy Court in the Chapter 11 Cases approving the sale to Buyer consistent with the terms of this Agreement and otherwise acceptable to Buyer and Sellers.

"Sale Order Deadline" means December 29, 2025.

"Seller" or "Sellers" has the meaning set forth in the first paragraph of this Agreement.

"Seller Transaction Expenses" means the collective amounts payable by Sellers for all out-of-pocket fees and expenses incurred in connection with the preparation, negotiation, execution and consummation of the Contemplated Transactions, other than the Stout Transaction Fee.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge (after good faith inquiry of current employees of Sellers, in each case primarily responsible for the subject matter in question) of Jeff Powell and Philip Parsons.

"Senior Secured Prepetition Obligations" has the meaning given such term in the Final DIP Order.

"Service Provider" means any consultant or independent contractor who is or has been performing services to either Seller.

"Store Depository Accounts" means those bank accounts maintained by the Sellers for and on behalf of each Continuing Restaurant listed on Schedule 2.1(j).

"Stout Transaction Fee" means the amount due and owing to Stout Capital, LLC as a success fee, after deduction of monthly payments previously made to Stout by Sellers under the terms of the engagement letter between Stout Capital, LLC and the Sellers, at Closing; provided, that such amount will not exceed $630,000.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof.  A Person or Persons own a majority ownership interest in a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all direct or indirect Subsidiaries of such Person.

"TABC" has the meaning set forth in Section 6.11(a).

"Tax" or "Taxes" means any United States federal, state or local or non-United States taxes, including income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, liquor, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Proceeding" means any examination, audit, Litigation or other proceeding with respect to Taxes attributable to the Business, the Purchased Assets, or the Assumed Liabilities.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.7.

"Transferred Employee" has the meaning set forth in Section 6.4(c).

"Transition Services Agreement" means an agreement which provides for the performance by Sellers, for the benefit of Buyer and its Permitted Designees, of certain transaction services with respect to the Business following Closing.

"WARN Act" means the Worker Adjustment and Retraining Act (29 USC § 2101 *et seq.*) and any similar Law.

"Winning Bid" has the meaning set forth in the Bidding Procedures Order.

"Winning Bidder" has the meaning set forth in the Bidding Procedures Order.

## ARTICLE II.
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing but effective as of the Effective Time, Buyer shall purchase, acquire and accept from the Sellers, on an "as is, where is" basis (except with respect to the representations and warranties made in ARTICLE III) and without any representation or warranty on the part of Sellers as to fitness, merchantability, or otherwise, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of Sellers' rights, title and interests in and to tangible and intangible real and personal property assets used or held for use by Sellers in the operation of the Business (the "Purchased Assets"), free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), for the consideration specified in Section 2.5. Without limiting the generality of the foregoing, the Purchased Assets shall include, without limitation, the following (except to the extent it is included in the definition of Excluded Assets):

15

(a)    all Cash other than the Excluded Cash Amounts;

(b)    all Accounts Receivable of Sellers for all Continuing Restaurants as of the Closing;

(c)    all Credit Card Receivables for all Continuing Restaurants;

(d)    all Inventory of Sellers as of the Closing for all Continuing Restaurants, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing, but excluding: (i) alcoholic beverage Inventory of Continuing Restaurants located in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals from the pertinent Governmental Authority; provided, however, Sellers shall transfer, assign, convey and deliver to Buyer such alcoholic beverage Inventories in each instance upon issuance of the relevant Liquor License Approvals or other authorization from the relevant Governmental Authority, and (ii) Inventory located at a restaurant that is covered by a Lease that does not constitute an Assigned Contract;

(e)    (i) all deposits under the Leases at each Continuing Restaurant, (ii) all deposits under all Assigned Contracts that are not Leases, and (iii) other prepaid deposits, charges and expenses of Sellers with respect to each Continuing Restaurant, including, but not limited to, all deposits for electricity, telephone, cable television, internet, Wi-Fi services, satellite television and other utilities (collectively, "Deposits");

(f)    to the maximum extent permitted by the Bankruptcy Code, all Assigned Contracts, the rights and benefits accruing thereunder, and all Records related thereto;

(g)    all Intellectual Property, including all Intellectual Property Licenses that are Assigned Contracts;

(h)    all of Sellers' recipes, methods, procedures, cooking/preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages (whether alcoholic or non-alcoholic), or otherwise (in each case, written or oral or in any other form whatsoever) (collectively, "Recipes");

(i)    all open purchase orders with suppliers related to the Continuing Restaurants;

(j)    the Store Depository Accounts and the Rapid Paycard Account;

(k)    all tangible personal property, including all machinery, equipment, tools, point of sale systems, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, cutlery, office supplies, production supplies, pots, pans, kitchen equipment, and other tangible personal property of any kind owned by Sellers (including any of the foregoing property that is subject to a personal property Lease)) located at (i) the Continuing Restaurants, (ii) the Sellers' principal place of Business located at 14131 Midway Road, Suite 750, Addison,

Texas 75001 and (iii) the Sellers' warehouse facility located at 1555 Avenue S, Grand Prairie, Texas 75050;

(l)        all Records, including Records related to Taxes paid or payable by either Seller related to the Continuing Restaurants; *provided* that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Debtors upon reasonable request and at such Debtor's expense;

(m)        all goodwill associated with the Business and the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of either Seller to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(n)        all rights of Sellers under non-disclosure or confidentiality, noninterference, inventions assignment, non-compete, or non-solicitation agreements with Current Employees or Former Employees, directors, consultants, independent contractors and agents of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(o)        all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Continuing Restaurants, including all Liquor Licenses to the extent transferrable and held by Sellers, other than alcoholic beverage permits (including Liquor Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Authority, in which case Sellers shall transfer, assign convey and deliver to Buyer such Permits, in each instance upon issuance of the requisite approvals from the relevant Governmental Authority, it being understood by the Parties that all access codes or other information needed to monitor the progress of the transfer of Liquor Licenses from Sellers to Buyer after the Closing shall be provided to Buyer at Closing;

(p)        the amount of, and all rights to any, insurance proceeds received by any of Sellers after the Effective Date in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities, including the Condemnation Proceeds and the Casualty Proceeds;

(q)        the Purchased Actions;

(r)        all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers, to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(s)        the right to receive and retain mail relating to Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing, in each case relating to the Continuing Restaurants;

(t)        all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names owned by Sellers or otherwise utilized by Sellers in conducting the Business;

(u)     all assets, rights and claims arising from or with respect to Taxes of either Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Authorities with respect to Taxes paid by Sellers, all deferred Tax assets, Tax deposits, Tax prepayments, and estimated Tax payments;

(v)     all rights, interests or claims with respect to or arising under any Customer Program; and

(w)     all other assets that are related to or used in connection with the Business (but excluding all of the Excluded Assets).

**Section 2.2    Excluded Assets**. Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)     the Excluded Cash Amounts;

(b)     all bank accounts of Sellers, safety deposit boxes, lock boxes and other cash management accounts (including cash amounts in any accounts against which outstanding bank drafts have been written, to the extent of the amount of such bank drafts);

(c)     neither Seller's articles of incorporation, bylaws, and other organizational documents, qualifications to conduct the Business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of either Seller as a corporation;

(d)     all equity securities of either Seller and all net operating losses of either Seller;

(e)     all Excluded Contracts;

(f)     the Excluded Claims;

(g)     any loans or notes payable to either Seller or any of its Affiliates from any employee of either Seller or any of its Affiliates (other than Ordinary Course of Business employee advances);

(h)     any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; *provided* that Buyer shall have the right to make copies of any portions of such retained Records referenced in subsection (2) to the extent that such portions relate to the Business or any Purchased Asset;

(i)     all Permits other than the Assumed Permits;

18

(j)      any Employee Benefit Plan or compensation, including all assets maintained or held (including all deposits) pursuant to or in connection with the Health Plans or the 401(k) plan(s) of Sellers, and any other employee benefit plan or program of Sellers, any Affiliate of Sellers or any of their ERISA Affiliates;

(k)      any claim, right or interest to any Tax refund or reimbursement due to Sellers or their Affiliates, except to the extent relating to any Tax period or portion of a Tax period for which Buyer is responsible for the applicable Tax under this Agreement;

(l)      all Insurance Policies (including with respect to directors and officers liability insurance) and all rights, claims and proceeds payable thereunder, except to the extent included in the Purchased Assets, or required to be conveyed to Buyer pursuant to Section 5.11, including rights to discounts, credits and refunds arising from such Insurance Policies;

(m)      all retainers held by Debtors' professionals; and

(n)      the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3      Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assigned Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Section 2.6), the following obligations of Sellers, and no others, shall be assumed by Buyer (the "Assumed Liabilities"):

(a)      All Liabilities arising under the Assigned Contracts that become due and payable from and after Closing (but not arising out of any breach or default thereof prior to the Closing and not with respect to any obligations thereunder that are required to be performed by Sellers on or prior to the Closing);

(b)      all Liabilities arising from or related to the Purchased Assets from and after the Closing as set forth in Schedule 2.5(a)(iii);

(c)      all Cure Costs, if any, payable with respect to the Assigned Contracts;

(d)      all obligations and Liabilities of Sellers under the Customer Program, whether the gift cards issued under such Customer Program were issued or sold prior to or following the Petition Date;

(e)      all property Taxes arising in connection with Continuing Restaurants that are due and owing after the Effective Time;

(f)      any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Assigned Contracts (as contemplated by Section 365 of the Bankruptcy Code); and

(g)      all Taxes owed to any Tax authority assessed with respect to the Purchased Assets for any period ending after the Closing Date, including, without limitation, all Transfer Taxes.

**Section 2.4      Excluded Liabilities**.  Notwithstanding anything herein to the contrary, except for the Assumed Liabilities, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers whatsoever associated with the Purchased Assets, the Business or with respect to any other properties, rights, contracts or other assets of Sellers existing on the Closing Date (collectively, the "Excluded Liabilities"), including but not limited to any of the following Liabilities which, in each case, Sellers shall expressly retain:

(a)      all Taxes owed by Sellers to any Tax authority for any period or portion thereof ending on or prior to the Effective Time (except to the extent such Taxes are expressly provided as Assumed Liabilities pursuant to Section 2.3);

(b)      all Liabilities of Sellers related to the Excluded Assets, whether such Liabilities arise before or after the Effective Time;

(c)      all Liabilities of Sellers owing to any Affiliate or Subsidiary;

(d)      any and all Employee Liabilities; and

(e)      all Liabilities with respect to Seller Transaction Expenses, other than the Stout Transaction Fee.

**Section 2.5      Consideration**.

(a)      In consideration of the sale of the Purchased Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

(i)      the aggregate amount of the Senior Secured Prepetition Obligations and the DIP Obligations, as established by and more fully set forth in the Final DIP Order, the estimated amounts for which are described in Schedule 2.5(a)(i), by means of a credit bid (the "Credit Bid"); *plus*

(ii)      the Cure Costs, if any; *plus*

(iii)      the assumption of the Assumed Liabilities listed on Schedule 2.5(a)(iii); *plus*

(iv)      the amount of the Stout Transaction Fee.

For the avoidance of doubt, the sum of the components of the Purchase Price set forth in this Section 2.5 is projected to equal an approximate amount of $18,801,925.94.

(b)     At the Closing, Buyer shall pay or cause to be paid by wire transfer of immediately available funds to a financial institution designated by Sellers an amount of cash equal to the Stout Transaction Fee.

**Section 2.6**      **Assumption and Assignment of Contracts; Excluded Locations**.

(a)     Assumption and Assignment of Contracts at Closing.

(i)     Schedule 2.6(a)(i) attached hereto sets forth (x) each Contract (including each Lease) to which either Seller is a party or by which either Seller is bound and that is used in or related to the Business or any of the Purchased Assets, (y) Cure Costs, if any, for each such Contract, and (z) a description of each such Contract (such schedule is referred to herein as the "Contract and Cure Schedule").

(ii)     No later than three (3) Business Days prior to the Sale Hearing, Buyer shall have delivered notice to Sellers (including by e-mail notice from Buyer's legal counsel to Sellers' legal counsel), which Sellers shall then file with the Bankruptcy Court, designating each Contract on the Contract and Cure Schedule as "Included" or "Excluded." Subject to Buyer's rights to modify the Contract and Cure Schedule at or before Closing, each Contract so designated as "Included" is referred to herein as an "Assigned Contract" and each Contract so designated as "Rejected" is referred to herein as an Excluded Contract. Notwithstanding the foregoing, Buyer shall have the right (in its sole and absolute discretion) to change any such designation and to notify Sellers in writing of any such change until the Closing in which case such Contract shall become an Assigned Contract or an Excluded Contract as indicated by such changed designation.

(iii)     Sellers shall provide timely and proper written notice of the procedures for the assumption and assignment of Contracts to counterparties to all Contracts in accordance with the Bidding Procedures Order and will take all other actions necessary to cause all Assigned Contracts to be assumed by Sellers (to the extent not already assumed pursuant to a Final Order of the Bankruptcy Court) and assigned to Buyer. Buyer shall, at or prior to Closing, comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign to Buyer the Assigned Contracts.

(iv)     Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract in accordance with the Bidding Procedures Order and shall use commercially reasonable efforts to correctly calculate the proper Cure Costs, if any, for each Assigned Contract.  To the extent that any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Cure Costs related to such Assigned Contract, or any portion thereof, shall be paid by Buyer on such date that the Assigned Contract is assumed by the applicable Seller and assigned to Buyer or on such other date as agreed to between Buyer and the counterparty to such Assigned Contract.

(v)     At Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents requested by Buyer, assign to Buyer (the consideration for which is included in the Purchase Price),

and Buyer shall assume from Sellers (to the extent not already assumed pursuant to a Final Order of the Bankruptcy Court), each of the Assigned Contracts.

(b)     <u>Assigned Contracts</u>.  Unless otherwise agreed by Sellers and Buyer, the Sale Order shall provide that all Excluded Contracts as of the Closing are deemed rejected by the Debtors pursuant to Section 365 of the Bankruptcy Code as of the Closing Date. Upon Closing, or on such other date that the applicable Contract is assumed and assigned to Buyer pursuant to this <u>Section 2.6</u>, such Contract shall constitute an Assigned Contract for all purposes under this Agreement; <u>provided</u>, that no Assigned Contract shall be assigned or transferred pursuant to this Agreement unless the Bankruptcy Court has previously approved the assumption and assignment thereof to Buyer.

(c)     <u>Excluded Locations</u>. As of the Closing, (i) any of Sellers' restaurant locations for which the Leases associated with such Leased Real Property have been designated by Buyer as Assigned Contracts shall be deemed to have been classified as Continuing Restaurants, and (ii) any of Sellers' restaurant locations for which the Leases associated with such Leased Real Property have been classified as Excluded Contracts shall be deemed to have been classified as Excluded Restaurants.

**Section 2.7     <u>Closing</u>**.  The closing of the Contemplated Transactions (the "<u>Closing</u>") shall take place remotely by electronic exchange of counterpart signature pages on the first Business Day on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in <u>ARTICLE VII</u> shall have been satisfied or waived (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) provided that the Closing shall take place on or before the Sale Order Deadline (the "<u>Closing Date</u>"). The Closing shall occur at 11:00 a.m. Central Time on the Closing Date, but shall be deemed to have occurred at 12:01 a.m. (prevailing time at each Continuing Restaurant) on the day following the Closing Date (the "<u>Effective Time</u>").

**Section 2.8     <u>Deliveries at Closing</u>**.

(a)     At the Closing but effective as of the Effective Time, Sellers shall deliver to Buyer and/or its Permitted Designees the following documents and other items, duly executed by Sellers, as applicable:

(i)     one or more Bills of Sale substantially in the form of <u>Exhibit A</u> attached hereto (each, a "<u>Bill of Sale</u>") (if requested by Buyer, Sellers shall execute a separate Bill of Sale with respect to each Continuing Restaurant);

(ii)     one or more Assignment and Assumption Agreements substantially in the form of <u>Exhibit B</u> attached hereto (each, an "<u>Assignment and Assumption Agreement</u>") (if requested by Buyer, Sellers shall execute a separate Assignment and Assumption Agreement with respect to each Continuing Restaurant);

(iii)     instruments of assignment substantially in the forms of <u>Exhibit C</u>, and <u>Exhibit D</u> attached hereto for each Registered Trademark and domain name, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "<u>Intellectual Property Assignments</u>");

22

(iv)     instruments of assignment substantially in the forms of <u>Exhibit E</u> attached hereto for each Intellectual Property License, if any, transferred or assigned hereby (the "<u>IP Lease Assignments</u>");

(v)     instruments of transfer mutually acceptable to the Buyer and Sellers transferring ownership to and access by Buyer for the Store Depository Accounts and the Rapid Paycard Account;

(vi)     a completed and duly executed IRS Form W-9 from each Seller;

(vii)     if deemed necessary by Buyer, the Interim Management Agreement related to Liquor Licenses substantially in the form of <u>Exhibit F</u> attached hereto;

(viii)     a Transition Services Agreement pursuant to <u>Section 6.11</u>;

(ix)     originals (or, to the extent originals are not available, copies) of all Assigned Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to Buyer;

(x)     physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery; and

(xi)     all other documents, instruments and writings reasonably requested by Buyer to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

(b)     At the Closing, Buyer shall deliver to, or for the benefit of, Sellers the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)     Cash held in the Rapid Paycard Account equal to the amount necessary to make distributions to certain Excluded Employees working at the Excluded Restaurants;

(ii)     the Bill(s) of Sale;

(iii)     the Assignment and Assumption Agreement(s);

(iv)     the Intellectual Property Assignments;

(v)     the IP Lease Assignments, if any;

(vi)     the Interim Management Agreement;

(vii)     the Transition Services Agreement pursuant to <u>Section 6.11</u>;

(viii)     the Stout Transaction Fee by wire transfer of immediately available funds to the account(s) designated by Sellers;

(ix)     Cure Costs, if any, by wire transfer of immediately available funds to the accounts designated by the applicable counterparties to the applicable Assigned Contracts;

(x)      if deemed necessary by Buyer, one or more additional Management Agreements; and

(xi)      all other documents, instruments and writings reasonably requested by Sellers to be delivered by Buyer at or prior to the Closing pursuant to this Agreement.

**Section 2.9      Allocation**.

(a)      Within sixty (60) calendar days following the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Purchased Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local Law, as appropriate) (the "Allocation") and deliver a copy of same to Sellers. Sellers shall notify Buyer in writing within fifteen (15) calendar days of receipt of the Allocation of any comments or objections to the Allocation. If Sellers do not deliver any written notice of objection to the Allocation within such fifteen (15) day period, Sellers shall be deemed to have agreed to the Allocation, and the Allocation shall be final, conclusive, and binding on the Parties.  If Sellers timely deliver a written notice of objection, the Parties will negotiate in good faith for a period of twenty (20) calendar days to resolve such dispute.  If Buyer and Sellers are unable to resolve any disputes within such twenty (20) calendar day period, the matters in dispute shall be (at the shared expense of Buyer and Sellers) submitted to the Independent Accounting Firm.  The decision of the Independent Accounting Firm shall be conclusive upon Buyer and Sellers.

(b)      The Parties shall (a) prepare and timely file, and cause their respective Affiliates to prepare and timely file all forms and Tax Returns required to be filed in connection with the Allocation (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation, (b) be bound by the Allocation for the purpose of determining Taxes, (c) prepare and file, and cause their respective Affiliates to prepare and file, all Tax Returns on a basis consistent with the Allocation, and (d) not take any position (whether in audits, Tax Returns or otherwise), or cause their respective Affiliates to take any position, which is inconsistent with the Allocation on any Tax Return or in any Tax Proceeding, unless required to do so by applicable Law; provided, however, that the foregoing shall not limit the ability of Buyer or Sellers to settle or compromise any matter with respect to any Tax related audit or other proceeding with any Governmental Authority; provided, further, that notwithstanding anything in this Section 2.9 to the contrary, the Parties shall be permitted to take a position inconsistent with that set forth in this Section 2.9 if required to do so by a change in Law after the date hereof or by a "determination" within the meaning of Section 1313(a) of the IRC or IRS Form 870-AD, or successor form. If additional amounts are paid pursuant to this Agreement following the finalization of the Allocation pursuant to this Section 2.9, the Parties agree to amend the Allocation in accordance with the methodology set forth in this Section 2.9 and Section 1060 of the IRC.

**ARTICLE III.**
**SELLERS' REPRESENTATIONS AND WARRANTIES**

Each Seller, jointly and severally, represents and warrants to Buyer that except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"):

**Section 3.1    Organization of Sellers; Good Standing**.

(a)    Each Seller is duly formed, validly existing and in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease and operate its properties and to conduct its Business in the manner in which it is currently being conducted. Each Seller has all requisite corporate power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)    Each Seller is duly authorized to conduct their Business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.2    Authorization of Transaction**.  Subject to the Sale Order having been entered and being a Final Order at the time of Closing:

(a)    each Seller has all requisite power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which such Seller is a party have been duly authorized by such Seller and no other action on the part of such Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    this Agreement has been duly and validly executed and delivered by each Seller, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which either Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming this Agreement constitutes a valid and legally binding obligation of Buyer, this Agreement constitutes the valid and legally binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that a Seller is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which either Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against each such Seller, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3    Non-contravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and being a Final Order at the time of Closing, (a) conflict with or result in a breach of the certificate of formation, articles of organization, operating agreement, company agreement, or other organizational documents of either Seller, (b) violate any Law to which either Seller is, or its respective assets or properties are, subject, or (c) subject to the entry of the Sale Order, conflict with, any Assigned Contract, and, in the case of clause (b) or (c),

for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.4    **Compliance with Laws**.  Sellers are, and have been within the three (3) years prior to the Effective Date, in compliance in all material respects with all applicable Laws applicable to the Business or the Purchased Assets. To Sellers' Knowledge, no Seller has received any oral or written notice or other written communication from any Governmental Authority or other Person (a) asserting any violation of, or failure to comply with, any requirement of any Law, or (b) notifying such Seller that it is under governmental investigation with respect to the violation of any applicable Permit.

Section 3.5    **Title to Purchased Assets**.  Sellers, as of the Closing, will have good and valid title to, or, in the case of leased assets, will have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under Section 2.6(d), Sellers will transfer, sell, assign and convey, subject to the Sale Order having been entered and still being a Final Order at such time, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code.

Section 3.6    **Contracts**.  Schedule 3.6(a) of the Disclosure Schedule sets forth the following Contracts (all Contracts listed or required to be listed herein are referred to as "Material Contracts") as of the Effective Date:

(a)    all Leases (including all amendments thereto) that pertain to each Continuing Restaurant;

(b)    all Contracts under which either Seller leases personal property in connection with the Business;

(c)    all Contracts under which the Sellers have paid in excess of $100,000 over the immediately preceding 12-month period;

(d)    all Contracts that are material to the operation of the Business, in the reasonable discretion of Sellers, and that Sellers' counterparties may terminate without more than 90 days' prior notice without a breach thereof by Sellers;

(e)    all Contracts between either Seller, on the one hand, and any Affiliate of such Seller, on the other;

(f)    all Contracts for the sale of any Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(g)    all employment, confidentiality, and/or noncompetition Contracts with Current Employees or Former Employees of either Seller and Contracts with Service Providers (or

similar arrangements for personal services) engaged in connection with the Business that in each case provide for base compensation in excess of $75,000 per year;

(h)     all collective bargaining agreements, if any, related to the Business;

(i)     all Contracts with any material supplier of the Business;

(j)     all Post-petition Contracts (which, for the avoidance of doubt, shall be separately identified on <u>Schedule 3.6(b) of the Disclosure Schedule</u>);

(k)     all Contracts with any Governmental Authority related to the Business; and

(l)     all other Contracts that are material to the operation of the Business at the Continuing Restaurants and not previously disclosed pursuant to this <u>Section 3.6</u>.

Except as set forth on <u>Schedule 3.6(c) of the Disclosure Schedule</u>, each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of the applicable Seller and, to Sellers' Knowledge, of the counterparties thereto, enforceable against each of them in accordance with its terms, and upon consummation of the Contemplated Transaction, shall continue in full force and effect without penalty or other Adverse Consequences. Except as set forth on <u>Schedule 3.6(d) of the Disclosure Schedule</u>, no Seller is in material default under any Material Contract, nor, to Sellers' Knowledge, is any other party to any Material Contract in breach of or default thereunder, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a breach or default by either Seller or any other party thereunder. Except as set forth on <u>Schedule 3.6(e) of the Disclosure Schedule</u>, no party to any of the Material Contracts has exercised any termination rights with respect thereto, and no party has given notice of any significant dispute with respect to any Material Contract. Sellers have and will transfer to Buyer at the Closing, good and valid title to the Assigned Contracts, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities). Except as set forth on <u>Schedule 3.6(f) of the Disclosure Schedule</u>, Sellers have delivered to Buyer true, correct and complete copies of all of the Material Contracts, together with all amendments, modifications or supplements thereto.

**Section 3.7     <u>Intellectual Property</u>**.

(a)     Except for those items of Intellectual Property described in clause (d) of the definition thereof, <u>Schedule 3.7(a) of the Disclosure Schedule</u> sets forth a true and complete list of (i) all material items of Intellectual Property that are owned by either Seller or used in or related to the Business, (ii) all material Contracts pursuant to which either Seller obtains the right to use any Intellectual Property, excluding licenses for off-the-shelf software, and (iii) all material Contracts pursuant to which either Seller grants to any other Person the right to use any Intellectual Property. Except for any Intellectual Property owned by Buyer, Sellers own all such Intellectual Property free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities) and subject to entry of the Sale Order, and all such Intellectual Property is valid, subsisting and, to Sellers' Knowledge, enforceable, and is not subject to any outstanding Order adversely affecting Sellers' use thereof or rights thereto.

(b)     To Sellers' Knowledge and except as set forth on <u>Schedule 3.7(b) of the Disclosure Schedule</u>, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection with the Business, infringes upon or otherwise violates the Intellectual Property of any other Person. To Sellers' Knowledge and except as set forth on <u>Schedule 3.7(c) of the Disclosure Schedule</u>, no third party is infringing any Intellectual Property owned by either Seller and included in the Purchased Assets.

**Section 3.8      Litigation**.   Schedule 3.8 of the Disclosure Schedule sets forth all unresolved material Litigation brought by or against the Business, the Purchased Assets, or either Seller, and, there is no other material Litigation threatened in writing or, to Sellers' Knowledge, orally, before any Governmental Authority against either Seller which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or delay the Contemplated Transactions.

**Section 3.9      Employees and Employment Matters**.

(a)     <u>Schedule 3.9(a) of the Disclosure Schedule</u> sets forth a list as of the Effective Date of Current Employees of Sellers and their respective (i) name, (ii) titles, (iii) dates of hire, (iv) current base salary or wages, and whether they are paid hourly or salary or another basis, (v) aggregate compensation paid during 2024 and targeted for 2025, (vi) accrued vacation and sick leave, (vii) the restaurant location at which such Current Employee performs services, (viii) full or part-time status, and (ix) active or inactive status, including identification of any current paid or unpaid leave of absence.

(b)     Except as set forth on <u>Schedule 3.9(b) of the Disclosure Schedule</u>, no Seller is a party to or bound by any collective bargaining agreement covering the Current Employees (as determined as of the Effective Date), nor is there any ongoing strike, walkout, work stoppage, or other material collective bargaining dispute affecting either Seller with respect to the Business.  To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the Effective Date).

(c)     To Sellers' Knowledge, and except as set forth on <u>Schedule 3.9(c) of the Disclosure Schedule</u>, there are no (and during the three (3) years preceding the date hereof, there have not been any) pending or threatened (i) unfair labor practice complaints against Sellers before the National Labor Relations Board or any other Governmental Authority, (ii) charges with respect to or relating to either Seller's employment practices before the Equal Employment Opportunity Commission, any state fair employment practice agency or any other Governmental Authority, or (iii) employment claims, investigations, or actions, including, without limitation with respect to discrimination, harassment, reasonable accommodations, statutory leave, civil rights, safety and health, workers' compensation, payment of wages, salary, overtime pay or other wage and hour issues with respect to any Current Employees or Former Employees of Sellers. During the past three (3) years, no Seller has received a citation or has been subject to an investigation by the Occupational Safety and Health Administration.

(d)      Except as set forth on <u>Schedule 3.9(d) of the Disclosure Schedule</u>, no WARN Liability exists as of the Effective Date with respect to the Current Employees, and no event was incurred in the preceding three (3) years that could have resulted in WARN Liability.

(e)      To Sellers' Knowledge, during the past three (3) years, Sellers have not been, nor have they received any written notice that either Seller is or has been the subject of, any audit or investigation relating to its violation of the Immigration Reform and Control Act of 1986 and all related Laws promulgated thereunder (the "<u>Immigration Laws</u>"), nor has either Seller been warned in writing, fined or otherwise penalized by reason of any failure to comply with the Immigration Laws, nor is any such Proceeding pending or, to Sellers' Knowledge, threatened. Sellers are in compliance with all Immigration Laws, and each Current Employee is (i) a United States citizen, (ii) a lawful permanent resident of the United States, or (iii) an alien authorized to work in the United States either specifically for Sellers or for any United States employer. Sellers have completed a Form I-9 (Employment Eligibility Verification) for each Current Employee and each such Form I-9 has since been updated as required by applicable Law and is correct and complete as of the Effective Date.

**Section 3.10    <u>Employee Benefit Plans</u>.**

(a)      None of Sellers nor any of their ERISA Affiliates currently or within the past six years has maintained or had an obligation to contribute to or has, within the past six years had or could have any Liability (whether direct or contingent) with respect to (i) a "single employer plan" (as such term is defined in Section 4001(a)(15) of ERISA) or any plan subject to Section 412 of the IRC or Section 302 of Title I of ERISA, (ii) any plan subject to Title IV of ERISA, (iii) a "multiemployer plan" (meaning a plan sponsored by more than one employer within the meaning of ERISA Sections 4063 or 4064 or Section 413(c) of the IRC), (iv) a "multiemployer plan" (as such term is defined in Sections 3(37) or 4001(a)(3) of ERISA) (a "<u>Multiemployer Plan</u>"), (v) a "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA), or (vi) a funded welfare benefit plan (as such term is defined in Section 419 of the IRC).

(b)      Each Employee Benefit Plan and all related trusts have been maintained, funded and administered, in material accordance with the terms of such Employee Benefit Plan and applicable Law; each Employee Benefit Plan that is a group health plan has at all times complied in all material respects, with the requirements of IRC Section 4980H, including the distribution of a "summary of benefits and coverage" to employees and calculations of full-time employees and full-time equivalent employees, and no material "Employer Shared Responsibility" payments described in IRC Section 4980H have been incurred; and there are no facts or circumstances that would be reasonably likely to subject Buyer or its affiliates to any material assessable penalty or material payment under Section 4980H of the IRC with respect to any period prior to the Closing. Sellers and each Employee Benefit Plan that is a "group health plan" as defined in Section 733(a)(1) of ERISA (an "<u>Employee Health Plan</u>") (i) are currently in material compliance with the Patient Protection and Affordable Care Act ("<u>PPACA</u>"), the Health Care and Education Reconciliation Act of 2010 ("<u>HCERA</u>") and all regulations and guidance issued thereunder (collectively, with PPACA and HCERA, the "<u>Healthcare Reform Laws</u>"), (ii) have been in material compliance with applicable Healthcare Reform Laws since March 23, 2010, and (iii) no event has occurred and, to either Sellers' Knowledge, no condition or circumstance exists, that could reasonably be expected to subject Sellers or any Employee Health Plan to penalties or

excise Taxes under Sections 4980D, 4980H, or 4980I of the IRC or any other provision of the Healthcare Reform Laws.

(c)     None of Sellers nor any of their ERISA Affiliates has (i) incurred or reasonably expects to incur, either directly or indirectly, any Liability under ERISA or the IRC or applicable local Law with respect to any Employee Benefit Plan or with respect to any state mandated employee benefit or compensation program, (ii) failed to timely pay contributions or premiums with respect to any Employee Benefit Plan, (iii) within the past six years withdrawn from any Multiemployer Plan or terminated any pension plan that is subject to Title IV of ERISA, (iv) engaged in any transaction which would give rise to Liability under Section 4069 or Section 4212(c) of ERISA, (v) incurred Taxes under Section 4971 of the IRC with respect to any Single Employer Plan, or (vi) participated in a multiple employer welfare arrangement.

(d)     There are no Contracts with any professional employer organization providing employment or benefits to Current Employees for which there is any Liability.

(e)     None of the Sellers nor any of their ERISA Affiliates has any Liability with respect to any employee benefit, policy or program that is subject to the Laws of a foreign jurisdictions.

**Section 3.11     Real Property**.

(a)     Sellers do not own any real property.

(b)     Schedule 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases for such Leased Real Property. Sellers have made available to Buyer true and complete copies of such Leases, as amended through the Effective Date.  Except as set forth on Schedule 3.11(b) of the Disclosure Schedule, the Leased Real Property has no material defects that at any Continuing Restaurant would reasonably be expected to cost Sellers $10,000.00 or more to repair, and is otherwise in good operating condition and repair and is adequate and suitable to conduct the Business of Sellers as currently conducted.

**Section 3.12     Permits**.

(a)     Schedule 3.12(a) of the Disclosure Schedule contains a list of all material Permits that Sellers hold as of the Effective Date in connection with the operation of the Business. Sellers are in compliance with, and during the past three (3) years have complied with, all Permits in all material respects. No Seller has received any written notice or other written communication from any Governmental Authority or other Person or, to Seller's Knowledge, any oral notice (i) asserting any violation of, or failure to comply with, any requirement of any Assumed Permit, (ii) notifying such Seller of the non-renewal, revocation, material modification or withdrawal of any Assumed Permit, or (iii) notifying such Seller that it is under governmental investigation with respect to the violation of any applicable Assumed Permit. As of the Effective Date, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits. To Sellers' Knowledge, all required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed.

(b)        Schedule 3.12(b) of the Disclosure Schedule sets forth a complete and correct list as of the Effective Date of all liquor licenses (including, without limitation, beer and wine licenses) held or used by Sellers, including the Seller in whose name such license is issued, a general description of the restaurant location to which the license relates, and the license number (collectively, the "Liquor Licenses"). To Sellers' Knowledge, except as set forth on Schedule 3.12(b) of the Disclosure Schedule, each Seller is in compliance in all material respects with all applicable state, municipal and other Laws with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the Continuing Restaurants, subject to and in accordance with all applicable provisions of the Liquor Licenses. To Sellers' Knowledge, since December 31, 2022, (i) there has been no material Litigation brought or threatened in writing to be brought by or before a Governmental Authority in respect of any such Liquor License or the activities of either Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License is subject to any due but unpaid Tax obligation owed to a Governmental Authority, the outstanding nature of which would preclude transfer of such Liquor License from either Seller to Buyer, and (iii) no such Liquor License has been threatened by a Governmental Authority to be revoked, limited or not renewed.

Section 3.13    **Environmental**.  Except as set forth on Schedule 3.13 of the Disclosure Schedule, Sellers are and have been in compliance in all material respects with all applicable Laws relating to the protection of the environment, pollution or health and human safety, and Sellers have not received any written notice, demand, claim or request for information alleging that Sellers may be in violation of, liable under or have obligations under any such Laws.

Section 3.14    **Taxes**.

(a)        All Tax Returns required to have been filed by Sellers in connection with the Business, the Purchased Assets and the Assumed Liabilities have been filed timely (taking into account any extension of time to file granted or obtained) and such Tax Returns were true, correct and complete in all material respects.

(b)        All Taxes required to have been paid by Sellers with respect to the Business, the Purchased Assets, and the Assumed Liabilities have been paid, other than Taxes of Sellers the payment of which is prohibited or stayed by the Bankruptcy Code.

(c)        There are no Liens with respect to Taxes on any of the Purchased Assets, other than Permitted Liens and, except as otherwise provided in this Agreement, such Liens that will be released upon entry of the Sale Order, as applicable.

(d)        There are no audits, examinations, investigations, or other proceedings in respect of Taxes or Tax Returns of Sellers with respect to the Business, the Purchased Assets, and the Assumed Liabilities, pending or, to Sellers' Knowledge, threatened.

(e)        All Inventory and similar items included in the Purchased Assets is, immediately prior to the sale to Buyer hereunder, located in North Carolina and Texas.

(f)        The sale of the Purchased Assets to Buyer hereunder continues an "occasional", "isolated", casual" or similar sale of such Purchased Assets for sales, use and similar

Tax purposes in each of the states in which the Purchased Assets are located immediately prior to the sale to Buyer hereunder, with such sale exempt from such Taxes in each such state.

Section 3.15  **Brokers' Fees**.  Except with respect to Stout Capital, LLC, Sellers' investment banker, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated to pay.

Section 3.16  **No Other Representations or Warranties**.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER SELLERS NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE CONTEMPLATED TRANSACTIONS, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF EITHER SELLER OR ANY OF THEIR AFFILIATES).

THE PROVISIONS OF THIS SECTION 3.16 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV.
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows:

**Section 4.1    Organization of Buyer**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Non-contravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements) will (a) conflict with or result in a breach of the certificate of formation or other organizational documents of Buyer, (b) subject to any consents required to be obtained from any Governmental Authority, to the knowledge of Buyer, violate any Law to which Buyer is, or its assets or properties are subject, or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the Contemplated Transactions. Buyer is not required to give any notice to, make any filing with, or obtain any

33

authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transactions, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the Contemplated Transactions.

Section 4.4    **Financial Capacity**.  As of the Closing, Buyer (a) will have the resources (including sufficient funds available to pay the Cure Costs, if any, and any other expenses and payments incurred by Buyer in connection with the Contemplated Transactions) and capabilities (financial or otherwise) to perform its obligations hereunder, and (b) will not have incurred any obligation, commitment, restriction or Liability of any kind, that would materially impair or materially adversely affect such resources and capabilities.

Section 4.5    **Adequate Assurances Regarding Executory Contracts**.  Buyer will use commercially reasonable efforts to assure that, as of the Closing, it will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

Section 4.6    **Good Faith Purchaser**.  Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets. Buyer has negotiated and entered into this Agreement in good faith.

Section 4.7    **Brokers' Fees**.  Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which either Seller could become liable or obligated to pay.

Section 4.8    **Condition of Business**.  Buyer is an informed and sophisticated purchaser, and has engaged or had the opportunity to engage advisors, experienced in the evaluation and purchase of properties and assets such as the Purchased Assets and assumption of Liabilities such as the Assumed Liabilities as contemplated hereunder. Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Buyer acknowledges that Sellers have given Buyer reasonable and open access to the key Current Employees, Records and facilities of the Business. Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in <u>ARTICLE III</u> of this Agreement, Sellers (including each of their Representatives) make no express or implied representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical condition or value of any of the Purchased Assets or the future profitability or future earnings performance of the Business. Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

## ARTICLE V.
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Effective Date and the Closing Date (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Certain Efforts; Cooperation**.

(a)    Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to a Final Order of the Bankruptcy Court, to make effective the Contemplated Transactions (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in ARTICLE VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Chapter 11 Cases.

(b)    On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Purchased Assets, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities) expressly contemplated by the Sale Order; provided, however, that Sellers' obligations hereunder shall only continue until the later of the day that (i) all Liquor Licenses have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (ii) the Chapter 11 Cases are converted, closed or dismissed. Buyer shall at all times take all appropriate actions necessary to permit, and shall refrain from taking any action that would prevent, the Bankruptcy Court to make findings in the Sale Order that (i) Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code, (ii) that the sale of the Purchased Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code, and (iii) Buyer is not a successor to Sellers with respect to the Purchased Assets.

**Section 5.2    Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the later of the day that (A) all Liquor Licenses have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (B) the Chapter 11 Cases are converted, closed or dismissed.

(b)     Sellers and Buyer shall cooperate with one another in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the later of the day that (A) all Liquor Licenses have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (B) the Chapter 11 Cases are converted, closed or dismissed.

(c)     Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Authority in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Subsidiaries and/or Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Authority in connection with the Agreement and the Contemplated Transactions and incorporate the other Party's reasonable comments, (iii) not participate in any substantive meeting or discussion with any Governmental Authority in respect of any filing, investigation, or inquiry concerning this Agreement and the Contemplated Transactions unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to participate in and/or attend such meeting and/or discussion, and (iv) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and/or Affiliates and Representatives, on the one hand, and any Governmental Authority or its respective staff, on the other hand, with respect to this Agreement and the Contemplated Transactions; provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (A) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (B) to remove references concerning financing arrangements, (C) as necessary to comply with contractual arrangements, and (D) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anticompetitive grounds.

Section 5.3 **Bankruptcy Actions**.

(a) <u>Bid Protections</u>. If this Agreement is not accepted by Sellers as the Winning Bid in accordance with the Bidding Procedures, then Buyer shall be entitled to an amount equal to $340,000.00 (the "<u>Breakup Fee</u>"), and Buyer's reasonable, documented out-of-pocket fees, costs and expenses (the "<u>Expense Reimbursement</u>") actually incurred, owed or paid to third parties in an aggregate amount not to exceed $50,000.00 (such amount shall be inclusive of attorneys' fees and expenses, consulting fees and expenses, accounting fees and expenses and Buyer's out-of-pocket expenses) in the preparation of a bid for the Business, the Purchased Assets and the Assumed Liabilities, the negotiations and execution of this Agreement and the other Related Agreements, and efforts related to consummation of the Contemplated Transactions (collectively, the "<u>Bid Protections</u>").

(b) <u>Alternate Transactions</u>. From and after the Effective Date, Sellers and their respective Affiliates and Representatives shall be permitted to market and solicit inquiries, proposals, offers or Qualified Bids from, any Person other than Buyer regarding an Alternate Transaction, and may take any other affirmative action in connection therewith (including (i) entering into any Alternate Agreement (or letter-of-intent with respect thereto), (ii) issuing press releases, placing advertisements or making other releases or disclosures in connection therewith), or (iii) seeking approval of the Bankruptcy Court for any Alternate Transaction), and nothing in this Agreement will, or is intended to, in any way be deemed to restrict such actions or efforts. None of Sellers nor any of their respective Affiliates or Representatives shall have any Liability to Buyer or any of its Affiliates or Representatives, either under or relating to this Agreement or any applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of such an Alternate Agreement (or letter-of-intent with respect thereto) provided that Buyer is paid the Bid Protections to the extent required to be paid pursuant to <u>Section 5.3(a)</u>, <u>Section 8.2(d)</u>, and the Bidding Procedures Order at the time provided for therein.

(c) <u>Auction</u>. The Auction, if necessary, shall take place at the date and time established by the Bidding Procedures Order. At the conclusion of the Auction, and in accordance with the Bidding Procedures, Sellers will determine the Winning Bid submitted by a Qualified Bidder (as defined in the Bidding Procedures) and the next highest or best Qualified Bid (the "<u>Back-Up Bid</u>") submitted by a Qualified Bidder (the "<u>Back-Up Bidder</u>"). Sellers will seek approval of the Winning Bid at the Sale Hearing. If for any reason, Buyer is selected as the Back-Up Bidder, and the Qualified Bidder submitting the Winning Bid fails to timely consummate the purchase of the Purchased Assets, Sellers may seek to consummate a sale to Buyer pursuant to this Agreement without further approval by the Bankruptcy Court. If Buyer is selected as the Back-Up Bidder, its Back-Up Bid and the obligation of Buyer to consummate the Contemplated Transactions shall remain open and in full force until the close of a sale of the Purchased Assets to the Winning Bidder.

(d) <u>Sale Order</u>. Seller shall use commercially reasonable efforts to cause the Sale Order to be entered by the Bankruptcy Court no later than the Sale Order Deadline. The Sale Order shall be in a form acceptable to Buyer in its reasonable discretion and provide, among other things, that:

(i) this Agreement is valid and enforceable;

(ii)     this Agreement and the Contemplated Transactions are approved;

(iii)     the Purchase Price may be paid Buyer by way of the Credit Bid;

(iv)     on the Closing Date, the Purchased Assets shall be sold to Buyer free and clear of any and all Liens (except for Permitted Liens), including any Liens granted during the Chapter 11 Cases, and Liabilities (other than Assumed Liabilities);

(v)     on the Closing Date but effective as of the Effective Time, the Assigned Contracts shall be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and, unless a counterparty to an Assigned Contract has agreed otherwise in writing, the Buyer shall pay the Cure Costs due in connection with the assumption and assignment of the Assigned Contracts;

(vi)     all causes of actions against any counterparty to the Assigned Contracts, related in any way to the Assigned Contracts, shall be forever released and waived by Sellers. Sellers, however, shall be entitled to assert any defenses against any claim asserted by any counterparty to the Assigned Contracts; and

(vii)     all Persons and entities, including, Tax, regulatory and other Governmental Authorities, lenders, trade and other creditors holding interests or claims of any kind or nature whatsoever against Sellers or their assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with or in any way relating to Sellers, the Business, the Purchased Assets, or the operations of Sellers prior to the Closing shall have no claims against Buyer, its Affiliates, or their respective successors or assigns, the Business, or the Purchased Assets, subject to rights of such Persons and entities for claims arising out of Assumed Liabilities.

(e)     <u>Sale Order Findings</u>. The Sale Order shall contain findings by the Bankruptcy Court that (i) Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code, (ii) Buyer is not a successor to Sellers, and (iii) the sale of the Purchased Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code.

(f)     <u>Cooperation</u>. Sellers and Buyer agree to use commercially reasonable efforts to cooperate, assist and consult with each other to obtain the issuance and entry of the Bidding Procedures Order and Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. The Sale Order shall also indicate that the transactions set forth in this Agreement may be consummated immediately upon entry of the Sale Order and pursuant to Bankruptcy Rule 6004(h), the sale of the Purchased Assets is not stayed pending the expiration of fourteen (14) days from the date of entry of the Sale Order. In the event the Sale Order is appealed, Sellers shall use their commercially reasonable efforts to oppose any such appeal.

(g)     <u>Liquor Licenses</u>. Sellers shall seek to have included in the Sale Order a provision that immediately upon the Closing, subject to applicable Law, Buyer shall be entitled to continue to sell alcoholic beverages at the premises included in the Purchased Assets upon the

same terms as Sellers were selling such alcoholic beverages until such time as Buyer has had the time and opportunity to obtain its own Liquor Licenses.

**Section 5.4    Conduct of Business**.  From the Effective Date until the earlier of the termination of this Agreement pursuant to Section 8.1 or the Closing Date, except (a) as disclosed on Schedule 5.4, (b) as may be required by the Bankruptcy Court, (c) for the consequences resulting from the continuation of the Chapter 11 Cases, or (d) as may be required or contemplated by this Agreement, subject to the terms of the Final DIP Order, each Seller shall conduct the Business and maintain the Purchased Assets in the Ordinary Course of Business and use its commercially reasonable efforts to preserve intact the Purchased Assets (and all goodwill relating thereto) and all respective relationships with customers, vendors, creditors, employees, landlords, agents, each Governmental Authority, and others having business relationships with them. Without limiting the generality of the foregoing, during the period from the Effective Date of this Agreement to the Closing, except as otherwise contemplated by this Agreement or as Buyer shall otherwise consent in writing, each Seller shall do the following:

(a)    Subject to necessary approval by the Bankruptcy Court, if applicable, pay all post-petition bills and invoices for post-petition goods or services when due, including rent, CAM, Taxes and other amounts due under the Leases that may become part of the Purchased Assets;

(b)    notify Buyer of any material adverse change (financial or otherwise), in its Business condition, properties, assets or Liabilities, or of the commencement of or any material development or disposition with respect to any material governmental complaints, investigations, or hearings (or any written threats thereof);

(c)    in the Ordinary Course of Business, maintain and repair all of the material equipment on the premises and the premises themselves;

(d)    maintain in the Ordinary Course of Business customary amounts of cash, cash equivalents and similar cash items at the location of each Continuing Restaurant in cash registers, safes, strongboxes and lock boxes ("Petty Cash");

(e)    maintain in the Ordinary Course of Business customary amounts and quality of Inventory;

(f)    comply in all material respects with all Laws applicable to it or having jurisdiction over the Business or any Purchased Asset and, without prior consent of the Buyer, will not incur any event that results in Liability under the WARN Act or any similar Law;

(g)    use its commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits (including Liquor Licenses) necessary or required by Law to own, lease and operate its respective properties (and the Purchased Assets) and to carry on the Business or that are material to the operation of the Business or the Purchased Assets, including by taking all actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date;

(h)     use commercially reasonable efforts to (i) conduct the Business in substantially the same manner as conducted as of the Petition Date and only in the Ordinary Course of Business, (ii) preserve the existing Business organization and management of the Business intact, (iii) keep available the services of the Current Employees, to the extent reasonably feasible, (iv) maintain the existing relations with customers, carriers, centers, distributors, suppliers, creditors, Business partners, Current Employees and others having business dealings with the Business, and (v) refrain from changing in any material respect any of its product or service prices or pricing policies (*e.g.*, discount policies) for any of its products or services; and

(i)     maintain insurance coverage with financially responsible insurance companies duly licensed in the states in which Sellers are then operating, substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers on the Effective Date.

**Section 5.5     Certain Restricted Conduct**.   Except as in the Ordinary Course of Business or as otherwise consented to in advance in writing by Buyer, during the period from the Effective Date to the Closing, no Seller shall, and each Seller shall cause each of its respective Affiliates not to, with respect to the Purchased Assets:

(a)     sell, lease, license, transfer, or dispose of any Purchased Assets;

(b)     directly or indirectly, (i) enter into any Contract, or (ii) assume, amend, modify, supplement or terminate, or waive any rights under, any Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Purchased Assets (including any Assigned Contract) or take any affirmative action not required by the terms of any such Contract;

(c)     dispose of or permit to lapse any rights in, to or for the use of any material Intellectual Property right;

(d)     including maintenance and repair, authorize, undertake, make, or enter into any commitments obligating either Seller to (i) make or accelerate any capital expenditures that cannot reasonably be substantially completed prior to the Closing or (ii) undertake or approve any material renovation, repair or rehabilitation of any Leased Real Property that cannot reasonably be substantially completed prior to the Closing, except pursuant to an Approved Budget as defined in the Final DIP Order;

(e)     (i) increase any compensation or enter into or amend, in a way that increases benefits, any employment, severance or other agreement with any of its officers, directors or Current Employees, (ii) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any existing Employee Benefit Plan, except for changes which are not more favorable to participants than provisions presently in effect, (iii) hire any employee or individual independent contractor with annual compensation in excess of $50,000 (except to the extent such hire is in replacement of a Current Employee with comparable compensation), or enter into any new employment or severance agreements that would result in post-termination payments that in the aggregate would exceed $5,000 becoming due or payable upon termination of employment or of the individual independent contractor, or (iv) assume or enter into any labor or collective

40

bargaining agreement relating to the Business, any Current Employee or future employee, or any Purchased Asset;

       (f)     take any action which, if taken, or omit to take any act which, if omitted to be taken, would constitute or result in an "Event of Default" under the Final DIP Order;

       (g)     permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien, except for Permitted Liens;

       (h)     directly or indirectly, cancel, forgive, settle, or compromise any debt or claim or waive or release any right of Sellers that constitutes a Purchased Asset;

       (i)     do any other act that would, to Sellers' Knowledge, cause any representation or warranty of either Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect;

       (j)     terminate the Health Plans; or

       (k)     authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

No Seller nor any of its Affiliates shall: (i) renew any Leased Real Property for any Continuing Restaurants nor suffer any Person other than such Seller, its employees, agents, servants and invitees to occupy or use the premises or any portion thereof, without in any case the express written consent of Buyer, which consent shall not be unreasonably withheld, or (ii) terminate, amend, extend, renew, modify, waive or allow any rights to lapse under any Leased Real Property for any Continuing Restaurants. If Sellers request such a consent from Buyer, the request shall be in writing specifying the terms of the renewal, termination, amendment, extension, modification and/or waiver, the identity of the proposed third party, assignee or sub-lessee; the duration of said desired sublease or renewal, the date same is to occur, the exact location of the space affected thereby and the proposed rentals on a square foot basis chargeable thereunder. Such request for Buyer consent shall be submitted to Buyer at least five (5) days in advance of the date on which Sellers desire to make such event occur.

       **Section 5.6**    **Notice of Developments**.  From the Effective Date until the Closing Date, each of Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.6 shall not limit or otherwise affect the remedies available to the Party receiving such notice under this Agreement if such Party objects to the disclosures contained in such notice within five (5) calendar days of receipt of such notice.

**Section 5.7      Access**.  Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during customary business hours, and in a manner so as not to interfere unreasonably with the regular business operations of Sellers, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

**Section 5.8      Press Releases and Public Announcements**.  Provided that Sellers shall provide notice to and consult with Buyer in advance, to the extent permitted by Law or by an Order of the Bankruptcy Court, Sellers shall be entitled to disclose, if required by applicable Law or by an Order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Sellers shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication regarding Buyer without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed; provided, however, Sellers, without the prior consent of Buyer, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Authority with competent jurisdiction. Buyer, without the prior consent of Sellers, may issue such press release or make such public statement, filing or disclosure (x) prior to Closing, as may, upon the advice of counsel, be required by applicable Law or any Governmental Authority with competent jurisdiction and (y) after Closing, as it may wish.

**Section 5.9      Bulk Transfer Laws**.  The Parties intend that, pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.10      Contracts**.  If at any time Sellers become aware, on or before the Closing, of any heretofore unrejected Contract to which either Seller is a party that satisfies the conditions of Section 3.6, but has not been included on Schedule 3.6 of the Disclosure Schedule, Sellers shall promptly thereafter advise Buyer of the existence of such Contract and provide Buyer with a copy thereof. Buyer shall have the right, for a period of five (5) Business Days following the delivery of any such Contract, to review such Contract and during such period Sellers shall refrain from modifying, terminating or rejecting such Contract without Buyer's express prior written consent. Buyer shall have the option, exercisable by written notice to Sellers given within such five (5) Business Day period, to request that Sellers assume (if applicable), assign and sell such Contract to Buyer. If Buyer timely exercises such option and subject to compliance with Section 365 of the Bankruptcy Code, Sellers shall use commercially reasonable efforts to assume (if applicable), assign and sell such Contract to Buyer, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Assigned Contracts or the Contracts to be acquired hereunder, as applicable; provided, however, that Buyer shall be responsible for the payment of any Cure Cost in connection with the assumption and assignment

42

of such Assigned Contract (if applicable), except as otherwise provided in <u>Section 2.6</u> and provided such Cure Cost is an Assumed Liability. If Buyer fails or declines to exercise such option, Sellers shall reject such Contract upon five (5) Business Days' notice to Buyer.

        **Section 5.11**   **Casualty, Condemnation, Loss of Lease**.

        (a)     If, prior to Closing, any Leased Real Property and the associated improvements or any part thereof shall be subject to a taking by any Governmental Authority through condemnation, eminent domain or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking) (collectively, the "<u>Condemnation</u>"), Buyer shall have the option, but not the obligation, to take title to the Purchased Assets relating to such affected Leased Real Property and improvements notwithstanding such Condemnation. At the Closing, Buyer shall succeed to (x) the rights of Sellers to the Condemnation proceeds, including insurance proceeds, with respect to a Condemnation (the "<u>Condemnation Proceeds</u>"), and (y) the rights to settle any such Condemnation proceeding, and Buyer shall, at Closing succeed to the rights of Sellers to all required proofs of loss, assignments of claims and similar items. If Buyer elects to take title to such Purchased Assets in accordance with the previous sentence, Sellers, at Closing, shall assign to Buyer all right, title and interest to any claims or proceeds Sellers may have. Sellers shall not settle any such proceedings without the consent of Buyer, which consent shall not to be unreasonably withheld or delayed.

        (b)     If, prior to Closing, any Leased Real Property and the associated improvements or any part thereof shall be destroyed or damaged by fire, earthquake, flood or other casualty (collectively, "<u>Casualty</u>"), Buyer shall have the option, but not the obligation, to take title to the Purchased Assets relating to such affected Leased Real Property and improvements. At the Closing, Buyer shall succeed to (x) the rights of Sellers to the Casualty proceeds, including insurance proceeds, with respect to such Casualty (the "<u>Casualty Proceeds</u>"), including without duplication, giving Buyer a credit against the Purchase Price in the amount of the Casualty Proceeds actually received by Sellers and not applied by Sellers to repair prior to Closing, and (y) the rights to settle after Closing any loss under all Insurance Policies applicable to the Casualty, and Buyer shall, at Closing and thereafter, succeed to the rights of Sellers to all required proofs of loss, assignments of claims and other similar items.  If Buyer elects to accept such Leased Real Property in accordance with the previous sentence, Sellers shall, at Closing, assign same to Buyer. Sellers shall not settle any such claims without the consent of Buyer; such consent not to be unreasonably withheld or delayed.

**ARTICLE VI.**
**OTHER COVENANTS**

        The Parties agree as follows with respect to the period from and after the Closing; <u>provided</u> that Sellers' obligations hereunder shall only continue until the later of the day that (i) all Liquor Licenses have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (ii) the Chapter 11 Cases are converted, closed or dismissed:

        **Section 6.1**   **Cooperation**.  Each of the Parties shall cooperate with the other Parties, and shall use their commercially reasonable efforts to cause their respective Representatives to

43

cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

Section 6.2    **Further Assurances**.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall promptly take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discover any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and promptly execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

Section 6.3    **Availability of Business Records**.  From and after the Closing, Buyer shall promptly provide to Sellers, Parent's equity holders, and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) seven (7) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, or (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain copies of all of Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense.

Section 6.4    **Employee Matters**.

(a)    Sellers shall, effective as of the Closing Date or such other date as mutually agreed upon between Sellers and Buyer (the "Employee Transfer Date"), discharge all Current Employees.

(b)    Following the Effective Date:

(i)    Sellers shall allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the Employees who are

44

members of executive management and other employees reasonably requested during normal business hours.

(ii)     Sellers shall not, nor shall Sellers authorize or direct or give express permission to any Affiliate, officer, director or employee of either Seller or any Affiliate of either Seller to, (A) interfere with Buyer's or its Representatives' rights under Section 6.4(c) to make offers of employment to any Offerees, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment.

(iii)     Sellers shall provide reasonable cooperation and legally permitted information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(c)     During the period from the Effective Date through the Employee Transfer Date (the "Interim Employment Term"), Buyer may, but shall not be obligated to, offer (or cause a designee of Buyer to offer) to employ those Employees desired to be employed by Buyer, in Buyer's sole discretion, to operate the Continuing Restaurants, with employment commencing as of the Employee Transfer Date. For purposes of this Agreement, each Employee who receives such offer of employment shall be collectively referred to as an "Offeree". Prior to the Employee Transfer Date, Buyer will provide Sellers with a schedule setting forth a list of the names of all Offerees. Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee". Each Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee".

(d)     Buyer shall not assume, and Sellers shall retain, any Liability whatsoever relating to any of the Employee Benefit Plans and Health Plans, and except otherwise expressly provided in this Agreement, any compensation to the Current Employees prior to the Closing Date. Notwithstanding anything to the contrary in this Agreement, Buyer shall offer any health and dental insurance coverage as may be required by COBRA to all individuals who are M&A Qualified Beneficiaries so long as the cost for such COBRA coverage is borne by such M&A Qualified Beneficiary electing this COBRA coverage.

(e)     Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary, paid time-off and benefits and any other amounts due under any Employee Benefit Plan or compensation arrangement or as required under applicable Law that are due and payable on or prior to the Closing Date or in connection with the Contemplated Transactions with respect to all Current Employees no later than the date such wages or salary are due under applicable Law, provided that Buyer shall fund the estimated amount of Current Employees' payroll and benefits in the amount set forth in Schedule 2.5(a)(iii). Sellers shall withhold, fund and remit all applicable payroll Taxes as required by Law that are due and payable on or prior to the Closing Date with respect to all Transferred Employees no later than the date such wages or salary are due under applicable Law.

(f)     Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Employee Transfer Date with respect to all Transferred Employees. Buyer shall withhold and remit all applicable payroll Taxes as required

45

by Law after the Closing Date with respect to Transferred Employees. In addition, as part of the wind-down expenses, Sellers shall (or shall cause its designee to) process all employee and Tax reporting covering the periods prior to the Employee Transfer Date in connection with the Excluded Employees and the Transferred Employees that will be required to be prepared and delivered after the Closing.  Nothing herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue any specific Employee Benefit Plan or any other employee benefit plan or to continue the employment of any specific person.

(g)     Nothing in this Agreement shall create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the Parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

(h)     Sellers shall retain all WARN Liability incurred prior to or on the Employee Transfer Date or otherwise in connection with the Contemplated Transactions, including Buyer's failure to hire any Current Employee on or after the Employment Transfer Date.

**Section 6.5     Landlord and Vendor Matters**.  After the Bid Deadline, Buyer and all other Qualified Bidders shall have the right to enter into discussions with (a) the landlords for the Continuing Restaurants in order to obtain needed concessions to make these profitable on a go-forward basis and (b) key vendors providing services with respect to the Assigned Contracts listed on Schedule 2.5(a)(iii).

**Section 6.6     Recording of Intellectual Property Assignments**.  All of the Intellectual Property Assignments shall be recorded and filed by Buyer with the appropriate Governmental Authorities as promptly as practicable following the Closing.

**Section 6.7     Transfer Taxes**.  To the extent not exempt under Section 1146 of the Bankruptcy Code, Buyer shall pay any stamp, documentary, registration, transfer, added-value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the Contemplated Transactions. Each Seller and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence, with the Parties as required by applicable Law to file any such Tax Returns and the other Parties to join therein to the extent required under applicable Law.

**Section 6.8     Wage Reporting**.  For purposes of payroll Taxes with respect to the Transferred Employees, Sellers shall treat the Contemplated Transactions, as a transaction described in Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (*i.e.*, Buyer shall be treated as a successor for payroll Tax purposes); and as such, Sellers and Buyer shall report on a predecessor/successor basis as set forth under the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320.

**Section 6.9     Collection of Accounts Receivable**.

(a)     As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to either Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing

Date, and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Effective Time with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to either Seller or Sellers' order, for Buyer's own account.

(b)      As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by either Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates (but in any event within five (5) Business Days of such receipt), any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)      From and after the Effective Time, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed, good sold or services provided by Buyer after the Closing.

**Section 6.10   Use of Name and Marks**.  Except in connection with the Chapter 11 Cases, neither Sellers nor any of their respective Affiliates or Subsidiaries shall use, license or authorize any third party to use, any name, slogan, logo or Trademark which is similar or deceptively similar to any of the names, Trademarks or service marks included in the Intellectual Property included in the Purchased Assets.

**Section 6.11   Liquor License Approvals**.

(a)      Sellers shall reasonably cooperate in a timely manner with Buyer (and at Buyer's sole cost and expense) in connection with Buyer's filings or any applications or other submittals with any Governmental Authority or third party (including the Texas Alcoholic Beverage Commission (the "TABC") and the North Carolina Alcoholic Beverage Control Commission (the "NCABCC")) with respect to any of the Liquor Licenses and obtaining the necessary consents and approvals pertaining to the transfer and/or issuance of the Liquor Licenses to Buyer to enable Buyer or its Permitted Designee to sell and serve alcoholic beverages at each Continuing Restaurant on and after the Closing Date consistent with their respective current service hours and days of operation as of the Effective Date (the "Liquor License Approvals"), including if deemed necessary by Buyer, by entering into the Interim Management Agreement and, if reasonably requested by Buyer, initiating and/or participating, at Buyer's sole cost and expense, in such legal proceedings reasonably requested by Buyer to obtain such Liquor License Approvals; provided, however, that (i) to the extent that the applicable Governmental Authority, including the TABC and the NCABCC, requires that a new license be purchased, the purchase price for such Liquor Licenses shall be paid by Buyer, without an adjustment to the Purchase Price, (ii) Buyer shall be responsible for all costs and fees charged by any third party, including but not limited to any escrow fee and fees for the processing of any vendor claims submitted to Buyer related to the

Liquor Licenses for periods prior to Closing and this obligation of Buyer shall survive the Closing, and (iii) Buyer shall be responsible for all costs and fees charged by any third party, including but not limited to any escrow fee and fees for the processing of any vendor claims submitted to Buyer related to the Liquor Licenses for periods from and after Closing, to the extent arising from or relating to the Liquor Licenses, after Closing, and these obligations of Buyer shall survive the Closing.

(b)     Prior to Closing, Sellers shall notify Buyer within five (5) Business Days of (i) the receipt from any applicable Governmental Authority, including the TABC and the NCABCC, of any complaint or notification of violation or (ii) any event of suspended operations occurring of any of the Continuing Restaurants, which in the case of either provision (i) or (ii), are related to the Liquor Licenses.

(c)     Sellers and Buyer acknowledge that due to the procedures established by the applicable Governmental Entities for the transfer of Liquor Licenses, Sellers may be operating the Continuing Restaurants for the benefit of Buyer for an undetermined period of time following the approval of the transfer of the Liquor Licenses from Sellers to Buyer by the applicable Governmental Authority (including the TABC and NCABCC) through the Closing.

(d)     In the event that the issuance of new Liquor Licenses to Buyer or the suitable transfer of Sellers' existing Liquor Licenses for each Continuing Restaurant to Buyer cannot be obtained by Buyer from the applicable Governmental Authorities (including the TABC and the NCABCC) prior to Closing for one (1) or more Liquor Licenses (including without limitation, temporary Liquor Licenses until permanent Liquor Licenses are transferred to or obtained by Buyer), to the extent permitted by Law, Buyer and Seller shall enter into one or more Interim Management Agreements, in form and substance substantially similar to Exhibit F to this Agreement, in order to permit Buyer to operate the Business and utilize the Liquor License for each Continuing Restaurant during the period commencing upon the Effective Time and terminating upon the receipt of the applicable Liquor Licenses for each respective Continuing Restaurant as issued to Buyer or its designated Affiliate and/or Subsidiary by the applicable Governmental Entities.

**Section 6.12   Data Privacy Protection**.  Buyer acknowledges that the Purchased Assets include personally identifiable information ("PII") within the meaning of Section 363(b) of the Bankruptcy Code, along with associated personal information about Sellers' customers.  In connection with the same, Buyer agrees to: (a) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (b) abide by all applicable Laws and regulations with respect to PII and (c) take such further actions with respect to PII as may be agreed by the Parties.  Sellers agree to take such action reasonably requested by Buyer, including amending their privacy policies with respect to PII, as may be necessary to transfer the PII to Buyer, including sending a notice to the subjects of the PII and giving each such subject the right to object to the transfer of the PII.  Buyer agrees that it shall, absent a customer's consent received after adequate notice: (i) abide by Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; *provided* that Buyer shall seek to obtain such information from Sellers) and (c) use PII only for the purposes of continuing Business operations

48

and continuing to provide similar goods and services to customers, including marketing the products and services related to the Purchased Assets.  Buyer shall use its reasonable commercial efforts to obtain the consent of a customer for any additional use of PII or other personal information or before making material changes to Sellers' privacy policies that weaken a customer's consumer protection.  Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to Tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

Section 6.13   **Transition Services Agreement**.  As promptly as practicable following the Effective Date and, in any event, prior to the Closing, if determined to be necessary by Buyer in its sole discretion, Buyer and the Sellers shall negotiate in good faith and use their respective commercially reasonable efforts to mutually agree on the form of a Transition Services Agreement to be entered into at closing regarding the provision of services following the Closing by Sellers (and/or their respective Affiliates) in favor of Buyer (and/or its respective Affiliates).

# ARTICLE VII.
# CONDITIONS TO CLOSING

Section 7.1   **Conditions to Buyer's Obligations**.   Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)   as of the Effective Date and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1 through Section 3.3 and Section 3.5 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in ARTICLE III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)   Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.8(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)   no Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)   the Sale Order is in a form and substance satisfactory to Buyer in its reasonable discretion;

(e)      the Sale Order shall have been entered by the Bankruptcy Court, which shall include a waiver of the fourteen (14) day stay set forth in Bankruptcy Rule 6004(h), and shall be a Final Order;

(f)      from the Effective Date until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

(g)      Sellers shall have delivered a certificate from an authorized officer of each Seller to the effect that each of the conditions specified in <u>Section 7.1(a)</u>, <u>Section 7.1(b)</u>, and <u>Section 7.1(f)</u> has been satisfied.

**Section 7.2      Conditions to Sellers' Obligations**.  Subject to <u>Section 7.3</u>, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)      as of the Effective Date and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 4.1</u> through <u>Section 4.3</u> shall be true and correct in all respects, and (ii) each other representation or warranty set forth in <u>ARTICLE IV</u> shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or the transactions contemplated by any Related Agreement; <u>provided</u>, <u>however</u>, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" contained in such representations and warranties shall be disregarded;

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by <u>Section 2.8(b)</u> to be delivered to Sellers (or tendered subject only to Closing);

(c)      no Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Sale Order shall have been entered by the Bankruptcy Court and shall be a Final Order;

(e)      Seller shall have received the Closing Cash Payment; and

(f)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> has been satisfied.

**Section 7.3      No Frustration of Closing Conditions**.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions

set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

# ARTICLE VIII.
# TERMINATION

**Section 8.1     Termination of Agreement**.  This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing:

(a)     by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)     by either Buyer, on the one hand, or Sellers, on the other hand, if the Sale Order has not have been entered on the docket in the Chapter 11 Cases on or before the Sale Order Deadline; <u>provided</u>, <u>however</u>, that (i) neither Buyer nor Sellers may terminate this Agreement under this <u>Section 8.l(b)</u> if such failure is due to the failure of such Party to perform or comply with the covenants hereof to be performed or complied with by it/them prior to the Sale Order Deadline and (ii) the Sale Order Deadline may only be extended with the prior written consent of Buyer in its sole discretion.

(c)     by either Buyer, on the one hand, or Sellers, on the other hand, if there shall be any applicable Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited or if consummation of the Contemplated Transactions would violate any Final Order of any Governmental Authority having competent jurisdiction;

(d)     by Sellers by giving written notice to Buyer at any time prior to Closing in (i) the event Buyer has breached any representation, warranty, agreement, or covenant contained in this Agreement such that any condition set forth in <u>Section 7.2</u> shall become incapable of being satisfied without cure, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in <u>Section 7.2</u> shall become incapable of being satisfied, unless such failure shall be due to the failure of either Seller to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Sellers;

(e)     by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event either Seller has breached any representation, warranty, agreement, or covenant contained in this Agreement such that any condition set forth in <u>Section 7.1</u> shall become incapable of being satisfied without cure, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.1 shall become incapable of being satisfied, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing and such condition is not waived by Buyer; or

(f)    by Buyer if:

(i)    an "Event of Default" is declared by the DIP Lender under the Final DIP Order;

(ii)    by Buyer if for any reason whatsoever Buyer is unable to Credit Bid the Purchase Price pursuant to <u>Section 2.5(c)(i)</u>;

(iii)    if any of the following occurs:

(A)    the Sale Order shall not have been entered by the Bankruptcy Court by the Sale Order Deadline;

(B)    the Bankruptcy Court enters a Final Order for the appointment of a trustee or examiner with expanded powers, other than at the request of Buyer, under Section 1104 of the Bankruptcy Code and such trustee or examiner takes any action to interfere with or impair the Contemplated Transactions;

(C)    the Chapter 11 Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or the Bankruptcy Court enters a Final Order appointing a trustee or an examiner with expanded powers (beyond those set forth under Section 1106(a)(3) of the Bankruptcy Code) in the Chapter 11 Cases prior to the Closing Date;

(D)    either Seller consummates a Plan in the Chapter 11 Cases that does not authorize or approve the Contemplated Transactions;

(E)    either Seller executes an Alternate Agreement or takes affirmative steps to effect an Alternate Transaction; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyer is the Back-Up Bidder; or

(F)    Buyer is not the Winning Bidder at the Auction pursuant to the Bidding Procedures Order; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyer is the Back-Up Bidder.

**Section 8.2   <u>Procedure Upon Termination</u>**.   In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to <u>Section 8.1</u>, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

Section 8.3     **Effect of Termination**.

(a)     Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)     No termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. If the Contemplated Transactions are not consummated (i) this Agreement shall become null and void and of no further force and effect (except that ARTICLE I (*Definitions*), ARTICLE IX (*Miscellaneous*), and this ARTICLE VIII shall survive any such termination), and (ii) if this Agreement is terminated by Buyer pursuant to a termination right set forth in this ARTICLE VIII or by Sellers for any reason other than under Section 8.1(d), Sellers shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further Liability of any kind to Sellers, any of its Affiliates, or any third party on account of this Agreement.

(c)     Nothing herein shall preclude any Party from exercising their respective remedies under Section 9.1.

## ARTICLE IX.
## MISCELLANEOUS

Section 9.1     **Remedies**. Each of Buyer and Sellers recognize that if it breaches or refuses to perform any covenant set forth in this Agreement, monetary damages alone would not be adequate to compensate the other Party for its injuries. Each Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by a Party to enforce such covenants, the other Party against which such Litigation is subject shall waive the defense that there is an adequate remedy at Law. Buyer and each Seller agrees to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. Buyer and each Seller agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

Section 9.2     **Expenses**. Except for the Bid Protections and as otherwise provided in this Agreement or a Related Agreement, each of Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

**Section 9.3**    **Entire Agreement**.    This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof; provided, however, the Confidentiality Agreement shall survive in accordance with its terms.  The recitals set forth above are expressly incorporated herein by reference.

**Section 9.4**    **Incorporation of Schedules, Exhibits and Disclosure Schedule**.  The schedules to this Agreement (the "Schedules"), the Disclosure Schedule, and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedules are incorporated herein by reference and made a part hereof.

**Section 9.5**    **Amendments and Waivers**.   No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.6**    **Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer may elect to have any or all of the Purchased Assets conveyed or transferred to, or any or all of the Assumed Liabilities assumed by, one or more of its Permitted Designees without the consent of any of Sellers; provided, however, Buyer shall remain liable for all of its obligations to Sellers under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a Plan confirmed in the Chapter 11 Cases or pursuant to a FInal Order of the Bankruptcy Court.

**Section 9.7**    **Notices**.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) when sent by email (with written confirmation of transmission), or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller, then to:

>Razzoo's Holdings, Inc.
>14131 Midway Road
>Suite 750
>Addison, Texas 75001
>Attention:  Philip Parsons
>Email: pparsons@razzoos.com

with a copy to (which does not constitute notice):

>Okin Adams Barlett Curry LLP
>1113 Vine Street, Suite 240
>Houston, Texas 77002
>Attention:  Matthew S. Okin and Ryan O'Connor
>Email:  mokin@okinadams.com / roconnor@okinadams.com

If to Buyer, then to:

>ThirtyThree97 LLC
>2455 McIver Lane
>Carrollton, TX 75006
>Attention: Edgar Guevara
>Email: Edgar.Guevara@mcrowd.com

with copies (which shall not constitute notice) to:

>Munsch Hardt Kopf & Harr, P.C.
>500 North Akard Street
>Suite 4000
>Dallas, TX 75201
>Attn: Kevin Lippman and Craig Harris
>Email: klippman@munsch.com / charris@munsch.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.7.

**Section 9.8      Governing Law; Jurisdiction**.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Texas without giving effect to any choice or conflict of Law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Law.  Prior to the closing of the Chapter 11 Cases, the Parties hereto agree that any Litigation seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, any Related Agreement or the Contemplated Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Litigation and irrevocably waives, to the fullest extent permitted by Law,

any objection that it may now or hereafter have to the laying of the venue of any such Litigation in the Bankruptcy Court or that any such Litigation which is brought in the Bankruptcy Court has been brought in an inconvenient forum; *provided* that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the federal courts of the United States of America sitting in Harris County, Texas, shall have exclusive jurisdiction over such Litigation.

**Section 9.9      Severability**.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.10      No Third-Party Beneficiaries**.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.11      No Survival of Representations, Warranties and Agreements**.  None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of any other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, (ii) this ARTICLE IX, and (iii) all defined terms set forth in ARTICLE I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.

**Section 9.12      Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the Effective Date." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or

56

supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.13    Computation of Time**.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.14    Mutual Drafting**.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.15    Disclosure Schedule**.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is reasonably apparent on the face of the disclosure contained in the Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the disclosure of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties and/or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced.

**Section 9.16    Headings; Table of Contents**.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.17    Counterparts; Facsimile and Email Signatures**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile, email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

**Section 9.18    Time of Essence**.  Time is of the essence of this Agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized Representatives as of the Effective Date.

**SELLERS**:

**RAZZOO'S, INC.,**
a Texas corporation

By: _____
Name: Philip Parsons
Title: Chief Executive Officer

**RAZZOO' HOLDINGS, INC.,**
a Texas corporation

By: _____
Name: Philip Parsons
Title: Authorized Representative

**BUYER**:

**THIRTYTHREE97 LLC,**
a Delaware limited liability company

By:  M CROWD RESTAURANT GROUP, LTD.,
     a Texas limited partnership and sole member

    By:  M Crowd Restaurant Group, Inc.
        a Texas corporation and
        its General Partner

    By: _____
    Name:    Edgar Guevara
    Title:     President & CEO

[Signature page to Asset Purchase Agreement]

## EXHIBIT A

## FORM OF BILL OF SALE

This Bill of Sale, dated as of December [•], 2025 (this "Bill of Sale"), is made and entered into by and among Razzoo's Holding, Inc., a Texas corporation ("Parent") and Razzoo's, Inc., a Texas corporation (collectively with Parent, the "Sellers", and each, individually, a "Seller"), and ThirtyThree97 LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement dated as of December 2, 2025 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

## RECITALS

1.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

2.      Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties hereto, intending to be legally bound, hereby agree as follows:

## AGREEMENT

1.      In accordance with the Asset Purchase Agreement, each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities) at each of the respective Continuing Restaurant locations set forth on Schedule 1 hereto.

2.      This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth, and shall be effective as of the date hereof.

3.      No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

4.      This Bill of Sale may not, without the prior written consent of all Parties hereto, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; <u>provided</u> that, notwithstanding the foregoing, Buyer may assign this Bill of Sale to one (1) or more of its Affiliates. Subject to the foregoing, this Bill of Sale shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

5.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the Party(ies) against whom the waiver is to be effective.

6.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      EXCEPT AS AND TO THE EXTENT PROVIDED IN THE ASSET PURCHASE AGREEMENT, SELLERS EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHETHER ORAL OR WRITTEN, AND WHETHER GIVEN OR MADE OR DEEMED TO HAVE BEEN GIVEN OR MADE AT ANY TIME OR TIMES IN THE PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING THE NATURE OR CONDITION OF THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION ANY AND ALL WARRANTIES AS TO THE MERCHANTABILITY OF THE PURCHASED ASSETS OR THE SUITABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR FOR ANY PURPOSE.

8.      Section 9.8 of the Asset Purchase Agreement shall apply to this Bill of Sale *mutatis mutandis*.

9.      This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

<u>**SELLERS**</u>:

**RAZZOO'S HOLDING, INC.,**
a Texas corporation

By: _____
Name:  Philip Parsons
Title:  Authorized Representative

**RAZZOO'S, INC.,**
a Texas corporation

By: _____
Name:  Philip Parsons
Title:  Chief Executive Officer

<u>**BUYER**</u>:

**THIRTYTHREE97 LLC,**
a Delaware limited liability company

By:  M CROWD RESTAURANT GROUP, LTD.,
        a Texas limited partnership and sole member

    By:  M Crowd Restaurant Group, Inc.
          a Texas corporation and
          its General Partner

        By: _____
        Name:  Edgar Guevara
        Title:   President & CEO

## **Schedule 1**

<u>List of Continuing Restaurants</u>

| Restaurant | Status |
|---|---|
| Alliance | Keep Open |
| Arlington | Keep Open |
| Cedar Hill | Keep Open |
| Cityview | Keep Open |
| Concord | Keep Open |
| Harker Heights | Keep Open |
| McKinney | Keep Open |
| Mesquite | Keep Open |
| Round Rock | Keep Open |
| Stafford | Keep Open |
| Sundance | Keep Open |

**EXHIBIT B**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement, dated as of December [•], 2025 (this "Agreement"), is made and entered into by and among Razzoo's Holding, Inc., a Texas corporation ("Parent") and Razzoo's, Inc., a Texas corporation (collectively with Parent, the "Sellers", and each, individually, a "Seller"), and ThirtyThree97 LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement dated as of December 2, 2025 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

**RECITALS**

1.     Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assigned Contracts, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

2.     Pursuant to Section 2.3 of the Asset Purchase Agreement, Buyer has agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties hereto, intending to be legally bound, hereby agree as follows:

**AGREEMENT**

1.     In accordance with the Asset Purchase Agreement, Sellers hereby assign the Assigned Contracts set forth on Schedule 1 to this Agreement and delegate all of the Liabilities arising from and after the Closing under such Assigned Contracts to Buyer, and Buyer hereby accepts assignment and delegation of and assumes such Assigned Contracts and the Assumed Liabilities on the terms as set forth in the Asset Purchase Agreement. Buyer assumes none of the Excluded Liabilities (including, without limitation, with respect to the Excluded Contracts) and the Parties agree that all such Excluded Liabilities remain the responsibility of Sellers.

2.     This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

3.     No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement or

any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

4.      This Agreement may not, without the prior written consent of all Parties hereto, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; provided that, notwithstanding the foregoing, Buyer may assign this Agreement to one (1) or more of its Affiliates. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

5.      None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the Party(ies) against whom the waiver is to be effective.

6.      This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Agreement shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the Asset Purchase Agreement. To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      Section 9.8 of the Asset Purchase Agreement shall apply to this Agreement *mutatis mutandis*.

8.      This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

<u>**SELLERS**</u>:

**RAZZOO'S HOLDING, INC.,**
a Texas corporation


By: _____
Name: Philip Parsons
Title:  Authorized Representative


**RAZZOO'S, INC.,**
a Texas corporation


By: _____
Name:  Philip Parsons
Title:  Chief Executive Officer


<u>**BUYER**</u>:

**THIRTYTHREE97 LLC,**
a Delaware limited liability company

By:  M CROWD RESTAURANT GROUP, LTD.,
       a Texas limited partnership and sole member

       By:  M Crowd Restaurant Group, Inc.
              a Texas corporation and
              its General Partner


              By: _____
              Name:  Edgar Guevara
              Title:   President & CEO

**Schedule 1**

Assigned Contracts

| Real Property Leases | | |
|---|---|---|
| **Contract Counterparty** | **Cure Cost** | **Location** |
| Alto Craig Crossing | $8,271.52 | McKinney[1] |
| ATC Investors, LP | $45,038.32 | Alliance |
| DPEG Fountains, LP | $55,702.80 | Stafford |
| DRP Market Heights Property Owners, LLC | $29,843.50 | Harker Heights |
| InvenTrust | $22,834.26 | Round Rock |
| Jacques L. Le Friant and Mary E. Le Friant Family Trust | $40,834.00 | Arlington |
| Mall at Concord Mills Partnership Ltd. | $4,383.18 | Concord-CAM/Signage |
| Matco Investments | $95,643.89 | Mesquite |
| PREP Hillside Real Estate Company LLC | $89,292.88 | Cedar Hill[2] |
| RPI Bryant Irvan, LTD. | $53,636.65 | Cityview |
| Sundance Square Partners, LP | $64,787.77 | Sundance |
| (a) The William L. Abernathy Testamentary Charitable Lead Trust; (b) The Abernathy Joint Trust dated July 31, 2023; (c) The Gillespie Joint Trust dated September 29, 2022; (d) The Heather Abernathy Revocable Trust dated March 15, 2013; (e) The Keri Gillespie Trust dated October 18, 2025; and (f) Creative Planning Trust Co. | $45,519.07 | Concord-Landlord |
| Equipment Leases | | |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** |
| Leaf Capital Funding LLC | $0.00 | Lease Agreement |
| Loomis Armored US LLC | $0.00 | SafePoint Agreement |
| Mood Media | $0.00 | Service Agreement |
| Oilmatic of the Carolinas | $0.00 | Service Agreement |

[1] Agreed Payment Terms – McKinney: $58,643.89 due at sale; $37,000 payable over eight (8) months.
[2] Agreed Payment Terms – Cedar Hill: Payable in six (6) monthly installments.

| Oilmatic Sytems, LLC | $0.00 | Service Agreement |
| Reliant Distribution Ltd. | $2,222.12 | Bulk Carbon Dioxide Service Agreement |

| **Payroll Processing** | | |
| --- | --- | --- |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** |
| 7Shifts, Inc. | $0.00 | SaaS Agreement |

| **Service Agreements** | | |
| --- | --- | --- |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** |
| AIG | $0.00 | Commercial Business Insurance |
| Amtrust Group | $0.00 | Commercial Business Insurance |
| Argonaut Insurance Company | $0.00 | Commercial Business Insurance |
| At-Bay Specialty | $0.00 | Commercial Business Insurance |
| Axon/Scottsdale | $0.00 | Commercial Business Insurance |
| Blue Cross Blue Shield of Texas | $0.00 | Employee Benefit Insurance |
| CBG Draft Services Inc. | $0.00 | Draft Line Cleaning Contract |
| Cigna Health and Life Company | $0.00 | Cigna Dental Choice and Vision |
| Cisco Systems Capital Corporation | $0.00 | Lease Agreement & Addendum |
| CNA | $0.00 | Commercial Business Insurance |
| Cyxtera | $0.00 | Service Order |
| Everest Insurance | $0.00 | Commercial Business Insurance |
| Guardian | $0.00 | Employee Insurance |
| Hartford | $0.00 | Commercial Business Insurance |
| Lloyd's of London | $0.00 | Commercial Business Insurance |
| Nationwide | $0.00 | Commercial Business Insurance |
| RLI Insurance Company | $0.00 | Surety Bond |
| Toko Marine HCC | $0.00 | Commercial Business Insurance |
| Westfield Specialty | $0.00 | Commercial Business Insurance |
| Wright National Flood Insurance Company | $0.00 | Commercial Business Insurance |

| Supply Agreements | | |
|---|---|---|
| **Contract Counterparty** | **Cure Cost** | **Contract Description** |
| All American Seasoning, Inc. | $0.00 | Contract |
| Reily Foods Company | $0.00 | Letter Agreement – Beverage Equipment & Supplies |
| Sysco Corporation | $1,370,205.40 | Master Services Agreement[3] |
| Texas Utility (TXU) | $0.00 | TXU Energy Contract Service Point Change Request Form |
| License Agreements | | |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** |
| Broadcast Music Inc. (BMI) | $0.00 | BMI Music License |
| Envysion | $4,876.80 | Software License Agreement |

---

[3] Sysco Corporation: Cure Cost subject to further discussion between Buyer and Sysco.

**EXHIBIT C**

**FORM OF TRADEMARK ASSIGNMENT AGREEMENT**

This Trademark Assignment Agreement ("Assignment"), dated as of December [•], 2025, is made and entered into by and among Razzoo's Holding, Inc., a Texas corporation ("Parent") and Razzoo's, Inc., a Texas corporation (collectively with Parent, the "Sellers", and each, individually, a "Seller"), and ThirtyThree97 LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated as of December [•], 2025 (the "Asset Purchase Agreement"), by and among Buyer, Seller and the other Parties thereto.

**RECITALS**

1.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Seller has, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Seller, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Seller in and to the Purchased Assets including, without limitation, Seller's rights and benefits with respect to all Trademarks and Trademark applications owned by Seller, which are set forth on Schedule 1 attached hereto (collectively, the "Marks"), free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

2.      Seller desires to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Seller's right, title and interest in and to the Marks.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties hereto, intending to be legally bound, hereby agree as follows:

**AGREEMENT**

1.      In accordance with the Asset Purchase Agreement, Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Marks listed on Schedule 1, together with the goodwill of the Business symbolized by and associated with the Marks, the right to sue for past, present, and future infringement of, dilution of, or unauthorized use of such Marks and the registrations thereof free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), and hereby instructs, authorizes and directs the United States Patent and Trademark Office, and the corresponding entity or agency in any applicable foreign country, to record Buyer as assignee and owner of the Marks. Seller owns all right, title, and interest in and to the Marks.

2.      This Assignment is being executed by Seller and Buyer and shall be binding upon each of Seller and Buyer, their respective successors and assigns, for the respective uses and

purposes herein set forth and referred to, and shall be effective as of the date hereof. This Assignment is not confidential and may be publicly disclosed and filed.

3.     No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Seller and Buyer, their respective successors and permitted assigns.

4.     This Assignment may not, without the prior written consent of all Parties hereto, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; underlined provided that, notwithstanding the foregoing, Buyer may assign this Assignment to one (1) or more of its Affiliates. Subject to the foregoing, this Assignment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

5.     None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Seller and Buyer, or in the case of a waiver, by the Party(ies) against whom the waiver is to be effective.

6.     This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.     Section 9.8 of the Asset Purchase Agreement shall apply to this Assignment *mutatis mutandis*.

8.     This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLER**:

**RAZZOO'S HOLDING, INC.,**
a Texas corporation

By: _____
Name:  Philip Parsons
Title:  Authorized Representative

**RAZZOO'S, INC.,**
a Texas corporation

By: _____
Name:  Philip Parsons
Title:  Chief Executive Officer

**BUYER**:

**THIRTYTHREE97 LLC,**
a Delaware limited liability company

By:  M CROWD RESTAURANT GROUP, LTD.,
    a Texas limited partnership and sole member

    By:  M Crowd Restaurant Group, Inc.
       a Texas corporation and
       its General Partner

       By: _____
       Name:  Edgar Guevara
       Title:   President & CEO

## **Schedule 1**

List of Marks

| Mark | App. No. | Reg. No. |
|------|----------|----------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**EXHIBIT D**

**FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT**

This Domain Name Assignment Agreement ("Assignment"), dated as of December [•], 2025, is made and entered into by and among Razzoo's Holding, Inc., a Texas corporation ("Parent") and Razzoo's, Inc., a Texas corporation (collectively with Parent, the "Sellers", and each, individually, a "Seller"), and ThirtyThree97 LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated as of December 2, 2025 (the "Asset Purchase Agreement"), by and among Buyer, Seller and the other Parties thereto.

**RECITALS**

1.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Seller has, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Seller, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Seller in and to the Purchased Assets including, without limitation, Seller's rights and benefits with respect to all domain names (including all sub-domain names and extensions thereof and thereto) owned by Seller, which are set forth on Schedule 1 attached hereto (collectively, the "Domain Names"), free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

2.      Seller desires to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Seller's right, title and interest in and to the Domain Names.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties hereto, intending to be legally bound, hereby agree as follows:

**AGREEMENT**

1.      In accordance with the Asset Purchase Agreement, Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Domain Names free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), and hereby instructs, authorizes and directs any and all registrars thereof to transfer the Domain Names to Buyer. Seller shall provide all information necessary to permit full access to, control of, and use of the Domain Names by the Buyer, including all usernames, passwords, and access or administrative information or codes related to each of the Domain Names. For each Domain Name, Seller shall also provide Buyer with the renewal deadline. Seller is the registrant for each Domain Name.

2.      This Assignment is being executed by Seller and Buyer and shall be binding upon each of Seller and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

3.      No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Seller and Buyer, their respective successors and permitted assigns.

4.      This Assignment may not, without the prior written consent of all Parties hereto, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; provided that, notwithstanding the foregoing, Buyer may assign this Assignment to one (1) or more of its Affiliates. Subject to the foregoing, this Assignment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

5.      None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Seller and Buyer, or in the case of a waiver, by the Party(ies) against whom the waiver is to be effective.

6.      This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      Section 9.8 of the Asset Purchase Agreement shall apply to this Assignment *mutatis mutandis*.

8.      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLER**:

**RAZZOO'S HOLDING, INC.,**
a Texas corporation

By: _____
Name:  Philip Parsons
Title:  Authorized Representative

**RAZZOO'S, INC.,**
a Texas corporation

By: _____
Name:  Philip Parsons
Title:  Chief Executive Officer

**BUYER**:

**THIRTYTHREE97 LLC,**
a Delaware limited liability company

By:  M CROWD RESTAURANT GROUP, LTD.,
     a Texas limited partnership and sole member

     By:  M Crowd Restaurant Group, Inc.
          a Texas corporation and
          its General Partner

          By: _____
          Name:  Edgar Guevara
          Title:   President & CEO

## **Schedule 1**

### Domain Names

**EXHIBIT E**

**FORM OF IP LICENSE ASSIGNMENT AGREEMENT**

This IP License Assignment Agreement ("Assignment"), dated as of December [•], 2025, is made and entered into by and among Razzoo's Holding, Inc., a Texas corporation ("Parent") and Razzoo's, Inc., a Texas corporation (collectively with Parent, the "Sellers", and each, individually, a "Seller"), and ThirtyThree97 LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated as of December 2, 2025 (the "Asset Purchase Agreement"), by and among Buyer, Seller and the other Parties thereto.

**RECITALS**

1.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Seller has, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Seller, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Seller in and to the Purchased Assets including, without limitation, Seller's rights and benefits with respect to all licenses to which each Seller is a party and convey rights to use (a) any software (other than off-the-shelf software), (b) inventions, trade secrets, copyrightable works of authorship, or other intellectual property created in whole or part by any employee of Sellers (as transferred to a Seller), and (c) any other intellectual property licensed to Sellers, all of which are set forth on Schedule 1 attached hereto (collectively, the "IP Licenses"), free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

2.      Seller desires to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Seller's right, title and interest in and to the Domain Names.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties hereto, intending to be legally bound, hereby agree as follows:

**AGREEMENT**

1.      In accordance with the Asset Purchase Agreement, Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the IP Licenses free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), and hereby instructs, authorizes and directs any and all registrars thereof to transfer the IP Licenses to Buyer. Seller shall provide all information necessary to permit full access to, control of, and use of the IP Licenses by the Buyer.

2.      This Assignment is being executed by Seller and Buyer and shall be binding upon each of Seller and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

3.      No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Seller and Buyer, their respective successors and permitted assigns.

4.      This Assignment may not, without the prior written consent of all Parties hereto, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; <u>provided</u> that, notwithstanding the foregoing, Buyer may assign this Assignment to one (1) or more of its Affiliates. Subject to the foregoing, this Assignment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

5.      None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Seller and Buyer, or in the case of a waiver, by the Party(ies) against whom the waiver is to be effective.

6.      This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      Section 9.8 of the Asset Purchase Agreement shall apply to this Assignment *mutatis mutandis*.

8.      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLER**:

**RAZZOO'S HOLDING, INC.,**
a Texas corporation

By: _____
Name:  Philip Parsons
Title:    Authorized Representative

**RAZZOO'S, INC.,**
a Texas corporation

By: _____
Name:  Philip Parsons
Title:    Chief Executive Officer

**BUYER**:

**THIRTYTHREE97 LLC,**
a Delaware limited liability company

By:  **M** CROWD RESTAURANT GROUP, LTD.,
      a Texas limited partnership and sole member

     By:  M Crowd Restaurant Group, Inc.
        a Texas corporation and
        its General Partner

       By: _____
       Name:  Edgar Guevara
       Title:    President & CEO

**<u>Schedule 1</u>**

<u>IP Licenses</u>

**EXHIBIT F**

**FORM OF INTERIM MANAGEMENT AGREEMENT**

This Master Interim Management Agreement (this "Agreement"), dated as of December [•], 2025 is entered into by and between ThirtyThree97 LLC, a Delaware limited liability company ("Owner") and Razzoo's, Inc., a Texas corporation, ("Permittee"), effective as of the Closing Date of the transactions contemplated by the Asset Purchase Agreement (as defined below) (the "Effective Date").

**WHEREAS,** pursuant to that certain Asset Purchase Agreement, dated as of December [•], 2025, by Permittee as Seller, Owner acquired certain assets of Permittee; a true and correct copy of the Asset Purchase Agreement without Schedules or Exhibits is attached to this Agreement as Exhibit A (the "Asset Purchase Agreement"). The Asset Purchase Agreement and this Agreement were approved by Order of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, that was entered in the chapter 11 cases of the Permittee and certain of its Affiliates on or about December [•], 2025 (the "Sale Order") that authorized, among other things, Permittee to sell to Owner substantially all the assets at each restaurant listed on Schedule 1 of this Agreement (with each restaurant on Schedule 1 a "Restaurant" and collectively the "Restaurants"). Capitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed to them in the Asset Purchase Agreement.

**WHEREAS,** the Restaurant is a casual-dining restaurant and includes the (i) on premise sale and consumption of alcoholic beverages under the respective Liquor Licenses held or used by Permittee (each a "Liquor License" and collectively the "Liquor Licenses") and (ii) sale of food under the respective permits held or used by Permittee (each a "Permit" and collectively the "Permits") at each Restaurant listed on Schedule 1 of this Agreement.

**WHEREAS,** Owner and Permittee desire the operation of each of the Restaurant to continue without interruption until Owner obtains from the relevant state and/or local government regulatory authorities the Liquor Licenses and/or Permits, as applicable, at the Restaurant in its name either through transfer or initial application.

**NOW, THEREFORE,** for and in consideration of the sum of Ten Dollars ($10.00) paid in hand, and other good and valuable consideration as provided herein and in the Asset Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      The "Term" shall commence on the Closing Date and shall terminate for each Restaurant upon the earliest of: (a) issuance from the pertinent state and/or local regulatory authority(ies) of each Liquor License and Permit for said Restaurant to Owner, (b) two (2) Business Days after the date that Permittee receives written notice of termination from Owner, or (c) one year from the Effective Date (unless this Agreement is otherwise terminated prior to the earliest of such dates pursuant to the terms hereof or by mutual agreement of the Parties).

2.      During the Term, Permittee shall remain the licensed retail vendor of alcoholic beverages and/or food for the Restaurants, as applicable, and in such capacity shall manage, control, and operate the Restaurants solely to the extent required for each Liquor License and/or Permit, as applicable, to remain effective. Permittee hereby appoints Owner as its agent to assist

with operation of the Restaurants. Pursuant to its appointment as Permittee's agent and subject to the following sentence, Owner shall be entitled to take any and all action on behalf of Permittee hereunder, including, but not limited to, opening of any bank accounts, executing new signature cards with respect to existing Permittee accounts associated with the Liquor Licenses and Permits, collecting and retaining all revenues generated by the Restaurants during the Term (the "Revenues"), and taking all such other actions as may be necessary or appropriate to effect the foregoing, and shall be solely responsible for and obligated to pay all costs, expenses, liabilities, and obligations, including reasonable compensation for performing the services required of Permittee pursuant to this Agreement and in accordance with the Asset Purchase Agreement and the insurance obligations of Permittee set forth in Section 6 below (individually a "Liability" and collectively the "Liabilities") arising out of, related to, or associated with the Restaurants during the Term. At the election of the Owner, the Revenues from the sale of alcoholic beverages at each Restaurant, less the costs, expenses, liabilities and obligations set forth in the preceding sentence, shall be deposited into an escrow account on terms reasonably acceptable to Permittee and Owner, which escrow account shall provide that such net Revenues (if any) shall be released at the expiration of the Term for such Restaurant to (i) Owner if Owner has received a Liquor License for such Restaurant, or (ii) Permittee in all other circumstances. Notwithstanding anything contained herein to the contrary, all employees necessary for the operation of the Restaurants shall be provided by the Owner, and Permittee shall have no duty or authority to take action as an employer with respect to any such employee or to enter into any contract on behalf of the Owner, without the Owner's prior written consent; provided, however, Owner shall make available to Permittee (for purposes of carrying out this Agreement) the services of certain former officers or employees of Permittee, to the extent they are hired and in the employ of Owner (in particular, those officers whose names are included on the Liquor Licenses and/or Permits). To the extent possible, Permittee shall grant access to its Texas Alcohol Industry Management System ("AIMS") account on or prior to the Effective Date and shall make available to Owner the services of certain current and former officers, managers, directors, or employees of Manager (in particular those current and former officers, employees, managers, directors or employees whose names are included on the Liquor Licenses and/or Permits) for purposes of carrying out the terms of this Agreement and effecting the issuance of the Liquor License and Permits to Owner as contemplated by this Agreement and the Asset Purchase Agreement.

       3.      For valuable consideration received, and in order to induce Permittee to enter into this Agreement, Owner and Permittee covenant and agree as follows, which covenants and agreements shall survive the termination of this Agreement:

       a.      Permittee shall have no duties or responsibilities under this Agreement other than those expressly specified herein and no implied obligations shall be read into this Agreement;

       b.      Neither Permittee nor any of its affiliates, employees, officers, directors, managers, members, Representatives, agents, attorneys, direct or indirect equity holders, successors, predecessors or assigns (collectively, "Permittee Indemnitees"), will be liable to Owner for, and Owner releases and forever discharges Permittee and Permittee Indemnitees from, any and all claims, Liabilities, actions, suits, judgments, losses, injuries, damages, costs and expenses arising out of or connected with any act or omission of Permittee Indemnitees and assigns

pursuant to this Agreement or with respect to the performance of Permittee's obligations under this Agreement;

        c.     Owner agrees to indemnify, defend and hold harmless and discharges Permittee and Permittee Indemnitees from and against any and all claims, actions, demands, judgments, losses, costs, expenses, damages and Liabilities (including, without limitation, attorneys' fees and other expenses of Litigation) arising out of or resulting from the arrangement entered into by Permittee pursuant to Section 2 hereof and any sales of alcoholic beverages and/or food thereunder.

        d.     During the Term, except as provided below, all purchases and services rendered with respect to the operation of the Restaurants shall be in the name of Owner, including, without limitation, all utility service and all accounts for the purchase of inventory. The foregoing notwithstanding, purchases of alcoholic beverage inventory for the Restaurants shall be made by Owner and in the name of Permittee as provided below, such purchases to be paid from the Revenues (or Owner to the extent that the Revenues are insufficient to pay for such purchases); and

        e.     Nothing in this Agreement or the Asset Purchase Agreement shall be deemed to be a transfer of any Liquor Licenses or Permits unless and until such transfer is duly approved by all applicable governmental entities having applicable licensing authority and each Liquor License and Permit is issued in the name of Owner or its designee. Notwithstanding the foregoing, Owner agrees to: (i) pay for all applicable license fees and/or license renewal fees which become owed to the licensing authorities as of and after the Effective Date in connection with the maintenance of each Liquor License and Permit; and (ii) provide all funds necessary to maintain each Liquor License and Permit in full force and effect (including the providing of letters of credit and/or bonds as required by the various governmental entities). If prior to the issuance or transfer of all Liquor Licenses and Permits, one or more of the Liquor Licenses or Permits are required to be renewed or otherwise require action by the licensee or permittee of record to fulfill any administrative or legal responsibility associated with said Liquor License(s) or Permit(s), Permittee agrees to cooperate in good faith with and facilitate the filing of state and/or local license renewal applications of any such Liquor License or Permit so as to secure the continued ability to sell and serve alcoholic beverages and food at the Restaurants to the extent allowed by applicable law; provided, however, that Owner shall pay any license fees and expenses required to be paid as part of such renewals or actions (including the providing of letters of credit and/or bonds as required by the various governmental entities).

        f.     Permittee agrees to indemnify all Current Employees and Former Employees for any and all claims, Liabilities, actions, suits, judgment, losses, injuries, damages, costs and expenses arising out of or connected with any act or omission of Permittee or Permittee Indemnitees pursuant to this Agreement or with respect to the performance of Permittee's obligations under this Agreement.

        4.     Permittee agrees that all equipment, facilities, and personal property necessary for operating the Restaurants shall be maintained by Owner and shall be insured during the term of this Agreement for the benefit of Owner in accordance with this Agreement and the Asset Purchase

Agreement (all such costs with respect to such insurance (including any premiums) to be paid for by Owner). Owner agrees that Permittee shall be named as an additional loss payee under such insurance policies maintained by Owner for so long as the Liquor Licenses and Permits are held or used by Permittee of Owner as provided for in this Agreement.

5.      Permittee shall, at the sole cost and expense of Owner, use commercially reasonable efforts to maintain and/or keep all Liquor Licenses and Permits valid. Without limiting any other term of this Agreement, Revenues will be used to pay for all alcoholic beverages sold and served at the Restaurants, as well as for Owner's costs and expenses in operating the Restaurants pursuant to this Agreement; provided, however, if such Revenues are not sufficient to pay for such costs, expenses, Liabilities, and obligations with respect to the alcoholic beverages sold and served at the Restaurants, Owner shall pay the difference. All alcoholic beverages purchases shall be made in customary fashion, and, to the extent required, Owner shall maintain a bank account in the name of Permittee, as applicable, which shall be funded by Owner for the purpose of making any such purchases.

6.      During the full Term hereof and for two (2) years after termination of this Agreement, Owner shall keep in full force and effect: (a) commercial general liability insurance with limits of at least $[●] per occurrence for personal injury and death and property damage, which shall, among other risks, include liquor liability coverage against all claims arising out of alleged liquor law or dram shop liability, and such commercial general liability policy shall name Permittee as additional insured for so long as the Liquor Licenses and Permits are held or used by Permittee on behalf of Owner as provided for in this Agreement; and (b) worker's compensation insurance as required by law. During the full Term hereof, Permittee shall: (i) use commercially reasonable efforts to keep each Liquor License and Permit in full force and effect; and (ii) to the extent that Permittee's obligations under this Agreement are insurable, maintain commercial general liability insurance for the benefit of Owner insuring Permittee's obligations under this Agreement, in accordance with Permittee's standard corporate insurance policies, processes and procedures (all such costs with respect to such insurance (including any premiums) to be paid for by Owner).  Further, Permittee shall indemnify Owner for all damages arising under this Agreement.

7.      In the event that either party violates: (a) any provision of this Agreement other than those related to Legal Requirements (as defined below) and maintenance of the insurance coverages required pursuant to Section 6 above) and such violation remains uncured for five (5) Business Days after notice thereof to the violating party or (b) any Legal Requirement (i) after issuance of a final decision is either not appealed or is upheld on appeal, or (ii) upon the issuance of a second citation alleging a violation of any Legal Requirement prior to a finding as per (i) hereof, where there is a finding of the applicable authority adverse to Owner or Permittee, the non-violating party shall have the right to terminate this Agreement immediately after five (5) Business Days' written notice to the violating party; provided, however, that if a violation above can be cured by payment of a fine or otherwise, the non-violating party may not terminate this Agreement if the violating party cures such violation within the earlier to occur of (i) the time required by law or set forth in the citation, or (ii) ten (10) Business Days after such decision is upheld on appeal, or if no appeal is filed, the last day permitted for filing an appeal. Upon or as a condition of the issuance or transfer to Owner of the required Liquor License or Permits for a Restaurant, Permittee

shall (i) deliver promptly the original Liquor Licenses or Permits, as the case may be, for such Restaurant to Owner or to the pertinent governmental entity, (ii) if requested by Owner, notify the pertinent governmental entity that it is surrendering the original Liquor License(s) or Permit(s), as the case may be, and desires that they be canceled, and/or (iii) take such other action with respect to the pertinent governmental entity as it may desire to effect and confirm the cancellation of the original Liquor License(s) or Permit(s), as the case may be, and as if it had actually surrendered the original Liquor License(s) or Permit(s). Upon issuance of Owner's Liquor License or Permit for a Continuing Restaurant, the parties shall arrange for and agree to have a complete inventory taken of all alcoholic beverages located at the Restaurant on the date that this Agreement terminates (the "Transfer Date Inventory"). The Transfer Date Inventory shall be sworn to, as required by law, on the requisite TABC forms and a copy thereof filed with the TABC. "Legal Requirements" shall mean and include all laws applicable to maintaining each relevant Liquor License and obtaining its respective Liquor License approval.

8.      Time is of the essence in this Agreement. Owner agrees to work diligently to secure the Liquor License approvals at the Restaurants and all necessary authorizations, consents and approvals to transfer the Permits at the Restaurants in its name, and Permittee agrees to cooperate in good faith with Owner at Owner's sole cost and as reasonably may be necessary.

9.      This Agreement shall be construed and interpreted in accordance with the laws of the State of Texas.

10.     This writing contains the entire agreement between the Parties hereto with respect to the subject matter of this Agreement, and all negotiations or prior understandings are merged herein. No modification or amendments to this Agreement shall be effective unless in writing and signed by each party hereto.

11.     This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, their successors, assigns, transferees, personal Representatives, executors, and heirs, provided that no party may assign any of its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld.

12.     Notwithstanding the foregoing, nothing herein is intended to waive, alter or amend any obligations of Owner or Permittee under the Asset Purchase Agreement.

Nothing contained herein shall be construed as to constitute the relationship hereby created as an employment, an agency, partnership, or a joint venture, Permittee having no authority to make any binding agreement or commitment on behalf of Owner.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

<u>**PERMITTEE:**</u>

**RAZZOO'S, INC.,**
a Texas corporation

By: _____
Name: Philip Parsons
Title:   Chief Executive Officer

<u>**OWNER**</u>**:**

**THIRTYTHREE97 LLC,**
a Delaware limited liability company

By:  M CROWD RESTAURANT GROUP, LTD.,
      a Texas limited partnership and sole member

     By:  M Crowd Restaurant Group, Inc.
        a Texas corporation and
        its General Partner

       By: _____
       Name:  Edgar Guevara
       Title:   President & CEO

## Schedule 1

| RESTAURANTS |
| --- |
| Alliance |
| Arlington |
| Cedar Hill |
| Cityview |
| Concord |
| Harker Heights |
| McKinney |
| Mesquite |
| Round Rock |
| Stafford |
| Sundance |

Exhibit A
<u>Asset Purchase Agreement</u>

# **SCHEDULES**

## Schedule PL

[to come]

<u>Schedule 2.1(j)</u>

**<u>Bank Accounts</u>**

| Account Type | Store | Bank | Account No. |
|---|---|---|---|
| Store Depository Account | Alliance | First Horizon Bank | -3446 |
| Store Depository Account | Arlington | First Horizon Bank | -3411 |
| Store Depository Account | Cedar Hill | First Horizon Bank | -3425 |
| Store Depository Account | Cityview | First Horizon Bank | -3397 |
| Store Depository Account | Concord | First Horizon Bank | -3516 |
| Store Depository Account | Harker Heights | First Horizon Bank | -3467 |
| Store Depository Account | McKinney | First Horizon Bank | -3432 |
| Store Depository Account | Mesquite | First Horizon Bank | -3376 |
| Store Depository Account | Round Rock | First Horizon Bank | -3460 |
| Store Depository Account | Stafford | First Horizon Bank | -3453 |
| Store Depository Account | Sundance | First Horizon Bank | -3383 |
| Rapid Paycard Account | - | Pathward, N.A. | -7241 |

Schedule 2.5(a)(i)

**Credit Bid Amount**

| Item[4] | Amount |
|---|---|
| Senior Secured Prepetition Principal Balance | $ 9,571,410.39 |
| Senior Secured Prepetition Obligations accrued interest through October 23, 2025 | $    314,235.47 |
| DIP Term Loans | $ 4,000,000.00 |
| DIP Term Loan accrued interest through December 29, 2025 (for all draws) | $      54,767.12 |
| Lender Professional fees through December 29, 2025 | $    100,000.00 |
| **TOTAL** | **$14,040,412.98** |

---

[4] Capitalized terms used but not defined herein have the meanings ascribed to them in the Final DIP Order.

Schedule 2.5(a)(iii)

**Assumed Liabilities**

| Accounts Payable | |
|---|---|
| **Vendor / Counterparty** | **Estimated A/P Amount[5]** |
| Airgras National Carbonation | $0.00 |
| Envysion | $6,111.00 |
| JTech, Inc. | $1,725.00 |
| MCI BPO, LC | $32,553.00 |
| National Produce FB, LLC | $0.00 |
| Off Duty Services, Inc. | $21,970.00 |
| Reliant Distribution Ltd. | $2,222.12 |
| Shelton's Water Refining | $3,538.00 |
| Sysco | $1,370,205.42 |
| | **$1,438,324.54**12/23/2025 |

| Operating Liabilities | |
|---|---|
| **Liability** | **Amount** |
| September 2025 Rent | $ 330,623.20 |
| October 2025 Rent | $ 368,333.77 |
| 2025 State Income Taxes | $ 135,000.00 |
| 2025 Ad Valorem Taxes for Continuing Restaurants | $ 525,000.00 |
| Restaurant Employee Payroll & Benefits | $ 670,743.36 |
| December 2025 Sales Tax | $ 15,779.78 |
| Gift Cards | $ 125,000.00 |
| Hourly Employee Accrued PTO | $ 138,756.00 |
| Salaried Employee Accrued PTO | $ 300,773.58 |
| Stout Transaction Fee | $ 630,000.00 |
| **TOTAL** | **$3,240,009.69** |

---

[5] A/P amounts as of December 22, 2025, and subject to further change through Closing by agreement of the Parties.

Schedule 2.6(a)(i)

**Contract and Cure Schedule**

| Real Property Leases | | | | |
|---|---|---|---|---|
| **Contract Counterparty** | **Cure Cost** | **Location** | **Included** | **Excluded** |
| Alto Craig Crossing | $8,271.52 | McKinney[6] | ✓ | |
| ATC Investors, LP | $45,038.32 | Alliance | ✓ | |
| AZHP2 Development, LLC | - | Spring | | X |
| BTX Old Town, LLC | - | Burleson | | X |
| CP Greenhill, LLC | - | Corporate Office | | X |
| DPEG Fountains, LP | $55,702.80 | Stafford | ✓ | |
| DRP Market Heights Property Owners, LLC | $29,843.50 | Harker Heights | ✓ | |
| InvenTrust | $22,834.26 | Round Rock | ✓ | |
| Israel Family Realty Co, LLC | - | Lewisville | | X |
| Jacques L. Le Friant and Mary E. Le Friant Family Trust | $40,834.00 | Arlington | ✓ | |
| Mall at Concord Mills Partnership Ltd. | $4,383.18 | Concord-CAM/Signage | ✓ | |
| Matco Investments | $95,643.89 | Mesquite | ✓ | |
| PREP Hillside Real Estate Company LLC | $89,292.88 | Cedar Hill[7] | ✓ | |

---

[6] <u>Agreed Payment Terms – McKinney</u>: $58,643.89 due at sale; $37,000 payable over eight (8) months.
[7] <u>Agreed Payment Terms – Cedar Hill</u>: Payable in six (6) monthly installments.

| | | | | |
|---|---|---|---|---|
| Rancho Keystone LLC | - | Keystone | | X |
| Raz Tyler I, L.P. | - | Tyler | | X |
| RPI Bryant Irvan, LTD. | $53,636.65 | Cityview | ✓ | |
| Simon Property Group (Texas), L.P. | - | Firewheel | | X |
| South Loop Development, LLC | - | Lubbock | | X |
| SS Southlake Investment LLC | - | Irving | | X |
| Sundance Square Partners, LP | $64,787.77 | Sundance | ✓ | |
| TGA TX INFILL GSW LLC | - | Warehouse | | X |
| UTC Realty, LTD. | - | College Station | | X |
| (a) The William L. Abernathy Testamentary Charitable Lead Trust; (b) The Abernathy Joint Trust dated July 31, 2023; (c) The Gillespie Joint Trust dated September 29, 2022; (d) The Heather Abernathy Revocable Trust dated March 15, 2013; (e) The Keri Gillespie Trust dated October 18, 2025; and (f) Creative Planning Trust Co. | $45,519.07 | Concord-Landlord | ✓ | |
| **Equipment Leases** | | | | |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** | **Included** | **Excluded** |
| Canon Financial Services, Inc. | - | Lease Agreements | | X |
| DirecTV | - | Customer Agreement | | X |
| Ecolab Inc. | - | Supply Agreement | | X |
| FP Mailing Solutions | - | Customer Agreement | | X |

| Leaf Capital Funding LLC | $0.00 | Lease Agreement | ✓ | |
| Lincoln Waste Solutions LLC | - | Agreements | | X |
| Loomis Armored US LLC | $0.00 | SafePoint Agreement | ✓ | |
| Mood Media | $0.00 | Service Agreement | ✓ | |
| Oilmatic of the Carolinas | $0.00 | Service Agreement | ✓ | |
| Oilmatic Sytems, LLC | $0.00 | Service Agreement | ✓ | |
| Reliant Distribution Ltd. | $2,222.12 | Bulk Carbon Dioxide Service Agreement | ✓ | |

| **Payroll Processing** | | | | |
|---|---|---|---|---|
| **Contract Counterparty** | **Cure Cost** | **Contract Description** | **Included** | **Excluded** |
| 7Shifts, Inc. | $0.00 | SaaS Agreement | ✓ | |
| Gratuity Solutions LLC | - | Tip Software | | X |
| Paycom Payroll, Inc. | - | Payroll and Human Capital Management Services Agreement | | X |

| **Marketing Agreements** | | | | |
|---|---|---|---|---|
| **Contract Counterparty** | **Cure Cost** | **Contract Description** | **Included** | **Excluded** |
| DoorDash, Inc. | - | Exclusivity Addendum | | X |
| GrubHub Holdings, Inc. | - | Agreement | | X |
| Maiteh, Claudia | - | Independent Contractor Agreement | | X |
| One Point (Pro Forma) | - | Uniform Program Service Level Agreement | | X |
| Patrick Henry Creative Promotions | - | Services Agreement | | X |

| UberEats | - | Sales & Marketing Agreement | | X |
|---|---|---|---|---|
| **Credit Card Processing Agreements** | | | | |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** | **Included** | **Excluded** |
| First Data Merchant Services LLC | - | Credit Card Processing Agreements | | X |
| **Consulting and Independent Contractors** | | | | |
| Contract Counterparty | Cure Cost | Contract Description | Included | Excluded |
| Administrative Fiduciary Services Inc. | - | Administrative Services Agreement | | X |
| Ryan, LLC | - | Property Tax Services Agreement | | X |
| **MSA's** | | | | |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** | **Included** | **Excluded** |
| 5&5 | - | Master Services Agreement | | X |
| BCM ONE, Inc. | - | Master Services Agreement(s) | | X |
| Olo, Inc. | - | Master Services Agreement | | X |
| ReSource Point of Sale, LLC | - | Master Services Agreement | | X |
| SageNet, LLC | - | Master Services Agreement | | X |
| ServiceChannel.com, Inc. | - | Master Services Agreement | | X |
| **Service Agreements** | | | | |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** | **Included** | **Excluded** |
| AIG | $0.00 | Commercial Business Insurance | ✓ | |

| | | | | |
|---|---|---|---|---|
| Amtrust Group | $0.00 | Commercial Business Insurance | ✓ | |
| Argonaut Insurance Company | $0.00 | Commercial Business Insurance | ✓ | |
| At-Bay Specialty | $0.00 | Commercial Business Insurance | ✓ | |
| Axon/Scottsdale | $0.00 | Commercial Business Insurance | ✓ | |
| Blue Cross Blue Shield of Texas | $0.00 | Employee Benefit Insurance | ✓ | |
| CBG Draft Services Inc. | $0.00 | Draft Line Cleaning Contract | ✓ | |
| Cigna Health and Life Company | $0.00 | Cigna Dental Choice and Vision | ✓ | |
| Cisco Systems Capital Corporation | $0.00 | Lease Agreement & Addendum | ✓ | |
| CNA | $0.00 | Commercial Business Insurance | ✓ | |
| Corvirtus Inc. | - | Personal Services Agreements | | X |
| Cyxtera | $0.00 | Service Order | ✓ | |
| Everest Insurance | $0.00 | Commercial Business Insurance | ✓ | |
| FreedomPay | - | Secure Switching Product Agreement | | X |
| Gofriendship, Inc. dba Landed | - | Sales Order | | X |
| Google | - | Food Ordering Partner Agreement | | X |
| Guardian | $0.00 | Employee Insurance | ✓ | |
| Hartford | $0.00 | Commercial Business Insurance | ✓ | |
| KnowBe4, Inc. | - | SaaS Contract | | X |
| Lloyd's of London | $0.00 | Commercial Business Insurance | ✓ | |
| Mirus Information Technology Services, Inc. | - | Application Services Agreement | | X |

| Contract Counterparty | Cure Cost | Contract Description | Included | Excluded |
|---|---|---|---|---|
| Monical Bell Team | - | Agreement | | X |
| Nationwide | $0.00 | Commercial Business Insurance | ✓ | |
| On the Mark Solutions, LLC | - | Custom Software Development Agreement | | X |
| RLI Insurance Company | $0.00 | Surety Bond | ✓ | |
| TDn2K LLC dba Black Box Intelligence | - | Software License Agreement | | X |
| Toko Marine HCC | $0.00 | Commercial Business Insurance | ✓ | |
| Triple Impact Connections | - | Work Order Agreement | | X |
| TrustedSec, LLC | - | 2025 PCI Implementation Guidance Proposal | | X |
| USA Datafax | - | Data Management Agreement | | X |
| Westfield Specialty | $0.00 | Commercial Business Insurance | ✓ | |
| Wright National Flood Insurance Company | $0.00 | Commercial Business Insurance | ✓ | |
| Zoom Video Communication Inc. | - | Subscription – Software License | | X |
| **Supply Agreements** | | | | |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** | **Included** | **Excluded** |
| All American Seasoning, Inc. | $0.00 | Contract | ✓ | |
| Alsco | - | Linen and Uniform Rental Services Agreement | | X |
| Edward Don & Co. | - | Distribution and Capabilities Proposal | | X |
| Keurig Dr. Pepper | - | Fontain Support Agreement | | X |
| National Produce FB, LLC | - | Management Agreement | | X |

| Reily Foods Company | $0.00 | Letter Agreement – Beverage Equipment & Supplies | ✓ | |
| Sysco Corporation | $1,370,205.40 | Master Services Agreement[8] | ✓ | |
| Texas Utility (TXU) | $0.00 | TXU Energy Contract Service Point Change Request Form | ✓ | |
| The Coca Cola Company | - | Beverage Marketing Agreement | | X |
| **License Agreements** | | | | |
| **Contract Counterparty** | **Cure Cost** | **Contract Description** | **Included** | **Excluded** |
| Broadcast Music Inc. (BMI) | $0.00 | BMI Music License | ✓ | |
| Emburse, Inc. | - | Software License Agreement – Chrome River | | X |
| Envysion | $4,876.80 | Software License Agreement | ✓ | |
| Horizon Data Center Solutions LLC | - | Secured Managed Cloud & Related Virtual Software Services | | X |
| LogMeIn USA, Inc. | - | Software License Agreement | | X |
| NuArx, Inc. | - | Secure PCI Subscription Services Agreement | | X |
| Orders Grid, Inc. | - | SaaS Agreement | | X |
| Red Book Connect, LLC | - | Subscription Services | | X |

---

[8] Sysco Corporation: Cure Cost subject to further discussion between Buyer and Sysco.

<u>Schedule 5.4</u>

**Exceptions to Conduct of Business by Sellers**

[to be provided by Sellers]

## SELLER DISCLOSURE SCHEDULES

### (to be completed by Sellers)

| APA Section | Description |
|---|---|
| Schedule 3.6 | Contracts |
| | (a)  List of Material Contracts |
| | (b)  Post-Petition Contracts |
| | (c)  Not in full force and effect |
| | (d)  Material default |
| | (e)  Termination rights exercised |
| | (f)  Material contracts not delivered |
| Schedule 3.7 | Intellectual Property |
| | (a)(i)  Owned |
| | (a)(ii)  Leased from Third Parties |
| | (a)(iii)  Leased to Third Parties |
| | (b)  Infringement on any other Person |
| | (c)  Infringement by any other Person |
| Schedule 3.8 | Litigation |
| Schedule 3.9 | Employee Matters |
| | (a)  List of current employees |
| | (b)  Collective bargaining agreements |
| | (c)  Employment Claims |
| | (d)  WARN Act liability |
| Schedule 3.11(b) | Leased Real Property |
| Schedule 3.12 | Permits |
| | (a)  Material permits |
| | (b)(i)  Liquor licenses |
| | (b)(ii)  Known violations |
| Schedule 3.13 | Non-Compliance with Environmental Laws |